**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAHMOUD KHALIL,<br><br>     *Plaintiff,*<br><br>v.<br><br>THE HERITAGE FOUNDATION; Victoria COATES; Robert GREENWAY; BETAR ZIONIST ORGANIZATION, INC.; BETAR ZIONIST MOVEMENT, INC.; BETAR WORLD; Ronn TOROSSIAN; MEGAMOT SHALOM D/B/A CANARY MISSION; Jonathan BASH; Victor MUSLIN; John DOE A; Stephen MILLER, individually and in his official capacity as *White House Deputy Chief of Staff for Policy and Homeland Security Advisor*; Marco RUBIO, individually and in his capacity as *Secretary of State*; Markwayne MULLIN, individually and in his official capacity as *Secretary of Homeland Security*; Todd BLANCHE, individually and in his official capacity as *Acting Attorney General*; Kristi NOEM, in her individual capacity; John ARMSTRONG, in his individual capacity,<br><br>     *Defendants.* | Case No. |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE .................................................................................... 11

THE PARTIES............................................................................................................... 11

FACTUAL ALLEGATIONS ........................................................................................ 21

I.    THE PRIVATE DEFENDANTS' LONGSTANDING HOSTILITY TOWARD THE BURGEONING PALESTINIAN RIGHTS MOVEMENT AND CORRESPONDING HARASSMENT OF PALESTINIAN HUMAN RIGHTS ADVOCATES BY SMEARING THEM AS ANTISEMITIC............................................................... 21

    A.  Betar Defendants' Animosity Towards Palestinians and Their Supporters............... 23

    B.  Canary Mission Defendants' Animosity Toward Palestinians and Their Supporters  26

    C.  The Heritage Foundation Defendants' Animosity Towards Palestinians and Their Supporters ....................................................................................................... 27

    D.  The Post-October 7 Landscape of Escalating Protest and Corresponding Beginnings of the Conspiratorial Plan to Squelch It........................................................ 29

II.    DEVELOPING THE CONSPIRATORIAL PLAN FOR A "PUBLIC-PRIVATE PARTNERSHIP" TO PUNISH PALESTINIANS AND THEIR SUPPORTERS FOR THEIR CONSTITUTIONALLY PROTECTED ADVOCACY. ............................... 32

    A.  Project Esther, Defendant Miller, and the Strategic Origins of the Conspiratorial "Blueprint"........................................................................................................ 32

    B.  The People Who Produced the Project Esther Blueprint ........................................... 36

III.    THE STRATEGY TO OPERATIONALIZE THE CONSPIRATORIAL PLAN IS OUTLINED IN THE BLUEPRINT ........................................................................ 38

    A.  The Plan Smears Pro-Palestinian Advocacy on Campuses as Antisemitic and as Supporting Terrorism..................................................................................... 38

    B.  The Plan Targets Universities and the Growing Student Pro-Palestinian Movement, Particularly at Columbia ....................................................................................... 40

    C.  The Plan to Implement the "Public-Private Partnership" in Cooperation with Willing Administration ......................................................................................................... 45

IV.    THE PRIVATE AND FEDERAL DEFENDANTS BEGIN CARRYING OUT THE CONSPIRACY. ................................................................................................... 48

    A.  The Betar and Canary Mission Defendants Begin Their Work to Effectuate the Conspiracy to Target Palestinians and Their Supporters............................................ 48

    B.  The Federal Defendants Implement the Conspiratorial Plan ..................................... 60

V.    NUMEROUS PALESTINIANS AND THEIR SUPPORTERS, INCLUDING MR. KHALIL, ARE ARRESTED PURSUANT TO THE CONSPIRATORIAL PLAN.. 67

    A.  Targeting of Mr. Khalil................................................................................................ 69

i

B.  Other Palestinians and Their Supporters are Similarly Targeted by the Conspiracy . 85

VI.  THE HERITAGE FOUNDATION DEFENDANTS ALSO TAKE CREDIT FOR THE CONSPIRACY'S IMPLEMENTATION. ....................................................... 104

VII.  GROSS PROCEDURAL IRREGULARITIES ORCHESTRATED BY THE FEDERAL DEFENDANTS' ONGOING PROSECUTION OF MR. KHALIL'S IMMIGRATION CASE REPRESENT THE CONTINUATION OF THE CONSPIRACY THAT MUST BE ENJOINED. ....................................................... 105

A.  Irregularities in Mr. Khalil's Arrest and Charging ................................................... 105

B.  Pretextual New Charges and Unprecedented Efforts by DHS, Under the Direction of Defendant Noem and Later Defendant Mullin, to Continue to Detain Mr. Khalil ... 106

C.  Federal Defendants' Continuation of the Conspiracy Through Plenary Control and Direction of Immigration Proceedings......................................................... 110

D.  Abandonment of Agency Procedure, Obvious Conflicts of Interest and Abandonment of Elementary Due Process by the BIA, Under the Direction of Defendant Blanche, to Effectuate the Conspiracy's Ultimate Unlawful Aims. ........................................... 113

VIII.  DEFENDANTS REPEATEDLY IGNORED, TOLERATED, OR EMBRACED BONA FIDE ANTISEMITISM EXHIBITED FROM TRUMP ADMINISTRATION OFFICIALS AND ELSEWHERE, FURTHER DEMONSTRATING THEIR ATTACKS ON PALESTINIAN ADVOCACY ARE MERE PRETEXT DESIGNED TO SILENCE CRITICISM OF ISRAEL'S SUBJUGATION OF PALESTINIANS. ................................................................................................. 117

TIMELINE OF THE CONSPIRACY ...................................................................................... 123

CLAIMS FOR RELIEF .......................................................................................................... 124

PRAYER FOR RELIEF .......................................................................................................... 128

## INTRODUCTION

1.       Plaintiff, Mahmoud Khalil, a Palestinian, Muslim, U.S. lawful permanent resident, and former Columbia University graduate student, brings this civil rights action under 42 U.S.C. § 1985(3), known as the Ku Klux Klan Act of 1871 ("KKK Act"), and § 1986, against several avowedly anti-Palestinian private actors and high-level federal government officials for jointly carrying out a conspiracy to single out Mr. Khalil and other non-citizen Palestinians and their supporters for arrest, detention, and deportation, as punishment for their support of Palestinian rights.

2.       Collectively, the conspirators' actions, motivated by their shared unlawful purpose and animus, sought to terrorize and make an example of Mr. Khalil and other non-citizen Palestinians or supporters of Palestinians (sometimes collectively referred to as "Pro-Palestinian" individuals) in order to intimidate and silence the growing movement for Palestinian rights and political freedom, in a manner the KKK Act was designed to proscribe when enacted during Reconstruction. The federal government defendants continue to operationalize the conspiratorial aims by whitewashing the blatantly unconstitutional removal and detention grounds they have lodged against Mr. Khalil through sham, corrupted immigration proceedings under their control to ensure a pre-ordained outcome. The plan did and continues to deprive Mr. Khalil of his fundamental constitutional rights to equal protection of the laws, freedom of speech and travel, and freedom from punitive detention. The federal officials' singling out of Mr. Khalil for punitive detention and deportation also works as an unconstitutional Bill of Attainder.

3.       The private agents of this conspiracy are the Heritage Foundation, Betar, Canary Mission, and their respective leaders and agents. The Heritage Foundation and two of its leaders, Victoria Coates and Robert Greenway, both of whom were former advisors to President Trump, led the formulation of the Project Esther, which served as the blueprint ("Blueprint" or "Project

1

Esther Blueprint") for the conspiracy. The Blueprint was a document that described the plan to identify and target pro-Palestinian, non-citizen students and scholars, who would then be arrested and deported by the federal defendant participants in the conspiracy. As agreed under this plan, the Betar Defendants and Canary Mission Defendants, who have for years both been steeped in anti-Palestinian animus and vitriol, selected the targets of the conspiracy—certain Palestinians and their supporters, including Mr. Khalil—for federal officials to punish, after doxxing and publicly smearing them as antisemitic and supportive of terrorism. They boasted of their role in Mr. Khalil's arrest and detention to maximize the speech-chilling goals of the conspiracy. These private individual and organizational co-conspirators are collectively referred to as "Private Defendants."

4.      The federal officials who are a part of the conspiracy include Senior Presidential Advisor Stephen Miller, Secretary of State Marco Rubio, Secretary of Homeland Security Markwayne Mullin, acting Attorney General Todd Blanche, former Secretary of Homeland Security Kristi Noem, and John Armstrong, an official at the Department of State's Bureau of Consular Affairs. The federal official conspirators are collectively referred to as the "Federal Defendants." The Federal Defendants worked hand-in-hand with the Private Defendants—through free access and regular communications—to deprive the selected individuals of their fundamental rights and to broadcast the chilling message that Palestinians and their supporters would be subject to state repression solely because of their identities and constitutionally-protected political viewpoints. And the Federal Defendants continue to carry out the conspiracy by using their plenary control over an immigration process to ensure that immigration adjudicators in their chain of command depart from any independent decision-making and ensure the demanded, predetermined outcome of deportation, in a corrupted legal process akin to post-bellum Southern justice.

5.      Soon after Israel began its overwhelming military assault on Gaza following the Hamas-led attacks on October 7, 2023, and the corresponding proliferation of student protests against U.S. support for the destruction of Gaza, Defendant Miller publicly expressed his eagerness to punish Palestinians and their supporters through arrest and deportation, should he be given the opportunity to re-enter the White House. He worked in partnership with the Heritage Foundation Defendants to prepare such a plan to implement after the election.

6.      One year later, in October 2024, Defendant Heritage Foundation publicly boasted of its development of this joint plan, when it published the Blueprint, which was co-authored by virulently anti-Palestinian actors, Defendants Victoria Coates and Robert Greenway. In the Blueprint, the Heritage Foundation Defendants described the plan to terrorize and dismantle the movement for Palestinian liberation by conflating support for Palestinian rights with antisemitism and/or terrorism, and collaborating with the Federal Defendants to ensure punishment and retribution against the Palestinians and their supporters the Defendants wished to coerce into silence. Antisemitism is properly understood as antipathy toward Jewish people and their faith and, as numerous federal courts have recognized, not as criticism of Israeli state policy; nevertheless, the Heritage Foundation and other Defendants sought cynically to smear pro-Palestinian support, including from millions of Jewish people, as antisemitic in order to shame and silence them—a tactic federal courts have also recognized violates advocates' First Amendment rights.

7.      To operationalize this plan, the Heritage Foundation Defendants needed the assistance of other, politically-aligned private actors—what they specifically call "a coalition of private organizations"—to "build and coordinate" the plan's aim of identifying the high-level targets of the conspiracy, not for the commission of any crime, but only for constitutionally-

3

protected support of Palestinian rights. According to the Blueprint, past efforts to smear Palestinians and their supporters as antisemitic would not be enough. To maximize its *in terrorem* effect, the conspiratorial plan also required the participation of "willing" federal officials who would have the power to carry out the plans for escalated retribution and public intimidation— namely, via state-sanctioned arrest, detention, and the procedurally corrupt deportation the Federal Defendants are currently pursuing. As the Blueprint specifically explains, the conspiracy's goals would require a "public-private partnership," *i.e.* a tight collaboration between the Private Defendants and the Federal Defendants; consistent with Defendant Miller's goals, the plan would be carried out at a time when a "willing Administration occupies the White House."

8.      The conspirators would set their sights on Columbia University students specifically, both because it was the most nationally prominent locus of student protest, and because Columbia University was itself complicit in tolerating and creating a campus atmosphere that was rife with harassment and that signaled alignment with the conspirators' aims. This was evidenced by, among other things, Columbia's one-sided focus on silencing Palestinian protests, while deploying intrusive surveillance mechanisms and, contrary to decades of articulated principles, calling the New York Police Department onto campus to clear and arrest students participating in encampments, and then engaging in mass disciplinary proceedings to punish students. At the same time, Columbia exhibited shockingly callous disregard for the rights and safety of Palestinian students including Mr. Khalil, who sent an email to the interim Columbia President asking for protection from the escalating threats as early as January 2025, and then again on the day before he was arrested in his Columbia University apartment vestibule. The University ignored both pleas.

9. Just days after a "willing [Trump] Administration" was elected to occupy the White House, the plan was operationalized. In November 2024, Defendant Betar began identifying Palestinians and their supporters for the Federal Defendants to arrest, detain, and deport and, by January 2025, openly admitted to communicating with Defendants Stephen Miller and Marco Rubio about the individuals it had selected for federal government retribution. Also, by January 2025, Defendant Canary Mission began moving away from its historical efforts to merely harass and dox supporters of Palestinian rights, and toward the conspiracy's discriminatory focus: surveilling and selecting *non-citizen* Palestinians and supporters of Palestinians to deprive them of their fundamental rights through Federal Defendants' coercive powers of arrest, detention, and deportation.

10. After many of the Federal Defendants assumed office in January 2025, they took on their role to carry the conspiracy into overt action. Starting in February 2025, Federal Defendants Miller, Rubio, Kristi Noem, and John Armstrong met regularly—including between 12 to 20 times in February-March 2025—to plan the implementation of the conspiracy; namely, to execute the arrests, imprisonment, and attempted deportation of those pro-Palestinian non-citizens the Betar and Canary Mission Defendants had selected for punishment. In March and April 2026, Defendant Mullin and Defendant Blanche took on their roles as Secretary of Homeland Security and acting Attorney General respectively, and, knowing full well the existence of the conspiracy, took steps to continue its aims to this day.

11. The arrests or attempted arrests of Mr. Khalil and at least eight other targets of the conspiracy followed a common process: Betar and/or Canary Mission would select pro-Palestinian targets, smear them as terrorists or antisemites, and publicly warn that they would be subject to arrest and deportation. Within weeks, or sometimes days, of these warnings, and acting on the

identification by the Betar and/or Canary Mission Defendants, the Federal Defendants at the Department of State ("DOS") and Department of Homeland Security ("DHS") would work together to revoke those individuals' visas and/or charge them as removable under a previously rarely invoked provision of the Immigration and Nationality Act ("INA"). Then, their agents would arrest them and send them to far-away Immigration and Customs Enforcement ("ICE") jails. In the case of Mr. Khalil, the Department of Justice ("DOJ") would then ensure that he would be prosecuted in sham, show-trial immigration proceedings, now under Defendant Blanche's control, to ensure a predetermined outcome, a process which continues to this day.

12. The Canary Mission Defendants boasted of being central to the arrest and deportation of Mr. Khalil and several other Palestinians and/or their supporters for their advocacy, while Betar and/or its agents similarly have admitted to pre-selecting "foreign nationals on visas who support Hamas," communicating with Defendants Miller and Rubio, "working with ICE," and being "involved in Project Esther." At least one month prior to Mr. Khalil's arrest, public reporting revealed that his name was on a list of pre-selected targets submitted by the Betar Defendants to members of the Trump Administration for persecution.

13. The conspirators targeted at least eight other non-citizen Palestinians or their supporters—five of them associated with Columbia University—following precisely the same pattern they deployed for Mr. Khalil. As the conspirators themselves acknowledge, the process of nomination to punishment was frictionless, such that all of the non-citizen individuals the Private Defendants selected for state targeting were nearly automatically targeted by the Federal Defendants for arrest and removal.

14. All of the Private and Federal Defendants' purported concern with the supposed antisemitism of these Palestinians and their supporters, and the threats they made as a result, were

pretext designed to coerce Palestinians and their supporters into silence about their opposition to the Israeli government's subjugation of Palestinians—a pretense made more obvious by the Defendants' lack of concern for bona fide and avowed antisemitism, indeed neo-Nazi embraces, by members of the Trump Administration.

15. The Private Defendants targeted Mr. Khalil specifically because of his prominent role in protests occurring on the Columbia University campus in support of Palestinian rights— the most well-publicized in the country—including his highly visible role as a negotiator-mediator between the students and administration regarding the student encampments. He was, pursuant to the conspiratorial plan, smeared with claims of antisemitism and support for terrorism, and made the subject of a determination by Defendant Rubio ("the Rubio Determination") under an unprecedented application of the INA—never before used to target speech and advocacy—that alleged he was removable because his continued presence in the United States presented "potentially adverse foreign policy consequences." The Rubio Determination is a conclusory, Soviet-style diktat that merely parrots the Private Defendants' pretextual claims of antisemitism and support for terrorism as grounds for deportation, and Mr. Khalil was correspondingly declared removable and arrested by agents of Defendant Noem.

16. After Mr. Khalil was arrested, Defendant Noem kept him detained in a remote ICE detention facility in Louisiana—more than 1,300 miles from his family (including his first child born while he was in detention)—for 104 days, until a federal court released him upon finding his detention was presumptively unconstitutional. He was detained so remotely in part to maximize the punitive signal to other activists and to take advantage of distinctive rules in that jurisdiction that would expedite his deportation, even while he pursued his legal appeals. He and his family

7

suffered and continue to suffer significant psychological damage from this retaliation and prolonged unlawful detention.

17.    The White House itself admitted that the targeting of Mr. Khalil would serve as the "blueprint" for targeting other students. The collective aim to stifle speech on campus in support of Palestinian rights came to fruition, as faculty and students across the country, and especially at Columbia, felt a repressive climate of fear and retribution following Mr. Khalil's arrest. And, contrary to the conspirators' pretextual smears of Mr. Khalil, Jewish students and faculty who actually know Mr. Khalil provided testimony en masse in court proceedings regarding the fatuousness of the antisemitism and terrorism-support allegations against Mr. Khalil, a man they uniformly describe as supportive, caring, and committed to cross-faith solidarity and liberation for all people.

18.    In May 2025, following the arrest of seven of the conspiracy's targets, Defendant Greenway admitted that it was "no coincidence that we called for a series of actions to take place privately and publicly, and they are now happening." And Defendant Coates described the Heritage Foundation Defendants' joint action with the Federal Defendants in the following way: "the phase we're in now is starting to execute some of the lines of effort in terms of legislative, legal, and financial penalties for what we consider to be material support for terrorism."

19.    What Coates and Greenway consider "material support for terrorism" is nothing more than constitutionally-protected advocacy for Palestinian rights. This is a fact which Federal Defendants knew, as internal DHS and DOS documents revealed that they explicitly acknowledged that they had no grounds to deport Mr. Khalil and others for material support for terrorism, and as revealed by the FBI's action to close an anonymously-solicited investigation into Mr. Khalil after finding no evidence that he solicited or engaged in violence. In courts of law, the

8

Federal Defendants at DHS and DOS have not produced a single shred of evidence regarding Mr. Khalil's actual antisemitism or support for terrorism.

20.    Federal courts have effectively confirmed the existence and operation of a coordinated plan between the Private Defendants and Federal Defendants that is the backbone of the conspiratorial arrangement challenged here. For example, in the habeas corpus case of Hampshire College student Efe Ercelik, a federal court concluded that the Federal Defendants' decision to unlawfully detain Ercelik "seems to have been almost exclusively triggered by Betar Worldwide."[1] In *American Association of University Professors v. Rubio* ("*AAUP*"), another federal court concluded after trial that there was a "conspiracy" at least including Defendants Noem and Rubio to "pick off certain people" for punishment[2] in order "to staunch public protest related to Israel's treatment of Palestinians."[3] According to the court, during the period in which the conspiracy was operating, the public witnessed "faceless agents of the federal government . . . snatching" people off the street, solely because they supported Palestinian rights.[4] Those images, according to the court, revealed tactics akin to the "despised Ku Klux Klan," designed to "terrorize Americans into quiescence."[5]

21.    Federal courts have also reviewed the legality of the detentions of the targeted pro-Palestinian students and scholars in habeas corpus proceedings. In each of those cases where decisions have been issued, including Mr. Khalil's case, those federal courts have concluded that the arrests and detentions—based exclusively on constitutionally-protected advocacy—likely

---

[1]    *Ercelik v. Hyde*, No. 1:25-CV-11007-AK, 2025 WL 1361543, at *12 (D. Mass. May 8, 2025).
[2]    Transcript of Remedies Hearing at 13–14, *Am. Ass'n of Univ. Professors v. Rubio ("AAUP"),* 802 F. Supp. 3d 120 (D. Mass. 2025) (No. 25-10685-WGY), *judgment entered*, 2026 WL 524753 (D. Mass. Jan. 22, 2026).
[3]    *AAUP*, 802 F. Supp. 3d at 187.
[4]    *Id*. at 162 n.30.
[5]    *Id*. at 174.

constitute government retaliation in violation of the First Amendment and/or are void for vagueness in violation of the Due Process Clause.

22.    Federal Defendants who remain in office have continued to pursue the plan to persecute Mr. Khalil through reliance on the unconstitutional Rubio Determination, by relying upon a corrupted and sham immigration process that is under the full control of DOJ and Defendant Blanche—infected with unprecedented irregularities—to predetermine the outcome in Mr. Khalil's case, all to pre-ordain the ultimate conspiratorial outcome: Mr. Khalil's re-detention and, ultimately, expulsion from the country. Federal Defendants have secured a final order of removal from the immigration courts they themselves are directing, under unusual and ethically-compromised proceedings, which they will likely aim to effectuate immediately, before a federal court can review it. This presents a continuing and substantial risk of harm.

23.    Congress enacted 42 U.S.C. § 1985(3) in 1871 in response to the racialized violence, intimidation, and terror by the Klan that sought the repression of Black people and their aspirations for self-determination and political freedom, and as part of a federal project to wrest control from corrupted and biased Southern state courts into the federal courts. Klan campaigns sought to make public examples of their targets to send a repressive message to others who would dare to exercise their constitutional rights. Section 1985(3) created a civil cause of action against individuals (private and/or governmental) who conspire to deprive persons of their fundamental rights. The Private and Federal Defendants in this case worked together to terrorize Palestinians, their supporters, and their political movement for self-determination, in a different way: through modern methods of repression—surveillance and a coordinated plan for arrests with the goal of deportation—in order to silence them and to send a repressive public message to others. The

10

message is that the student movement advocating for justice and freedom for Palestinians will be publicly shamed through state suppression and punishment.

24.     Under the law and the United States' fundamental commitment to protecting civil rights from those who would collectively act to repress them, this Court is empowered to force Defendants to account for their illegal activity. Mr. Khalil is entitled to monetary damages for the injuries Defendants caused him. He is also entitled to a declaration that the continuing acts of the conspiracy to persecute him through corrupted and pre-ordained immigration proceedings violate his fundamental rights and to an injunction prohibiting Defendants Miller, Rubio, Mullin, and Blanche from continuing their conspiracy by relying upon the Rubio Determination and other retaliatory mechanisms in their continuing efforts to re-detain and remove Mr. Khalil.

## JURISDICTION AND VENUE

25.     This action arises under 42 U.S.C. §§ 1985(3), 1986, and U.S. Const. art. I, § 9, cl. 3, and this Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question). The Court has equitable power to enjoin the Defendants' unlawful acts taken under color of law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015); 5 U.S.C. § 702. Jurisdiction is also proper pursuant to 28 U.S.C. § 2201 *et seq*. (Declaratory Judgment Act).

26.     Venue is proper in the Southern District of New York under 28 U.S.C. §§ 1391(b)(2) and (e)(1).

## THE PARTIES

**PLAINTIFF**

27.     **Mahmoud Khalil** is a U.S. lawful permanent resident, married to a U.S. citizen, and father to a U.S. citizen, one-year-old son. He is Palestinian and Muslim. His grandparents were forcibly displaced from their home in Tiberias, Palestine as a result of what Palestinians refer to

11

as the Nakba, or Catastrophe, in 1948. His grandparents took refugee status in Syria, and Mr. Khalil was born and raised in the Khan Eshieh Refugee camp near Damascus.

28.    At age 18, Mr. Khalil was forced to flee Syria to Beirut, Lebanon after two of his friends were abducted for their collective work challenging the repressive Assad regime in Syria; they were tortured and eventually killed. While in Beirut, Mr. Khalil took up construction and other work, learned English, and eventually enrolled in university there where he graduated with a computer science degree. Deeply committed to international human rights and public service, he was accepted and granted a scholarship to attend Columbia University's Master's program at the School of International and Public Affairs.

29.    While in this Master's program at Columbia University, Mr. Khalil attempted to raise awareness of the subjugation of Palestinians. He eventually became active in Columbia's student advocacy and protest movement after October 7, 2023, when it became evident that the Israeli government, with full military and diplomatic support of the United States, was conducting a relentless military bombardment of and siege on the civilian population in Gaza.

30.    As with their predecessors who protested the Vietnam war and South African apartheid, students advocating and protesting at Columbia became a flashpoint for contesting Israeli and U.S. actions in Gaza, and were the subject of national and high-intensity local attention. Mr. Khalil, who was well-respected by both faculty and students, was selected as a mediator between students and the Columbia administration regarding student demands and the existence of the encampment, a role which made Mr. Khalil a public face of the protest movement.

31.    On March 8, 2025, plain clothed ICE officers unlawfully entered the vestibule of Mr. Khalil's apartment building and arrested him without a warrant in front of his then-pregnant

12

wife, and, within hours, spirited him to immigration detention in Jena, Louisiana, nearly 1,300 miles from family and counsel.

32.     After Mr. Khalil filed a federal habeas petition challenging the legality of his detention, a federal district judge in New Jersey granted him a preliminary injunction, finding his detention and deportation presumptively unconstitutionally void for vagueness. Then, after 104 days of detention, the federal court ordered Mr. Khalil released from custody on June 20, 2025.[6]

**DEFENDANTS**

    **A.    The Heritage Foundation Defendants**

33.     **The Heritage Foundation** is a 501(c)(3) registered not-for-profit organization incorporated in Washington, D.C. with a principal place of business in Washington, D.C. It directed the development of the Blueprint, titled *Project Esther: A National Strategy to Combat Antisemitism*, which outlined the conspiratorial plan between Private and Federal Defendants. The Heritage Foundation also established the National Task Force to Combat Antisemitism ("Project Esther Taskforce").[7] The Heritage Foundation is also responsible for Project 2025, developed in collaboration with former (and, in some cases, returning) Trump officials for policies that the Trump Administration has implemented to reshape the federal government and advance the Foundation's longstanding opposition to racial justice, immigrants' rights, reproductive rights, and LGBTQIA+ rights. Defendant Stephen Miller's organization, America First Legal, was listed on

---

[6]     The Third Circuit Court of Appeals, in a split decision, subsequently ruled that the district court lacked subject matter jurisdiction over Mr. Khalil's habeas petition, without addressing the merits of his claims that the arrest and detention were retaliation for his constitutionally-protected advocacy and also violated his due process rights. On May 22, 2026, the full court denied Mr. Khalil's petition for rehearing en banc, by a 6-5 vote. On May 26, 2026, the Third Circuit Court of Appeals issued a stay of a mandate pending Mr. Khalil's filing of a Petition for Certiorari, if any, and the United States Supreme Court's final disposition or until the time for filing such petition has expired.

[7]     In November 2025, the Project Esther Taskforce disaffiliated itself from the Heritage Foundation and, upon information and belief, the Taskforce is now housed within the Conference of Christian Presidents for Israel, a coalition of Christian advocacy groups.

the advisory board of Project 2025 before he sought to remove its name from the website in July 2024.

34.     **Victoria Coates** is the Vice President of the Kathryn and Shelby Cullom Davis Institute for National Security and Foreign Policy at the Heritage Foundation and a co-chair of the National Task Force to Combat Antisemitism, formerly housed at the Heritage Foundation, who oversees Project Esther. She works at the Heritage Foundation's Washington, D.C. office. Between 2017 and 2021, during the first Trump Administration, she was on the National Security Council in various roles, including as the Senior Director for Strategic Communications, Senior Director for Middle Eastern Affairs, and Deputy National Security Advisor for Middle Eastern and North African Affairs. Her tenure at the White House overlapped with that of Defendant Miller. She is one of the principal authors of the Project Esther Blueprint. Her writing includes hateful and stereotypical characterizations of Palestinians as having a "predilection for violence."

35.     **Robert Greenway** is the former Director and current Visiting Fellow at the Allison Center for National Security at the Heritage Foundation. He is now the Senior Vice President at American Global Strategies. Between 2017 and 2021, during the First Trump Administration, he served as Deputy Assistant to the President and Senior Director of the National Security Council's Middle Eastern and North African Affairs Directorate. His tenure at the White House overlapped with that of Defendant Miller. He is one of the principal authors of the Project Esther Blueprint. Prior to his role at the Heritage Foundation, he was the President and Executive Director of the Abraham Accords Institute for Peace, founded by President Trump's son-in-law Jared Kushner.

B.     **Betar Defendants**

36.     **Betar Zionist Organization, Inc.** (EIN# 99-3287943) is a not-for-profit corporation incorporated in the state of New York on May 28, 2024, with an address in Katonah,

14

New York. It was recognized by the IRS as a 501(c)(3) tax-exempt organization, allowing tax-deductible donations, in July of 2024. Following an investigation by the Office of the Attorney General of New York, on January 12, 2026, Betar Zionist Organization, Inc. and the Attorney General of the State of New York entered into a settlement agreement under which it was required to cease instigating violence against, and harassing or assaulting, Palestinians, Muslims, Arabs, or Jewish people in New York.

37.    On January 14, 2026, Betar announced on X that it was "voluntarily mov[ing] to Delaware" and would be known as the **Betar Zionist Movement, Inc.** As of July 7, 2026, the organization continued to accept donations through the New York organization known as Betar Zionist Organization, Inc. but, upon information and belief, it will be transitioning full operations and transferring all assets to a new corporate entity in Delaware named Betar Zionist Movement, Inc. (EIN # 33-4689672). Because the entities operate as one entity soliciting donations within the United States, both Betar Zionist Organization and Betar Zionist Movement are referred to herein as "Betar USA".

38.    **Betar World a/k/a Betar Worldwide** is a nonprofit in Israel that handles, *inter alia*, technological operations for its worldwide operation. It is located in a building named Metzudat Ze'ev (aka Jabotinsky's House) in Tel Aviv, the headquarters of Israeli Prime Minister Benjamin Netanyahu's Likud Party. Because Betar Zionist Organization and Betar Zionist Movement are chapters of Betar World, and because the three operate in tandem and as one, including through what appears to be a joint social media account on X, the three entities are referred to jointly as "Betar."

15

39. Betar USA and Betar World are arms of a century-old movement founded on principles of Jewish supremacy[8] and territorial expansion in the land of Palestine, Jordan, and Israel, promoted by its founder, Ze'ev Jabotinsky.

40. **Ronn Torossian** is an Israeli-American entrepreneur and the founder and chairman of Betar USA, and a founder and vice-chair of Betar Worldwide. He has been involved with Betar since he was an adolescent. He resides in New York, New York. He is the founder of 5W Public Relations, through which he has done crisis communications for the Eric Trump Foundation and worked with Roger Stone, Donald Trump's longtime political advisor, and Felix Sater, President Trump's former business advisor.

### C. Canary Mission Defendants

41. **Megamot Shalom d/b/a Canary Mission ("Canary Mission")** is an Israeli-registered public benefit corporation—a form of not-for-profit that has shareholders—founded in late 2015 by Defendant Jonathan Bash, months after Canary Mission's website appeared online. According to Israeli filings, Megamot Shalom's mission is to "ensure the national image and strength of the state of Israel via the use of information disseminated by technological means." Canary Mission is an anonymously-run blacklisting, cyberstalking, and doxxing entity that runs a website, www.canarymission.org, and social media accounts that publish the personal information of individuals and organizations critical of Israel and its subjugation of Palestinians. Canary Mission has used a range of tactics to maintain its anonymity, as captured by its "motto" in its strategic planning document obtained by investigative reporters, "Anonymity as a tool to scare the

---

[8] An ideology that asserts that Jewish people are entitled to exclusive or superior rights in the land that is Israel and Palestine, including through the displacement of and discrimination against Palestinians living there. *See A regime of Jewish supremacy from the Jordan River to the Mediterranean Sea: This is apartheid*, B'Tselem (Jan. 12, 2021), https://www.btselem.org/publications/fulltext/202101_this_is_apartheid.

enemy." Canary Mission has concealed the ownership of the domain name for its website through Domains By Proxy, LLC, a company specializing in shielding the identity of domain owners.

42.    Canary Mission has a particular focus on U.S. college campuses, and its goals are to chill criticism of Israel and punish and intimidate pro-Palestinian advocates. Canary Mission's back-end pages that have recently been made public suggest a highly structured operation; they identify multiple teams, including a management team and department leaders, as well as a content-strategy team that had a weekly meeting schedule and tracked key performance indicators. Reporting, public IRS filings, and Israeli public records show that Megamot Shalom receives grants for Canary Mission from the United States through the New York-based Central Fund of Israel and that, since at least 2019, Central Fund of Israel's grants account for all of Megamot Shalom's incoming donations. Central Fund of Israel is a 501(c)(3) not-for-profit corporation registered in Cedarhurst, New York, out of the offices of J. Mark Interiors.

43.    One of the founding shareholders of Megamot Shalom is Ben Packer, a U.S. citizen who resides in Israel who, upon information and belief, has knowledge of Canary Mission's U.S. operations. Packer has publicly discussed his long-standing friendship with Defendant Stephen Miller, with whom he attended Duke University, including writing in 2016 that "Stephen Miller is not just my friend, he's not just our friend, HE IS US!"[9]

44.    **Jonathan Bash** is the founder and current director of Megamot Shalom and, upon information and belief, the director of Canary Mission. He is a British citizen and a resident of Israel.

---

[9]    Recent reporting has revealed the identities of some of the highest paid individuals at Megamot Shalom, working as "content" producers or social media managers, all of whom are also United States citizens: Elihu David Stone, Aharon Dikel, Alexander Malbin Duncan, Yehuda HaKohen and Abigail Bornstein.

45.     **Victor Muslin** is a Columbia University alumnus who works with Canary Mission to identify Columbia University students and faculty who support Palestinian rights to become targets of the conspiracy. He is a resident of New York.

46.     **John Doe A** is a U.S.-based individual who works with Canary Mission and conspires with Federal Defendants and other Defendants. Public reporting has revealed that Canary Mission had a U.S. presence at its founding in 2015, in an office in the United States, and hired staff in the United States.

### D.     Federal Defendants

47.     **Stephen Miller** is the White House Deputy Chief of Staff for Policy and Homeland Security Advisor. He is President Trump's primary advisor on immigration matters advocating for the exclusion and mass deportations of non-white immigrants as part of his embrace of various strands of white supremacist ideologies seeking to recast America into a "pure civilization" inhabited predominantly by white people. He is a key architect of the Trump Administration's efforts to exclude individuals from Muslim-majority countries, dubbed the "Muslim Ban," and has advocated for deporting pro-Palestinian advocates. From his positions inside and outside the White House, Miller was involved in developing, directing, and implementing the conspiracy to punish, arrest, imprison, transport, and deport Palestinians and their supporters. During the first Trump Administration, between 2017 and 2021, Miller was a senior advisor to the President. His tenure in the White House overlapped with that of Defendants Greenway and Coates. Miller has close ties with the Heritage Foundation Defendants. In November 2024, he was appointed as an advisor to the White House for Trump's second term, where he was able to effectuate the goals of the conspiracy. In January 2025, Defendant Betar admitted that it had communicated with Defendant

18

Miller about the individuals that Defendant Betar pre-selected for deportation. Defendant Miller is sued in his individual and official capacities.

48.    **Marco Rubio** is the Secretary of State. Rubio was involved in developing, directing, and implementing the conspiracy to punish, arrest, imprison, transport, and deport Palestinians and their supporters, including Mr. Khalil specifically. In January 2025, Defendant Betar admitted that it had communicated with Defendant Rubio about the individuals that Defendant Betar pre-selected for deportation. On September 30, 2025, the District Court of Massachusetts ruled that Defendant Rubio and Defendant Noem had "intentionally and in concert" targeted non-citizens engaged in pro-Palestinian advocacy for detention and deportation in order to chill speech supportive of Palestinian rights. *AAUP*, 802 F. Supp. 3d at 175. Defendant Rubio is sued in his individual and official capacities.

49.    **Kristi Noem** was the Secretary of Homeland Security from January 25, 2025 to March 24, 2026. In this role, she was the director of Immigrations and Customs Enforcement ("ICE") and Homeland Security Investigations ("HSI"). Noem was involved in developing, directing, and implementing the conspiracy to punish, arrest, imprison, transport, and deport Palestinians and supporters of Palestinians. On September 30, 2025, the District Court of Massachusetts ruled that Defendant Rubio and Defendant Noem had "intentionally and in concert" targeted non-citizens engaged in pro-Palestinian advocacy for detention and deportation in order to chill speech supportive of Palestinian rights. *Id*. On March 5, 2026, President Trump announced that he was firing Defendant Noem as Secretary. She is now Special Envoy for the Shield of the Americas. Defendant Noem is sued in her individual capacity.

50.    **Todd Blanche** was the deputy Attorney General between March 6, 2025 and April 2, 2026, is now the acting Attorney General, having assumed the position on April 2, 2026, and

19

has been nominated by President Trump for the permanent role of Attorney General. Blanche also previously served as President Trump's personal lawyer. In his role as the acting head of the DOJ, he directs the immigration courts and Board of Immigration Appeals ("BIA"). Despite knowing about the unlawful conspiracy to punish Mr. Khalil and other Palestinians and their supporters, Defendant Blanche has entered and continued the conspiracy by directing Mr. Khalil's highly irregular removal proceedings, ensuring that the immigration court and the BIA overseeing them, which are under Defendant Blanche's direction, swiftly rubber-stamp the final step of the conspiracy: Mr. Khalil's expulsion from the United States. Defendant Blanche is sued in his individual and official capacities.

51.    **Markwayne Mullin** is the Secretary of Homeland Security, having assumed the position on March 24, 2026. In this role, and despite knowing about the unlawful conspiracy to punish Mr. Khalil and other Palestinians and their supporters, Defendant Mullin has continued the conspiracy by seeking to re-detain and quickly deport Mr. Khalil. Defendant Mullin is sued in his individual and official capacities.

52.    **John L. Armstrong** is the Principal Deputy Assistant Secretary at the Bureau of Consular Affairs at DOS. Prior to this role, between February 27, 2025 and December 22, 2025, he was a Senior Bureau Official at the Bureau of Consular Affairs. Between February and March 2025, Armstrong met with, *inter alia*, Defendants Miller, Rubio, and Noem between 12-20 times to discuss implementation of the conspiracy. From his position at the Bureau of Consular Affairs, he was involved in revoking the immigration statuses of Palestinians and their supporters or recommending that Defendant Rubio find them removable. Defendant Armstrong is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### I.    THE PRIVATE DEFENDANTS' LONGSTANDING HOSTILITY TOWARD THE BURGEONING PALESTINIAN RIGHTS MOVEMENT AND CORRESPONDING HARASSMENT OF PALESTINIAN HUMAN RIGHTS ADVOCATES BY SMEARING THEM AS ANTISEMITIC.

53.    Advocacy and activism challenging the Israeli government's unlawful actions—including territorial expansion, illegal occupation, and system of apartheid imposed on Palestinians in Israel and the West Bank, and the long-standing siege of occupied Gaza[10]—has increased substantially over the past decade. This has occurred while public support for the Israeli government and its policies has correspondingly diminished.[11] In the wake of Israel's military onslaught on Palestinians in Gaza starting in October 2023—which U.S.-based, Palestinian, Israeli, and international organizations, courts, and institutions have described as constituting war crimes, crimes against humanity as well as the crime of genocide—outrage toward Israel's government and demands for recognition of Palestinian rights have increased dramatically.[12]

54.    For at least 15 years, advocates for Palestinian rights, particularly students, have consistently faced reprisals by institutions for their speech and advocacy critical of Israel's

---

[10]    Legal Consequences Arising from the Policies and Practices of Israel in the Occupied Palestinian Territory, Including East Jerusalem, Advisory Opinion, 2024 I.C.J. 186, ¶¶ 88–94, 115–19, 173, 179, 229 (July 19), https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-adv-01-00-en.pdf ("ICJ 2024 Advisory Opinion on Palestine").

[11]    *Majority Of Voters Oppose Deploying National Guard To D.C., Quinnipiac University National Poll Finds; Support Drops For U.S. Military Aid To Israel As 50% Think Israel Is Committing Genocide In Gaza*, Quinnipiac Univ. Poll (Aug. 27, 2025), https://poll.qu.edu/poll-release?releaseid=3929 (survey results from poll where voters were asked "whether their sympathies lie more with the Israelis or more with the Palestinians based on what they know about the situation in the Middle East" revealed numbers that were "at an all-time high for the Palestinians and an all-time low for the Israelis since the Quinnipiac University Poll began asking this question of registered voters in December 2001").

[12]    Ted Van Green et al., *How Americans View the Israel-Hamas Conflict 2 Years Into the War*, Pew Rsch. Ctr. (Oct. 3, 2025), https://www.pewresearch.org/politics/2025/10/03/how-americans-view-the-israel-hamas-conflict-2-years-into-the-war/ (59% of respondents hold an unfavorable opinion of the Israeli government, up from 51% in early 2024); Ryan Grim, *LEAKED: Israel Is Considered a "Genocidal, Apartheid Country" Abroad, According to Israel's Own Research*, Drop Site News (Sept. 5, 2025), https://www.dropsitenews.com/p/leaked-israel-reputation-survey-research-mark-penn-stagwell.

21

subjugation of Palestinians—a heavily-documented phenomenon commonly understood as "The Palestine Exception to Free Speech."[13] Reprisals and punishment designed to stifle criticism and chill dissent are most often driven by private anti-Palestinian groups, often backed by the Israeli government, and have come in many forms, including meritless administrative complaints and lawsuits, censorship, intrusive investigations, viewpoint based discrimination, legislation such as anti-boycott, divestment, and sanctions bills, and even criminal prosecution.[14]

55.    A common tactic informing attacks by anti-Palestinian-rights entities against these advocates is to smear them with inflammatory accusations of antisemitism, falsely conflating anti-Zionism and criticism of the actions of the Israeli government—including those well-recognized as unlawful—as animosity toward Jewish people, even as so many Jewish people condemn those state practices as contrary to the principles of justice animating their Jewish faith.

56.    Indeed, as the many thousands of Jewish people protesting Israel's subjugation of Palestinians are aware, anti-Zionism is not itself antisemitic nor is protesting a massive military onslaught against a civilian population. Anti-Zionism is opposition to the political ideology of Zionism, an ideology that has been controversial within Jewish communities since its inception. Critics of Zionism understand it as a colonial ideology that asserts that Jewish people are entitled to exclusive or superior rights in the land that is Israel and Palestine, including by the displacement of and discrimination against Palestinians living there.[15]

57.    As the First Circuit has explained, equating the terms "anti-Zionism" with "antisemitism" would effectively "treat as antisemitic any criticism of Israel's conduct in Gaza,

---

[13]    Palestine Legal & the Ctr. for Const. Rts., *The Palestine Exception to Free Speech: A Movement Under Attack in the US* (2015), https://ccrjustice.org/sites/default/files/attach/2015/09/Palestine%20Exception%20Report%20Final.pdf.

[14]    *Id*. at 17–39.

[15]    *On Antisemitism, Anti-Zionism and Dangerous Conflations*, Jewish Voice for Peace, https://www.jewishvoiceforpeace.org/2023/11/09/antisemitism-dangerous/ (last visited July 8, 2026).

any suggestion that violence by Palestinians can be understood as resistance to colonial rule and Israeli expansion, and any implication that Palestinians should govern—or even simply be 'free'—in all of Palestine." *StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 16 (1st Cir. 2025), *reh'g denied*, 165 F.4th 97 (Mem.) (1st Cir. 2026).

58.    Likewise, these Palestinian rights advocates are smeared with charges of support for "terrorism," a racist assertion that presupposes that demands for justice for the Palestinian people—including justice mandated by elementary principles of human rights law and through courts of law—is inherently violent. It is also a strategy intentionally designed to silence advocacy in support of Palestinian rights.

A.    **Betar Defendants' Animosity Towards Palestinians and Their Supporters**

59.    Betar USA is the U.S.-based, incorporated chapter of the Betar movement, which was founded in 1923 by Vladimir "Ze'ev" Jabotinsky,[16] the founder of Revisionist Zionism, which advocated for exclusive or superior rights for Jewish people, and territorial expansion into ancestral Palestinian land, as well as Jordanian land.[17]

60.    In the 1930s, the Betar movement integrated into the Irgun, a Zionist militia group responsible for, among other crimes, the infamous Deir Yassin Massacre of 1948, in which over 100 Palestinians were murdered, including children, women, and the elderly, triggering a mass exodus of Palestinians from their land.

61.    Defendant Betar USA's social media director, Yoni Kletzel, has proudly described Betar as "a vigilante force." According to its January 2026 settlement agreement with the New York Attorney General, Betar USA has also described its mission as being to "[g]et Jews armed"

---

[16]    *Ideology*, Betar US, https://betarus.org/about/ideology/ (last visited July 6, 2026).
[17]    Ze'ev Jabotinsky, *The Ideology of Betar* 3 (1923), https://betarus.org//wp-content/uploads/pdf/Ideology-of-Betar.pdf (last visited July 13, 2026).

23

and "attend and disrupt" protests in support of Palestinian rights, has described its members as "cruel" and "aggressive," and has claimed that "violence is needed."

62. In a now-deleted social media post on X, in response to a list of hundreds of Palestinian babies whom Israeli forces killed in Gaza, Betar wrote in February 2025: "Not enough. We demand blood in Gaza!"[18]



63. Other social media posts by the group repeatedly threatened Palestinians and their supporters with violence[19] and called for the expulsion of Palestinians from their land.[20]

---

[18] Betar US (@Betar_USA), X (Feb. 20, 2025), https://x.com/Betar_USA/status/1892681040184926373 [https://archive.ph/m84Aa].

[19] Betar Worldwide (@Betar_USA), X (Feb. 18, 2025), https://x.com/Betar_USA/status/1892053140158996591 [https://perma.cc/F7NQ-G8XL].

[20] Betar Worldwide (@Betar_USA), X (Dec. 23, 2025), https://x.com/Betar_USA/status/2003536374797119777 [https://perma.cc/MR3Z-SH6M].

64.   In January and February 2025, individuals affiliated with Betar USA attempted to force pagers onto Palestinians and/or their supporters in the United States, including at a university campus in New York. This was a menacing reference to Israel's September 2024 attack in Lebanon and Syria where Israel detonated thousands of pagers in the pockets of Lebanese and Syrian people, resulting in civilian deaths and mass civilian injuries.

65.   Defendant Betar USA is also the subject of another federal lawsuit that alleges its involvement in an anti-Palestinian and anti-Muslim conspiracy. Complaint, *Mohsen v. Betar Zionist Org., Inc.*, No. 26-cv-01585 (S.D.N.Y. Feb. 26, 2026), ECF No. 4. Nerdeen Mohsen (a.k.a. Nerdeen Kiswani), the Palestinian and Muslim plaintiff in that lawsuit, alleges that since the beginning of 2025, Betar USA has also fixated on her, posting violent threats, bounty offers, and working towards her denaturalization, and that "individuals conspiring with Betar USA have made these threats a reality, stalking, assaulting, and otherwise terrorizing her."

66.   In a documentary published in November 2025, Kletzel, the social media director of Betar USA, exhibited his rank anti-Islamic and anti-Arab animus, stating that while "Nazis are more pure evil, wanna kill all Jews . . . Muslims sort of wanna kill everybody. [...] They're taking over Europe, and they're taking over the whole world."

67.   In that same documentary, Defendant Ronn Torossian stated "Jews are not safe. You might have a mayor tomorrow who supports a free Palestine," referring to New York City Mayor Zohran Mamdani. The statement reflects the belief of the Betar Defendants that freedom for Palestinians was objectionable and that a mayor who supported Palestinian human rights or who is Muslim was inherently dangerous for Jewish people—yet another racist canard.

68.   On January 12, 2026, the New York Attorney General entered into a settlement agreement with Betar USA, signed by Defendant Torossian, after finding that Betar USA engaged

25

in harassment and violence motivated by anti-Palestinian, anti-Arab, and anti-Muslim animus "expressed by its leadership and members." The settlement noted that Betar USA's social media referred to Palestinian flags as "terrorist flags," reflecting Betar and the conspiracy's plan to promote the notion that Palestinian is synonymous with terrorist.

69.     The settlement also documented a central premise of the conspiracy—that Betar USA regularly publicized on social media that its members specifically "follow" and "hound" people to "get them deported."

70.     The settlement agreement further found that Betar USA violated New York Civil Rights Law § 40-c for harassing individuals who were exercising their First Amendment rights, because of a belief or perception regarding their race, creed, color, or national origin, and for threatening to report individuals to the government for deportation in retaliation for their speech.

B.      **Canary Mission Defendants' Animosity Toward Palestinians and Their Supporters**

71.     Chief among anti-Palestinian groups has been Canary Mission, which has, since 2015, surveilled and identified pro-Palestinian students and scholars and carried out doxxing and harassment campaigns against them, falsely labeling them as antisemitic or supporting of terrorism. Since its inception, its campaigns against such students have been designed to interfere with their targets' professional and educational opportunities, and even their ability to visit Palestine, which requires going through Israeli-controlled borders and points of entry.

72.     When lodging such attacks and seeking to defame Palestinian rights activists, Canary Mission relies on dog-whistling, stereotyping, guilt-by-association, and anti-Palestinian, anti-Muslim, and anti-Arab animus to accuse activists of connections to terrorism. For example, Canary Mission has intentionally falsely labeled Jewish Voice for Peace—a national Jewish advocacy organization critical of Israel's human rights and international law violations—as a

26

"semi terrorist group," the Muslim Student Association a "virtual terrorism factory," and Students for Justice in Palestine as "linked to terrorist activity."

73.     The Canary Mission Defendants' surveillance of student activists and willingness to lodge false and inflammatory accusations to silence critics of Israel made it a critical partner to carry out the Defendants' conspiracy to punish high-profile supporters of Palestinian rights. And the availability of partners in the Trump Administration who shared their anti-Palestinian animus allowed Canary Mission to escalate their private harassment and discrimination against pro-Palestinian advocates into a much more forceful and repressive retributive mechanism, by leveraging the power of the federal government.

74.     Canary Mission operative Victor Muslin, who created dossiers on Palestinian rights advocates on Columbia University campus, has described them as "roaches" that need to be squashed.

**C.    The Heritage Foundation Defendants' Animosity Towards Palestinians and Their Supporters**

75.     The Heritage Foundation Defendants have also been public about their anti-Palestinian animus, particularly following October 7, 2023. Since as early as November 3, 2023, Defendant Heritage Foundation has posted on X falsely describing Students for Justice in Palestine as "pro-Hamas" and advocating that foreign student members of the organization be deported "swiftly."[21]

76.     Defendant Coates has been especially public about her anti-Palestinian animus. In her book, *Battle for the Jewish State*, published in December 2024, Coates repeatedly quotes Ze'ev Jabotinsky, the founder of the Betar movement and of Revisionist Zionism, which advocated for

---

[21]    Heritage    Foundation    (@Heritage),    X    (Nov.    3,    2023), https://x.com/Heritage/status/1720574335079878834 [https://perma.cc/MCU4-DL55].

Jewish supremacy and territorial expansion into Palestinian and Jordanian land, describing him as "prophetic."

77.     Defendant Coates holds grotesquely racist, reductionist views of all Palestinians:

> The Palestinians are not unsophisticated—they have smartphones, watch YouTube, and are beneficiaries of the largest single refugee effort in history, the United Nations Relief and Works Agency (UNRWA), as well as a host of other international nongovernmental organizations (NGOs), to the tune of billions of dollars of international aid. **Yet their default mechanism is sadistic savagery. The question is whether their predilection for violence, which even their supporters acknowledge, is sociopathic,** or is rather a legitimate—even laudable—Palestinian tactic to achieve their goal of replacing the Jewish state with a Palestinian one "from the river to the sea."

78.     She also describes Mahmoud Abbas's "population"—referring without distinction to all Palestinians who are governed by the Palestinian President—as "a deeply radicalized population that had been raised on genocidal antisemitic hate."

79.     In the same book, she also embraces as "prophetic" the following statement by Moshe Dayan, a former member of the Haganah (a Zionist paramilitary organization that supported the Deir Yassin massacre of Palestinians in 1948), and former Israeli Minister of Defense:

> We mustn't flinch from the hatred that accompanies and fills the lives of hundreds of thousands of Arabs, who live around us and are waiting for the moment when their hands may claim our blood.

80.     Similarly, on May 6, 2024, Defendant Coates posted on X describing student protests for Palestinian rights at Columbia University specifically as "Hamas campus riots" and "domestic terrorism."[22]

---

[22]     Victoria       Coates       (@VictoriaCoates),       X       (May       6,       2024), https://x.com/VictoriaCoates/status/1787472203560153114 [https://perma.cc/855T-KXDH].

81.     On May 23, 2026, Defendant Coates posted on X: "Honest question: why does Khalil want so badly to stay in a place he believed to be complicit in genocide?  It's just bizarre."

82.     After October 7, 2023 and the corresponding growing protests against the Israeli government's assault against Palestinians in Gaza, these Private Defendants' animosity toward Palestinians and their supporters had escalated, so they looked for partners in the government who shared their anti-Palestinian animus and their purpose of punishing Palestinians and their supporters, and who had the power to actually effectuate the state repression via imprisonment and expulsion.

**D.      The Post-October 7 Landscape of Escalating Protest and Corresponding Beginnings of the Conspiratorial Plan to Squelch It**

83.     Since October 7, 2023, the Israeli government has carried out an unprecedented military assault against Palestinians in Gaza, with multiple Israeli political and military leaders proudly announcing their intent to destroy, in whole or in part, Palestinians, including through the imposition of a total siege on Gaza.[23] United Nations bodies, genocide experts, and human rights organizations have confirmed this assault amounts to a genocide,[24] and a U.S. federal court and

---

[23]     *Law for Palestine Releases Database with 500+ Instances of Israeli Incitement to Genocide – Continuously Updated*, Law for Palestine (Jan. 4, 2024), https://law4palestine.org/law-for-palestine-releases-database-with-500-instances-of-israeli-incitement-to-genocide-continuously-updated/.

[24]     Indep. Int'l Comm'n of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel, *Legal Analysis of the Conduct in Gaza Pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, U.N. Doc. A/HRC/60/CRP.3 (Sept. 16, 2025), https://www.un.org/unispal/wp-content/uploads/2025/09/a-hrc-60-crp-3.pdf; Int'l Ass'n of Genocide Scholars, IAGS Resolution on the Situation in Gaza (Aug. 31, 2025), https://genocidescholars.org/wp-content/uploads/2025/08/IAGS-Resolution-on-Gaza-FINAL.pdf; Physicians for Hum. Rts. Israel, Destruction of Conditions of Life: A Health Analysis of the Gaza Genocide (2025), https://www.phr.org.il/wp-content/uploads/2025/07/Genocide-in-Gaza-PHRI-English.pdf; B'Tselem, Our Genocide (2025), https://www.btselem.org/sites/default/files/publications/202507_our_genocide_eng.pdf; Hum. Rts. Watch, Extermination and Acts of Genocide: Israel Deliberately Depriving Palestinians in Gaza of Water (Dec. 19, 2024), https://www.hrw.org/report/2024/12/19/extermination-and-acts-genocide/israel-deliberately-depriving-palestinians-gaza.

29

the International Court of Justice have described it as a plausible genocide.[25] Independent research published in the world's leading medical journal estimated that, by January 2025—i.e., within the first 16 months of the campaign—over 75,000 Palestinians, over half of which are women, children, and the elderly, had been killed.[26] Israel has destroyed nearly every facet of civil, healthcare, educational, and religious institutions in Gaza, while forcibly displacing and starving the civilian population.[27]

84.    As a result of the widely broadcast slaughter, displacement, and starvation of Palestinians in Gaza, activism protesting Israel's actions proliferated across the United States and the world, particularly on college campuses. Student "encampments," symbolizing solidarity with Palestinians suffering in makeshift tent camps following Israel's destruction of their homes and neighborhoods, grew across the country to dozens of campuses. These encampments and other student protests demanded an end to Israel's genocidal campaign and the support for it by the United States and many educational institutions that have investments in, and provide research services for, companies that provide deadly weapons to Israel.[28]

85.    Columbia University became the prominent face of student protest and encampment activity. The advocacy and encampments at Columbia were central to the student-led

---

[25]    *Def. for Child. Int'l-Palestine v. Biden*, 714 F. Supp. 3d 1160, 1163 (N.D. Cal.), *aff'd*, 107 F.4th 926 (9th Cir. 2024) ("[T]he undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law."); Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (*S. Afr. v. Isr.*), Order, 2024 I.C.J. 3 (Jan. 26), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf.

[26]    Michael Spagat et al., *Violent and non-violent death tolls for the Gaza conflict: new primary evidence from a population-representative field survey*, 14 The Lancet Global Health e552 (Feb. 18, 2026), https://www.thelancet.com/journals/langlo/article/PIIS2214-109X(25)00522-4/fulltext.

[27]    *Legal Analysis of the Conduct in Gaza Pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, *supra* note 24, ¶¶ 85–136, 190.

[28]    Heba Gowayed, *Pro-Palestine Campus Encampments and Israel's Targeting of American Students*, Arab Ctr. D.C. (June 7, 2024), https://arabcenterdc.org/resource/pro-palestine-campus-encampments-and-israels-targeting-of-american-students/.

Palestinian rights movement nationwide and received persistent, national attention.[29]

86.    Accordingly, just as the student protests in the United States turned the tide against the U.S.-led war in Vietnam and against South African apartheid, student protests in the United States have contributed to historically low levels of public support for Israel's actions, by highlighting the Israeli government's systematic discrimination and dispossession—and ultimately genocide—of Palestinians.[30]

87.    The Defendants, starting with the Private Defendants and Defendant Miller, recognized that these widely-publicized protests were effective in changing public opinion and were thus a threat to the continuation of Israel's military assault upon and displacement of Palestinians—as well as to the viability of continued U.S. military, economic, and political support for Israel's policies.

88.    To stifle the effectiveness of these protests, Defendants developed their coordinated strategy to silence, punish, and broadly chill advocacy critical of Israel and supportive of Palestinian life and dignity. The strategy deploys the same tactics that have been historically used against Palestinian rights advocates—namely, falsely smearing activists as antisemitic and supportive of terrorism. But those tactics alone were not enough to stop the accelerating Palestinian rights movement.

89.    Accordingly, the conspiracy sought to go a substantial step further and deploy the punitive leverage of the U.S. government to deprive Mr. Khalil and others of their fundamental rights in the hopes of silencing those individuals, while also scaring into silence all those who

---

[29]    *Timeline of the nationwide protest movement that began at Columbia University*, Associated Press (May 6, 2024), https://apnews.com/article/israel-palestinian-campus-protests-timeline-f7cd3abe635f8afa4532b7bed9212b56.
[30]    Quinnipiac Univ. Poll, *supra* note 11.

witnessed Mr. Khalil's and others' widely-publicized unconstitutional arrests and prolonged detentions—citizens and non-citizens alike.

## II. DEVELOPING THE CONSPIRATORIAL PLAN FOR A "PUBLIC-PRIVATE PARTNERSHIP" TO PUNISH PALESTINIANS AND THEIR SUPPORTERS FOR THEIR CONSTITUTIONALLY PROTECTED ADVOCACY.

### A. Project Esther, Defendant Miller, and the Strategic Origins of the Conspiratorial "Blueprint"

90. Soon after October 7, 2023, individuals inside and outside of Defendant Heritage Foundation, including Defendants Greenway, Coates, and, upon information and belief, Federal Defendant Miller, worked collectively to develop the Blueprint for the conspiracy.

91. The Blueprint described a joint plan to punish Palestinians and their supporters by smearing, arresting, detaining, and deporting non-citizen advocates, thereby repressing their constitutional rights to free speech, equal protection, and travel, as well as freedom from punitive detention, and attempting to render all such advocacy subject to state repression. The plan was stained with animus toward Palestinians and anti-Palestinian racism.

92. Defendant Miller was not yet back in the White House at the time, but was preparing to return to office, and was public about his work with the Heritage Foundation on its "Presidential Administration Academy,"[31] an online course intended to train "the next conservative presidential administration."

93. An organization founded and led by Defendant Miller, America First Legal ("AFL"), was also listed on the advisory board of the Heritage Foundation's Project 2025 before he sought to remove its name from the website in July 2024.

---

[31] The Heritage Foundation (@TheHeritageFoundation), *Project 2025 Presidential Administration Academy*, YouTube (Sept. 20, 2023), https://www.youtube.com/watch?v=lTw6SNI3SR4 [https://perma.cc/B4FL-KNC4].

94.     Before its name was removed from the website, in April of 2024, AFL sued the Department of Education for preventing the release of confidential records of student protestors on college campuses. In a press release related to the suit and revelatory of AFL and Defendant Miller's broader goals, AFL stated, "Foreigners in the United States on F-1 student visas who support Hamas and terrorism should be deported. Naturalized citizens who support Hamas and terrorism should be denaturalized and deported as well." Pursuant to AFL and Miller's silencing strategy, any professed support for Palestinian rights or criticism of Israel's onslaught in Gaza was synonymous with support for Hamas and terrorism.

95.     Defendant Miller at the time also personally revealed his own anti-Palestinian animus and the goals he shared with the Heritage Foundation Defendants: his eagerness to wield federal law enforcement and immigration authority to punish Palestinians and their supporters if given the opportunity to return to the White House.

96.     On November 3, 2023, Defendant Miller posted on X, in response to an article about a protest in support of Palestinian rights, "Deport."[32]



97.     On November 4, 2023, he posted on X, in response to a comment about the National March to Free Palestine in DC: "Deport Hamas supporters. Revoke their visas. Cancel their green

---

[32]     Stephen     Miller     (@StephenM),     X     (Nov.     3,     2023), https://x.com/StephenM/status/1720570100124688574 [https://perma.cc/37QY-PAD3].

cards. Reject the citizenship applications. Arrest and remove. This is what a serious country, concerned with preserving its liberties and blessings, would do. The West must get serious—fast."[33]



98.    On October 28, 2023, Defendant Miller posted on X, in response to a video of a pro-Palestinian protest in London: "The US must ban all jihadist migration. (And I hope to get the chance to personally work on these EOs)."[34]

---

[33]    Stephen Miller (@StephenM), X (Nov. 4, 2023), https://x.com/StephenM/status/1720880389885931873 [https://perma.cc/RRZ3-RBMW].

[34]    Stephen Miller (@StephenM), X (Oct. 28, 2023), https://x.com/StephenM/status/1718307801305428467 [https://perma.cc/4K69-TMHK]. *See also* Stephen Miller (@StephenM), X (Nov. 2, 2023), https://x.com/StephenM/status/1720057848934150522 [https://perma.cc/VDQ5-TAAJ] ("When the [Biden] WH says they are combatting 'Islamophobia' what they are really saying is that any opposition to unlimited jihadist migration is unacceptable. You must welcome these profound social and cultural changes, even at the cost of your own safety.").

99.    A year later, on October 7, 2024, and just one month before President Trump's eventual election, Defendant Heritage Foundation published the Blueprint of the plan to effectuate what Defendant Miller had articulated in his November 2023 posts, titling it "Project Esther."[35]

100.    The Project Esther Blueprint set forth the contours of the conspiracy. The first, necessary step of the conspiracy would rely upon the tried-and-true tactic of falsely characterizing criticism of the Israeli state's subjugation of Palestinians as necessarily antisemitic and classifying demands for human rights and international justice made by Palestinians and their supporters as necessarily connected to terrorism—a tactic that had been deployed by Defendant Canary Mission for nearly a decade. The characterization was pretext manufactured to silence pro-Palestinian speech and aligned with Defendant Miller's shared strategic vision to punish criticism of Israel.

101.    A subsequent step in the conspiracy was to identify and surveil Palestinians and their supporters and, with the support of the other Private Defendants, hand-pick certain individuals—especially high-profile non-citizen pro-Palestinian advocates.

102.    The following step was to work hand in hand with the Federal Defendants to ensure these pre-selected individuals would be arrested, imprisoned, and deported on the pretextual charges of antisemitism and terrorism that the Private Defendants manufactured.

103.    The goal of such maximal punishment of Palestinians and their supporters was to squelch opposition to Israel's subjugation of Palestinians.

104.    Accordingly, because this conspiracy sought forms of state-enabled punishment beyond what private anti-Palestinian groups could accomplish through their prior tactics of smearing and other private forms of punishment, the Heritage Foundation Defendants understood

---

[35]    *Project Esther: A National Strategy to Combat Antisemitism*, Heritage Found. (Oct. 7, 2024), https://www.heritage.org/progressivism/report/project-esther-national-strategy-combat-antisemitism.

they would need co-conspirators in high-level federal government positions—in their own words, "a willing Administration occup[ying] the White House."[36]

105.    That "willing Administration" was not yet elected to office, but the Heritage Foundation Defendants and Defendant Miller were eagerly awaiting and planning for it.

106.    One month later, Donald Trump would be elected as president, cementing the conditions necessary for the conspiracy to advance.

## B.    The People Who Produced the Project Esther Blueprint

107.    Several leaders in the development of the Blueprint had substantial connections to the incoming Trump Administration, having held senior advisory positions to Trump in his first administration and several, like Defendant Miller, continue to work in the current Trump administration.

108.    Soon after October 7, 2023, the following individuals had an initial meeting to develop the Blueprint: James Carafano, senior counselor to the President at the Heritage Foundation and a member of Trump's transition team during his first term; Ellie Cohanim, Donald Trump's former antisemitism envoy at DOS; Mario Bramnick, an Evangelical adviser to Trump; and Luke Moon, Executive Director of the Philos Project, a Christian Zionist not-for-profit organization.

109.    In November 2023, the group launched the Project Esther Taskforce, which was supported by the Heritage Foundation, and which would advise the authors of the Project Esther Blueprint.[37]

---

[36]    *Id*. at 3, 17.

[37]    The Project Esther Taskforce has since disaffiliated itself from the Heritage Foundation, after the Heritage Foundation defended journalist Tucker Carlson's interview with white nationalist and antisemitic political commentator Nick Fuentes. Upon information and belief, it is now housed within the Conference of Christian Presidents for Israel.

110.    The architects at the Heritage Foundation of the Blueprint include Defendants Robert Greenway and Victoria Coates, as well as Daniel Flesch, a U.S. citizen who formerly served as a soldier in Israel and a former Senior Advisor to Israel's Permanent Mission to the United Nations.

111.    Defendant Robert Greenway was the Director of the Allison Center for National Security at the Heritage Foundation, and is now a Visiting Fellow at the Center. He was formerly a deputy assistant to Donald Trump and was the Senior Director of the National Security Council's Middle Eastern and North African Affairs Directorate.

112.    Defendant Victoria Coates is a vice president at the Heritage Foundation and oversees the implementation of the Project Esther Blueprint. Like Greenway, she was on the National Security Council during President Trump's first term and became Trump's Deputy National Security Advisor. She was also on Trump's transition team for his first term.

113.    During the first Trump administration, Defendants Greenway and Coates both served on the National Security Council at the same time as Defendant Miller served in the White House as a senior advisor to Trump.

114.    Upon information and belief, Defendant Miller not only regularly met with the Heritage Foundation Defendants and shared their strategic goals, he also contributed to Defendants Greenway, Coates, and the Heritage Foundation's development of the Blueprint.

115.    Even if the particular targets of the conspiracy would only become clear later through the Private Defendants' surveillance and pre-selection, Miller had the vision for and understood the strategic design and purpose of the overall plan, and its foreseeable consequences to Palestinians and supporters of Palestinian rights. And he described publicly his willingness to implement it if given the opportunity to return to the White House.

37

116.    According to Defendant Coates, other members of the National Security Council from the first Trump Administration are also on the advisory committee for the Project Esther Blueprint.

117.    Notably, very few Jewish organizations participated in the development of the Project Esther Blueprint, or endorsed its claims of antisemitism, let alone its repressive aims, after it was released. In fact, several major organizations that Defendant Heritage Foundation claimed were involved rejected the claim, including the World Jewish Congress and the Republican Jewish Coalition.

## III.    THE STRATEGY TO OPERATIONALIZE THE CONSPIRATORIAL PLAN IS OUTLINED IN THE BLUEPRINT

118.    In the Project Esther Blueprint, the Heritage Foundation Defendants admitted to the goals of the conspiracy, the groups to be involved in it, and the conspiracy's planned actions to punish Palestinians and their supporters. This Blueprint mirrored what Defendant Miller had assured, as early as November 2023, he would agree to do if given the opportunity to re-enter the White House.

### A.    The Plan Smears Pro-Palestinian Advocacy on Campuses as Antisemitic and as Supporting Terrorism.

119.    To the Heritage Foundation Defendants and their collaborators, the Palestine solidarity movement was a problem because it was "pro-Palestinian,"[38] and because, as they underscored in the Blueprint, the movement's goals were "to generate internal political pressure to compel the United States government to change its long-standing policy of support for Israel"[39] and to cast "Palestinians, Arab or Muslim" as "victims."[40]

---

[38]    *Project Esther: A National Strategy to Combat Antisemitism*, *supra* note 35, at 3.
[39]    *Id*.
[40]    *Id*. at 6.

120.    The Heritage Foundation Defendants' statements laid bare the conspirators' animus toward people who are Palestinian, Arab, or Muslim, and their supporters, as it suggests those being subjected to an internationally-recognized genocide cannot claim to be "victims" of state violence and have no right to seek a change to the policies inflicting harm upon their people. These statements also underscore that charges of antisemitism were a pretext to bully and silence dissenting policy views they disliked.

121.    To silence growing Palestinian activism, the conspiracy leveraged the old tactics designed to target Palestinian advocacy by casting the entirety of the "pro-Palestinian movement" as inherently antisemitic and supportive of terrorism and/or of Hamas, and by describing anti-Zionism as inherently antisemitic, thereby conflating advocacy for Palestinian freedom with antisemitism and terrorism.

122.    As described above, and as numerous courts have confirmed, criticism of Israeli policies or criticism of what is the ideological and dispossessing project of Zionism, does not amount to criticism of Jewish people or their faith, and is not itself antisemitic.

123.    In addition to casting the Palestine solidarity movement as antisemitic, the Heritage Foundation Defendants and Defendant Miller, like the Canary Mission and Betar Defendants and other anti-Palestinian groups, sought to cast Palestinians and their supporters as supporters of terrorism. To that end, the Blueprint asserted:

> The virulently anti-Israel, anti-Zionist, and anti-American groups comprising the so-called pro-Palestinian movement inside the United States are exclusively pro-Palestine and—more so—pro-Hamas. They are part of a highly organized, global Hamas Support Network (HSN) and therefore effectively a terrorist support network.[41]

---

[41]    *Id*. at 3.

39

124.    In so doing, the Heritage Foundation Defendants assert that the entirety of the "pro-Palestinian movement" is part of a "terrorist support network."

125.    In the Blueprint, the Heritage Foundation Defendants identify pro-Palestinian advocacy groups such as Students for Justice in Palestine and Jewish Voice for Peace as being a part of the Hamas Support Network ("HSN") or an affiliated Hamas Support Organization ("HSO") without any factual basis.[42]

### B.    The Plan Targets Universities and the Growing Student Pro-Palestinian Movement, Particularly at Columbia

126.    Part of the conspiratorial Blueprint concentrated, as have prior anti-Palestinian campaigns, on the role of universities and students, by imagining that tolerance of pro-Palestinian advocacy in educational institutions represents a hotbed of antisemitism and a "[c]orrupt[ion of] the U.S. education system." As described in the Blueprint, according to the Heritage Foundation Defendants:

> HSOs have infiltrated their ideology into the U.S. education system across all levels. It is pervasive. The U.S. education system fosters antisemitism under the guise of 'pro-Palestinian,' anti-Israel, anti-Zionist narratives across universities, high schools, and elementary schools, often under the umbrella or within the rubric of diversity, equity, and inclusion (DEI) and similar Marxist ideology.[43]

127.    The Heritage Foundation Defendants were particularly fixated on Columbia University. For example, Defendant Coates wrote in her 2024 book *Battle for the Jewish State* that "Columbia University, where one of the first protest 'encampments' appeared, was ground zero in" what Defendant Coates perceived to be "pro-Hamas demonstrations and antisemitic attacks on campus[.]"[44]

---

[42]    *Id*. at 7–8.
[43]    *Id*. at 10.
[44]    Victoria Coates, Battle for the Jewish State 20 (2024).

40

128.    Similarly, the Heritage Foundation Defendants noted in the Blueprint that Columbia University is where the Gaza solidarity encampments began and that it was one of the largest centers of activism in the country in support of Palestinians' rights, all of it highly publicized. Citing Defendant Canary Mission, the Heritage Foundation Defendants emphasized that Columbia University allegedly had the greatest number of professors (70 in total) who "openly advocated or supported up to 63 different HSOs [. . .], membership in HSOs, or participation in anti-Israel demonstrations."[45]

129.    In addition, in the Blueprint, the Heritage Foundation Defendants referred to "antisemitic mobs of students, faculty, staff, and other supporters at Columbia, NYU, and Princeton, to name only a few."[46]

130.    Columbia University was foremost on the Heritage Foundation Defendants' minds in devising their plan to punish and repress student activism.

131.    For its part, Columbia University actively contributed to an environment where Palestinian students and their supporters were demonized. Between April 2024 and October 2025, the University, including its affiliate Barnard, authorized the New York Police Department ("NYPD") to enter campus to clear the nonviolent Gaza Solidarity Encampment and other student protests on four separate occasions, resulting in the deployment of the NYPD Strategic Response Group, the arrest of at least three hundred students, the suspension of at least 200 students (including interim suspensions of student journalists covering the protests), and the expulsion of at least 12 students, all for their pro-Palestinian protest activity.

132.    The University also formed a secret disciplinary body which nearly exclusively investigated student advocates for Palestinian rights–including for such offenses as drafting an op-

---

[45]    *Project Esther: A National Strategy to Combat Antisemitism*, *supra* note 35, at 10.
[46]    *Id*. at 12.

ed in a student newspaper, putting up stickers off campus, and hosting an art exhibition–and which accepted anonymous complaints and required students to sign a non-disclosure agreement to see the unredacted evidence against them. The University has deployed chilling surveillance tactics against its students by hiring private investigators to monitor and question students about their pro-Palestinian political activity on campus and using CCTV footage and data from student ID swipes to track and punish student protestors. And it willingly cooperated with a Congressional House investigation, relinquishing student disciplinary records and handing over tens of thousands of pages of documents to the federal government.

133. Columbia's unlawful collaboration and breach of student confidentiality has been challenged by a number of Columbia students in separate, ongoing federal litigation.

134. In the context of this repression, on January 31, 2025, after the Project Esther Blueprint had been published and immediately after the issuance of President Trump's executive order, described below, and facing increased doxxing by Private Defendants, Mr. Khalil emailed Columbia University interim president Katrina Armstrong and other administrators to strenuously urge Columbia to take immediate action to protect international students facing severe and pervasive doxxing, discriminatory harassment, and very possibly deportation in retaliation for their exercise of their rights to freedom of speech, expression, and association. He received no response.

135. Again, on March 7th, 2025, after facing doxxing including by Private Defendants, Mr. Khalil emailed Columbia University interim president Katrina Armstrong, stating "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home. I urgently need legal support, and I urge you to intervene and provide the necessary protections to prevent further harm." He received no response.

136.    The Heritage Foundation's fixation on Columbia mirrored Defendant Miller's own fixation on the role of universities as revealed in a December 6, 2023 post on X in which he stated, "Taxpayer-subsidized universities have become incubators for jihadism. This is a matter of national security. Subpoena all relevant records. Depose admin. Determine which intifada[47] enthusiasts are foreign nationals. Suspend access to the student visa program. Cut off federal funds."[48]




137.    And again, in an April 23, 2024 post on X, Miller revealed his contempt for universities, as well as for Palestinians and their supporters. There, he re-posted a video of New York University faculty protecting students who were protesting Israel's continued onslaught in Gaza, and commented: "You, taxpayer, are funding this. Defund the marxists. Deport foreign nationals who support Hamas."[49]

---

[47]    Intifada is an Arabic word that translates to "to shake off," and is used to describe Palestinian uprisings against Israeli occupation of the West Bank and Gaza. *What Is an "Intifada?"*, Inst. for Middle E. Understanding (Oct. 22, 2005), https://imeu.org/resources/palestine-101/what-is-an-intifada/355.

[48]    Stephen    Miller    (@StephenM),    X    (Dec.    6,    2023), https://x.com/StephenM/status/1732395986881073516 [https://perma.cc/4TDT-HDRF].

[49]    Stephen    Miller    (@StephenM),    X    (Apr.    23,    2024), http://x.com/StephenM/status/1782766606981984563 [https://perma.cc/4CEH-UVZX].



138.    Defendant Miller's posts, published at a time when he was publicly collaborating with the Heritage Foundation to prepare for a second Trump Administration, mimic the language ultimately published by the Heritage Foundation Defendants in the Blueprint, indicating his involvement in creating it.

139.    In sum, a key feature of the conspiratorial plan would be to target non-citizen university students, with a focus on Columbia University students, in order to terrorize other supporters of Palestinian rights and silence criticism of Israel's subjugation of Palestinians—and U.S. support for it—on campuses.

C.    **The Plan to Implement the "Public-Private Partnership" in Cooperation with Willing Administration**

140.    According to the Blueprint, the success of the conspiracy would depend on a "public-private partnership" once a "willing Administration occupies the White House"[50] to leverage federal power to impose serious punishment on the Palestinians and their supporters whom the Private Defendants sought to target.[51]

141.    As described in the Blueprint itself, the Heritage Foundation Defendants would rely on the federal co-conspirators using "counterterrorism, hate speech, and immigration laws,"[52] including the use of federal immigration power to deport non-citizen Palestinians and their supporters.

142.    After casting all supporters of Palestinian rights as terrorists or "Hamas Support Organizations" ("HSO"), the Blueprint specified the following goals of the conspiracy:[53]

- "Foreign HSO leaders and members deported from the U.S."
- "Foreign HSO leaders and members voluntarily depart the U.S."
- "HSO members in violation of student visa requirements"
- "HSO-supporting foreign faculty and staff in violation of visa requirements"

143.    The "Desired Effects"[54] of the conspiracy were to terrorize other Palestinians and their supporters into silence. As the Heritage Foundation Defendants explicitly stated in the Blueprint, their goals included:

- "People are unwilling to join demonstrations."
- "HSOs rendered unable to conduct or sustain demonstrations."
- "HSOs' voice/access to propaganda dissemination mechanisms lost."
- "HSO propaganda eradicated from the U.S. education system at all levels."
- "HSOs unable to disseminate propaganda inside the United States."
- "HSO propaganda purged from curricula."
- "HSOs no longer have access to U.S. open society."

---

[50]    *Project Esther: A National Strategy to Combat Antisemitism*, *supra* note 35, at 3, 17.
[51]    *Id*. at 26.
[52]    *Id*. at 27.
[53]    *Id*. at 22.
[54]    *Id*. at 20–21.

- "Executive branch confronts, pursues, and prosecutes HSO legal and criminal violations."[55]

144.    The Heritage Foundation Defendants recognized that the conspiracy would require other private collaborators, working hand in hand with them and government officials. As they described in the Blueprint:[56]

> The Heritage Foundation is a powerful organization with great brand recognition and outstanding credibility, but it cannot successfully implement Project Esther alone. And it does not need to: Given Heritage's extensive social and professional network across all dimensions of American society along with other like-minded organizations and super-empowered individuals, a coalition of the willing and able will be well-positioned and well-resourced to generate the necessary action to counter the HSN.

145.    According to the Blueprint, the Heritage Foundation Defendants would "[m]obilize a coalition of private organizations," and "[b]uild and coordinate the efforts and activities of private organizations in the U.S. to achieve combined effects."[57] In turn, this coalition would "orchestrate actions and activities across society in collaboration with federal and state government to achieve the desired impact and align resources toward priorities."[58]

146.    On October 7, 2024, at a panel discussion organized by Defendant Heritage Foundation to launch the Blueprint, Defendant Greenway stated:

> Ultimately we're looking at, again, creating circumstances in which a federal government . . . a federal administration would know exactly how it can contribute. Where it can be the most impactful in supporting and assisting the execution of this. And in those actions where only a federal government, or in some cases a state government, can take.

---

[55]    *Id*. at 19–21.
[56]    *Id*. at 25.
[57]    *Id*. at 4.
[58]    *Id*. at 26.

147.    On November 5, 2024, the "willing Administration" that the Heritage Foundation Defendants were awaiting arrived when Donald Trump was elected into office.

148.     As a presidential candidate pursuing his second term, Trump expressed anti-Palestinian animus, by denominating the phrase "Palestinian" as a slur and conflating "Palestinian" with "member of Hamas." Referring to a political opponent—a Jewish Senator who had been critical of Israel's Prime Minister Benjamin Netanyahu—Trump said: "Chuck Schumer refused to shake the Israeli prime minister's hand . . . . Chuck Schumer has become a Palestinian. Can you believe it? He's become a proud member of Hamas."

149.    Similarly, in June 2024, Trump said that then-president Biden did not want to let Israel "finish the job" of its genocidal assault on Gaza because "he's become like a Palestinian," but that he was a "very bad Palestinian, a weak one."

150.    And, by November 11, 2024, Trump had nominated Defendant Miller as his senior advisor. Miller's eagerness to punish Palestinians and their supporters assured the Heritage Foundation Defendants that he would be a "willing" partner.

151.    By November 2024, Trump had also nominated Defendant Rubio as head of the Department of State. The prior year, on October 15, 2023, then-Senator Rubio, had referred to ongoing student protests in support of Palestinians, stating that the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America." He, too, would be a "willing" partner of the Private Defendants.

152.    The election of an administration that itself harbors anti-Palestinian animus and to which Defendants Greenway and Coates had deep connections, mobilized the Heritage Foundation Defendants and their coalition—that would include the Canary Mission and Betar Defendants—to put its Blueprint into action.

47

## IV.    THE PRIVATE AND FEDERAL DEFENDANTS BEGIN CARRYING OUT THE CONSPIRACY.

### A.    The Betar and Canary Mission Defendants Begin Their Work to Effectuate the Conspiracy to Target Palestinians and Their Supporters.

153.    Soon after the Blueprint was published, and the Trump Administration was elected into office, the Blueprint's stated goal of recruiting a private "coalition" was accomplished when the Betar and Canary Mission Defendants began their work to effectuate the conspiracy, sometime between late 2024 and January 2025.

154.    Upon information and belief, pursuant to the Blueprint, in or around November 2024, the Betar and Canary Mission Defendants began surveilling and pre-selecting Palestinians and their supporters as targets of the conspiracy with the goal of beginning the execution of the "public-private partnership," and then communicated directly with the Federal Defendants who effectuated the arrest, detention, and attempted deportation of those pre-selected targets.

### 1.    The Betar Defendants, Driven by Anti-Palestinian Animus, Surveilled and Pre-Selected Students for the Federal Defendants to Arrest, Detain, and Deport.

155.    On November 23, 2024, just a few weeks after President Trump was elected and after the Heritage Foundation had officially published the Blueprint, Defendant Betar USA's then-CEO, Ross Glick, stated that Betar had "started commencing lists of Jew-hating foreign nationals on visas who support Hamas."

156.    Reporting at the time indicated that the Betar Defendants had pre-selected about 30 people for the Federal Defendants to target, including students from Columbia University, where the student encampments—and attacks upon them—had begun.

157.    On February 11, 2025, a representative of Defendant Betar USA told a news reporter that it had pre-selected Mr. Khalil as well as Mohsen Mahdawi, both Columbia University

48

students, and Momodou Taal, a Cornell University student, for deportation, and given their names to the Trump Administration to be targeted for arrest and deportation.

158.    In a matter of weeks, the conspiracy continued as planned: the Federal Defendants arrested, detained, and attempted to deport Mr. Khalil and Mahdawi, and revoked Taal's visa.

159.    By March 25, 2025, according to Daniel Levy, a spokesperson for Betar, Betar had selected and given "hundreds of names to the Trump Administration of visa holders, and naturalized Middle Easterners and foreigners" who, he said, "support US designated terrorist organizations."

160.    Although the selected individuals were only briefly made public, according to archived webpages, between at least April 5-7, 2025, Betar posted on its website images of individuals that it was "working to deport," including Columbia students Mr. Khalil and Mahdawi.



161.    Betar's webpage, which has since been deleted, named eight out of the nine Palestinians or their supporters whose targeting by the Federal Defendants for arrest and/or deportation between March-May 2025 was publicly known, as described below.

162.    Some of them—Dr. Badar Khan Suri, Dr. Rümeysa Öztürk, Yunseo Chung, and Leqaa Kordia—have their images all appearing side-by-side on Betar's list:



163.    The webpage included another tell: some individuals were identified as having had their visas revoked or having been detained for things such as: "pro-Palestinian op-ed," "Gaza-related posts," or "Gaza petition," but many of those alleged revocations or detentions have not been publicly reported, which suggests that the Betar Defendants received this information from a non-public source. It would be revealed at the *AAUP* trial in July 2025, over two months after this webpage was published, that there were, in fact, at least fifteen to twenty Palestinian supporters who Defendant Armstrong sent to Defendant Rubio to approve their deportation, though the names of those individuals are still not publicly known. According to Defendant Armstrong, of those, "almost all were agreed and executed" by Defendant Rubio.

164.    Through this webpage, Betar described the reason that it was working on deporting those individuals. In many instances, Betar stated that it was targeting certain individuals because their speech or expressive activities were "pro-Palestinian." For example, Betar's reasons for targeting certain people included: "organizing a pro-Palestinian vigil," "pro-Palestinian posts on X," "organizing a pro-Palestinian teach in," or "lead[ing] a pro-Palestinian encampment," "pro-Palestinian activism," and "pro-Palestinian flyer distribution."

165.    Betar also stated on that same webpage that it believed certain other individuals "should be deported" because of: "pro-Palestinian speech," "joining a Gaza solidarity march," "a pro-Palestinian op-ed," "Gaza-related posts," "a Gaza petition," "Gaza advocacy," "involvement in Gaza protests," a "Gaza solidarity march," "pro-Palestinian tweets," "organiz[ing] a pro-Palestinian rally."

166.    That webpage was removed from the Betar website.

167.    According to Betar, one of the ways it selected the individuals to be targeted was through the use of facial recognition technology and "relationship database technology" to identify individuals based on their presence at campus protests criticizing Israel's actions in Gaza. Specifically, Betar has admitted to using AI technology, including a facial-recognition tool called NesherAI, launched by a company called Stellar Technologies, to select protestors as targets of this conspiracy. The company claims the tool is meant to assist law enforcement and security agencies.

168.    In frequent posts on X, Betar threatened to use this technology against anyone who dared to protest the Israeli government's actions in Gaza. For example, ahead of a planned protest of Benjamin Netanyahu at the White House on February 2, 2025, Betar tweeted "We will video all attendees and with masks or no masks report visa holders to @ICEgov thanks to @terrorwatch613," referring to its use of NesherAI facial recognition technology.[59]

169.    The following day, ahead of a Columbia University "community action," Betar posted "We can confirm Betar will be at this rally . . . and we will reveal names of jihadis wearing masks at this event to @ice."[60]

---

[59]    Betar    Worldwide    (@Betar_USA),    X    (Feb.    1,    2025), https://x.com/betar_usa/status/1885901221464002947 [https://perma.cc/N3T6-U68J].

[60]    Betar    Worldwide    (@Betar_USA),    X    (Feb.    3,    2025), https://x.com/betar_usa/status/1886409822318252185 [https://perma.cc/4REX-36VN].

170.    Betar has admitted to conveying the names of the individuals it pre-selected to the Trump Administration, including to Defendants Miller and Rubio. For example, as early as November 24, 2024, prior to Trump taking office, Defendant Betar's then-CEO Glick pronounced that Betar was "in contact with 'prospective' Trump administration appointees in the Justice Department about how best to take action on those identified . . . ." And, according to Glick, "We're just doing the work to give the Trump team a head start when they start work in January."

171.    By January 2025, Daniel Levy admitted that Betar had communicated specifically with Defendant Marco Rubio, Defendant Stephen Miller, and then-attorney general Pam Bondi, to share its pre-selected list of people identified for arrest and deportation.

172.    In addition, Betar has repeatedly publicized that it is working with ICE. For example, on January 30, 2025, Betar posted on its X account a video accompanied by the text "We work with @ICEgov and let these jihadis know it last nite. Today we will release many videos and names of scumbag jihadis who attended and those who continue to harass Jews in america. Enough. Jews fight back. They must go!"[61] The video shows individuals, presumably agents of Betar USA, harassing protestors by saying: "Show us your faces so we can get you deported. We work with ICE. We're gonna scan faces later . . . . Get the fuck out of America . . . . Get out so you can get deported by ICE . . . . Go to Gaza, bitch . . . . Show your faces, so ICE can deport you already."[62]

173.    Betar has also acknowledged that it is implementing the plan laid out by the Heritage Foundation Defendants in the Blueprint. By January 2025, Daniel Levy stated that "Betar . . . seeks to assist Project Esther," and that "a 'public-private partnership' is needed to reshape

---

[61]    Betar    Worldwide    (@Betar_USA),    X    (Jan.    30,    2025), https://x.com/Betar_USA/status/1884962753867088118 [https://perma.cc/HJF8-CBHJ].
[62]        *Id*.

college campuses," mirroring the language of the "public-private partnership" set forth in the Blueprint.

174.   Betar repeatedly boasted on social media that it was surveilling Palestinians and their supporters for the purpose of pre-selecting them for the Heritage Foundation and Federal Defendants to ensure their arrest and deportation. For example, on January 15, 2025, in response to a flyer about a protest in Dallas in support of a "ceasefire today" and "liberation tomorrow" in Gaza, Betar posted the following on X: "Join us in Times Square as we document jihad terror supporters calling for destruction of Israel. We will submit names of pro terror supporters in #timessquare to the @Heritage and their important Project Esther work. Deportations must start immediately as we reclaim America!"[63]

175.   On January 20, 2025, Betar posted on X: "We have set up our Zionist information center and documenting @nyu students who support Hamas in coordination with Project Esther of @Heritage." While these statements are not unlawful on their own, they are evidence of the conspiracy.

176.   In interviews for a documentary released in November 2025, Defendant Torossian confirmed that Betar is "involved with Project Esther," and stated that "I think we can give you a sneak peak—here are the four people who we think will next be deported, by the way those do so well, and by the way—I think I'm able to get it done. In other words, we're speaking to the right people in Israel, we're talking to the right people in America. That's it."

---

[63]   Betar   Worldwide   (@Betar_USA),   X   (Jan.   15,   2025), https://x.com/Betar_USA/status/1879632342257705133 [https://perma.cc/PLH9-HHDF].



**A Propaganda Film By Betar USA**

 The Grayzone ✓
532K subscribers    Subscribe

 👍 9.4K   👎   ➦ Share

177.    In that same documentary, Defendant Torossian said that he could not discuss the specifics of Betar's Palestinian deportation plan while on camera but that, "of course, Betar submits information to the Government." He continued, "I read that a federal judge ruled that Betar was nearly solely responsible for the . . . arrest of a jihadi. The only thing America should say to Betar is thank you." He explained that Betar's role is to do everything it can to protect Jewish people, which includes "deporting bastards."

178.    In that same documentary, Yoni Kletzel, the social media director of Betar USA, also admitted that "I can't get into detail exactly what that role is," referring to Betar's role in Mr. Khalil's arrest, "but I think for sure there was a real role played by Betar in deportations [ . . . ] many of them."

179.    The federal government has admitted to relying on Betar's pre-selection of students for arrest and deportation. During the *AAUP* trial, an ICE official testified that, by March of 2025, Betar was one of the lead sources of information that a subdivision of DHS, Homeland Security

54

Investigations ("HSI"), used to investigate student protestors for arrest and deportation. *AAUP*, 802 F. Supp. 3d at 140.

**2.      Canary Mission, Driven by Anti-Palestinian Animus, Surveilled and Pre-Selected Students for the Federal Defendants to Arrest, Detain, and Deport.**

180.    As described, since its founding in 2015, the Canary Mission Defendants have compiled and disseminated a blacklist of Palestine solidarity activists on college campuses in the United States, irrespective of citizenship. The group used those lists to pressure employers to fire or rescind job offers from individuals on the list, to pressure universities and other educational institutions to suspend student groups named on the site, and to prevent individuals from traveling to Palestine or entering Israel's borders. In or around late 2024, with a friendly Trump Administration soon assuming power, the Canary Mission Defendants eagerly reoriented Canary Mission's work to effectuate the conspiracy to punish Palestinian students and their supporters through state-sanctioned arrest, detention, and attempted deportation.

181.    In line with the Blueprint's strategy, the Canary Mission Defendants began focusing on *non-citizen* students vulnerable to immigration consequences and casting the non-citizen individuals who would be targeted—including Mr. Khalil and other students, particularly at Columbia—as "pro-Hamas" and connected to a foreign terrorist network, the Blueprint's predicate for federal government retribution.

182.     Due to this particular focus on Columbia University, Canary Mission needed on-the-ground operatives there to select individual targets. One such operative was Victor Muslin, a Columbia University alumnus, who leveraged his relationships with his Columbia University network, as well as his longstanding work with multiple anti-Palestinian groups identifying and doxxing pro-Palestinian students and faculty, to identify targets for the conspiracy.

183.    In a closed alumni chat group, in response to one group chat member asking "Anybody here affiliated with the Canary Mission?" another group chat member identified Muslin as an "honorary bird."

184.    Muslin attended on-campus protests to photograph Palestinian students and supporters of Palestinian rights at Columbia University, and maintained an online archive that contained dossiers on such individuals, singling out non-citizen students. Defendant Muslin thus served as a conduit of information between Columbia campus and Canary Mission.

185.    Additionally, sometime around or before January 21, 2025, Muslin solicited photographs of Columbia student protestors in order to help identify them. He wrote, in response to messages about a particular protest involving support for Palestinians, "[i]f there are photos of someone who needs to be identified (even with a partially obscured face) I have access to tech that may be able to help. DM me." Victor Muslin described these protestors as "roaches" that need to be squashed.

186.    On January 21, 2025, and in support of Canary Mission's avowed mission to identify and target non-citizens at Columbia for deportation, Victor Muslin set out to identify non-citizen Palestinian students and student supporters of Palestinian rights on campus who, under the plan, would be eligible and targeted for removal. He posted in the closed group chat consisting of Columbia University alumni and affiliates: "How does anyone know whether any given troublemaker is in fact a foreigner or on a visa"?

187.    Defendant Muslin's archive singled out Mahmoud Khalil and Mohsen Mahdawi's profiles with red font that read "foreign student alert."

188.    On January 30, 2025, Canary Mission published a report, authored by or with contributions from Defendant Victor Muslin, called *From Tehran to Columbia: Inside America's*

*Student Intifada*. The report alleges that it "shows how foreign terror organizations—all proxies of Iran—and their American affiliates transformed Columbia University into a gateway hub for Hamas' activism in the United States." Mr. Khalil's profile appears in the report as exemplar of the type of foreign national Canary Mission would work to punish, as does Mohsen Mahdawi's.

189. As an operative of Defendant Canary Mission, Muslin shared its animus towards Palestinians and their supporters and its focus on punishing non-citizen students vulnerable to immigration consequences, evidencing his understanding and agreement with the broader conspiratorial plan to effectuate their removal. On information and belief, Canary Mission relied on Defendant Muslin's dossier of Mr. Khalil to prioritize Mr. Khalil as a target for the Federal Defendants to arrest and deport.

190. Like the Betar Defendants, the Canary Mission Defendants used facial recognition surveillance technologies to identify individuals who would be targeted, based on their mere presence at student protests. An internal document describing the Canary Mission Defendants' work in 2024 noted "facial rec software combined with scraping is efficiently producing named [persons of interests]." Upon information and belief, that is the same technology that Muslin advertised having "access to" as he solicited images of protestors at Columbia University.

191. Like the Betar Defendants, the Canary Mission Defendants have revealed their anti-Palestinian animus. On March 24, 2025, Canary Mission stated on a webpage titled "Uncovering Foreign Nationals Who Could Qualify Under Trump's Executive Order" that Mr. Khalil's participation in a student protest after October 7th makes him part of "Columbia's pro-Hamas movement." The webpage also lists Cornell student Momodou Taal's "objectionable" activities as leading encampment protests, posting on social media, and leading an event in support of the anti-apartheid-inspired movement for boycott, divestment, and sanctions.

57

192.    Canary Mission's web page specifically references the rarely used provision of the INA the Federal Defendants unconstitutionally applied to Mr. Khalil and a number of other students, the so-called "Foreign Policy Ground" putatively authorizing designation by Defendant Rubio for deportation: § 237(a)(4)(C)(i) (8 U.S.C. § 1227(a)(4)(C)(i)) of the INA).

193.    The Canary Mission Defendants have also revealed that they were likely privy to inside information that presumably only federal government officials knew, and they took responsibility for the coordinated targeting and arrests of non-citizen students, particularly pertaining to Columbia. For example, on March 10, 2025, two days after Mr. Khalil was arrested, Defendant Canary Mission posted ominously on X, "We have more @Columbia news on its way... "[64] That same day, a federal law enforcement official advised an attorney for Columbia University student Yunseo Chung that her lawful permanent resident ("LPR") status was being "revoked."

194.    Three days later, on March 13, 2025, federal law enforcement agents executed a search warrant at Columbia University and searched Chung's dormitory.

195.    That same day, Defendant Todd Blanche, then Deputy Attorney General, stated that DOJ "worked with the Department of Homeland Security to execute search warrants from an investigation into Columbia University for harboring and concealing illegal aliens on its campus."

196.    Also on March 13, 2025, Leqaa Kordia, a Palestinian who had been arrested at a protest at Columbia, was detained by ICE. One month later, on April 14, 2025, Columbia student Mohsen Mahdawi was arrested.

197.    On March 27, 2025, two days after then-Tufts Ph.D. student Dr. Rümeysa Öztürk was arrested by ICE—and subject to deportation on recommendation by Defendant Armstrong for nothing more than publishing an op-ed in the Tufts University student newspaper—Defendant

---

[64]    Canary    Mission    (@canarymission),    X    (Mar.    10,    2025), https://x.com/canarymission/status/1899180339186294804 [https://perma.cc/F3YM-3W89].

Canary Mission posted on its X account that "sources point to Canary Mission as primary cause" of Dr. Öztürk's arrest.[65]

198.    Defendant Canary Mission did not clarify what "sources" credited Canary Mission for Dr. Öztürk's arrest. Yet the fact that Dr. Öztürk's arrest was based entirely on an op-ed she wrote that Defendant Canary Mission had identified would be confirmed publicly months later, during a federal trial in *AAUP*, 802 F. Supp. 3d at 157–60. There, the court made public a report of analysis ("ROA") of Dr. Öztürk written by HSI. The government had fought to keep confidential the ROA, which confirmed that Canary Mission was indeed the primary "cause" that led ICE to arrest her.

199.    The federal government has admitted to relying on Canary Mission's pre-selection of students for arrest, detention, and deportation. Specifically, in the federal *AAUP* litigation, an ICE official testified under oath that, by March of 2025, roughly 75% of the names of student protestors investigated by ICE came from Canary Mission.

200.    Recent reporting on back-end websites and content management systems used by Defendant Canary Mission shows that it measured its "company impact" metrics through several categories, including denials of entry to the United States, arrests, "self-deportation," and "deportation/forced to flee." The internal documents laying out these metrics among other plans were captured in May, June, and July of 2025.

201.    On that same internally-facing site, Canary Mission uploaded to the "impacts" portion of its tracker a news article describing testimony in the *AAUP* trial confirming DHS's reliance on Canary Mission to identify visa-holders for deportation.

---

[65]    Canary    Mission    (@canarymission),    X    (Mar.    27,    2025), https://x.com/canarymission/status/1905262753264046392 [https://perma.cc/LPU2-ZA68].

**B.**　　**The Federal Defendants Implement the Conspiratorial Plan**

202.　Immediately after President Trump was inaugurated, the Federal Defendants who were in office at the time began carrying out their role to operationalize the conspiracy described in the Blueprint.

**1.**　　**President Trump Announces Federal Policy to Target Palestinians and Their Supporters for Their Advocacy.**

203.　On his first day in office, January 20, 2025, President Trump, with Defendant Miller as one of his closest advisors, signed Executive Order 14161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats."

204.　It proclaims that it is the United States' policy to "protect its citizens" from non-citizens who "espouse hateful ideology." It further articulates the administration's desire to target non-citizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security" and those who "bear hostile attitudes toward [U.S.] citizens, culture, government, institutions, or founding principles."

205.　On January 29, 2025, President Trump signed Executive Order 14188, "Additional Measures to Combat Anti-Semitism." It states that the Trump Administration will target for investigation "post-October 7, 2023, campus anti-Semitism."

206.　The next day, the White House published an accompanying fact sheet to the Executive Order parroting the language of the Blueprint: it describes the Executive Order as targeting "leftist, anti-American colleges and universities," and has a "promise" to "Deport Hamas Sympathizers and Revoke Student Visas," sending a clear message to all "resident aliens who joined in pro-jihadist protests" that the federal government "will find you . . . and deport you."

60

207.    "Pro-jihadist protest" is a pretextual and racist smear for pro-Palestinian protests of the kind that had been growing across the country in the prior months, especially on college campuses.

208.    Taken together, these two Executive Orders parrot and cement the strategy described in the Blueprint, by falsely casting activism in support of Palestinian rights as antisemitic and terroristic so as to justify retaliatory arrests and deportations on precisely those grounds.

209.    At the same time, President Trump continued to reveal the anti-Palestinian animus shared with the Private Defendants that would guide the administration and the implementation of the conspiratorial plan. For example, in a Truth Social post on February 6, 2025, President Trump endorsed a vision of ethnically cleansing Gaza, and using a term that Trump obviously believed disparaging, labeled Jewish Senator Chuck Schumer a "Palestinian."[66]

210.    And, on March 12, 2025, repeating what he believed was a slur, stated while speaking to reporters in the Oval Office: "Schumer is a Palestinian as far as I'm concerned. He's become a Palestinian. He used to be Jewish. He's not Jewish anymore. He's a Palestinian."

211.    Any pretense that Trump's Executive Orders attempting to punish "antisemitism" were anything other than pretext for punishing constitutionally-protected speech critical of Israel's subjugation of Palestinians was exposed by the federal court in *AAUP,* which held, after a two-week trial with numerous witnesses, that: "although couched in a concern for hateful ideologies, antisemitism, and antisemitic harassment . . . [the Orders] in fact incorporated a definition of antisemitism that encompassed protected political speech, and, by means of intentionally discriminatory enforcement procedures implementing them, led to the singling out of pro-Palestine and anti-Israel speech for a campaign of speech-chilling retribution." 802 F. Supp. 3d at 186.

---

[66]    Donald    Trump    (@realDonaldTrump),    Truth    Social    (Feb.    6,    2025), https://truthsocial.com/@realDonaldTrump/posts/113956721204228037.

212. The pretextual use of the "antisemitism" label to squelch pro-Palestinian advocacy is also laid bare, as detailed in Section VIII below, by the avowed antisemitism by prominent members and supporters of the Trump Administration and within the Heritage Foundation itself.

### 2. Federal Defendants Implement the Conspiracy to Target Palestinians and Their Supporters Identified by Private Defendants.

213. In February and/or March of 2025, as revealed by Defendant Armstrong in *AAUP*, senior federal officials, including Defendants Miller and Armstrong, as well as representatives from DOS and DHS, including, upon information and belief, Defendants Rubio and Noem, met 12-20 times, 802 F. Supp. 3d at 138, to plan the implementation of the conspiracy to target individuals pre-selected by the Private Defendants for arrest, imprisonment, and deportation. In these meetings, they discussed, among other things, a process to deport Palestinians and/or their supporters.

214. As agreed upon in these meetings, the Federal Defendants who were in office at the time created a new system at DHS under Defendant Noem's leadership, and at DOS under Defendant Rubio's leadership, to effectuate the conspiracy. Under this new system, DHS HSI's Office of Intelligence would create a "Tiger Team" to compile reports of analysis ("ROA"), or dossiers, on those individuals pre-selected by the Private Defendants,[67] so that those individuals' arrest and deportation could be approved by Defendants Rubio or Armstrong.[68]

215. In other words, the ROAs assembled unvetted allegations directly from Private Defendants, which formed the basis for the pretextual justification for the joint effort to arrest, imprison, and deport those pre-selected individuals.

---

[67] *AAUP*, 802 F. Supp. 3d at 139 ("AD Hatch was told by DHS leadership (Hatch could not recall who) to review the names of student protestors on the Canary Mission website, which contains a database of over 5,000 individuals."); *id*. at 140 ("Hatch also related that the team relied on Betar U.S.'s website for additional names"); *id*. ("He was also provided lists of names from HSI 'top leadership'.").

[68] *Id*. at 188–89.

216.    In early March, HSI created the "Tiger Team," led by Roy Stanley, the unit chief of the analysis division for HSI's Office of Intelligence, which began work by at least March 3, 2025.

217.    Another official at HSI, Peter Hatch, testified in *AAUP* that 75% of the names that HSI investigated and created ROAs for under this program came from Defendant Canary Mission.

218.    And, when asked by the court what other sources the names came from, whether it was "Betar," Hatch responded, "that sounds right."

219.    Through a FOIA production, Mr. Khalil has learned that, by March 21, 2025, the Tiger Team had reviewed 513 subjects–supplied, as admitted by Peter Hatch in *AAUP*, primarily by the Betar and Canary Mission Defendants. Of that total number, 431 were citizens, and the immigration statuses of 13 were unidentifiable. The Tiger Team had determined that *all* of the remaining 69 individuals who were non-citizens required ROA productions. These numbers suggest that the Tiger Team intended to create an ROA on every single individual supplied by the Canary Mission and Betar Defendants, and the Tiger Team's role was simply confirming that they were a non-citizen.

220.    By that same date, the Tiger Team had managed to complete ROAs on 23 out of those 69.

221.    The ROAs were sent to officials at the National Security Division ("NSD") of HSI.

222.    As an official at NSD, Andre Watson, testified in *AAUP*, NSD then referred *every one* of these ROAs to DOS, in particular Defendant Armstrong. Watson also described that NSD "work[ed] hand and glove with the Department of Justice and the Department of State."

223.    By July 11, 2025, there were at least fifteen to twenty individuals who Defendant Armstrong had sent to Defendant Rubio to approve their arrest and deportation, and, as further

63

testified by Defendant Armstrong, "almost all were agreed" by Defendant Rubio. "There may have been one that was not. I'm not sure."

224.    Having received the names of these individuals from DHS, either Defendant Rubio or Defendant Armstrong made the determination that they should be deported for the stated grounds of the Private Defendants' pre-selection: advocacy criticizing Israel's subjugation of Palestinians.

225.    As the court in *AAUP* described, the sham process between Private Defendants pre-selecting individuals to those individuals being arrested, imprisoned, and placed in deportation proceedings by the Federal Defendants was "frictionless." Specifically, "[d]ue to the frictionless quality described above, once one was on the lists, one was potentially subject to adverse action so long as, it seems, there was any online mention of one's pro-Palestine activities." 802 F. Supp. 3d at 188.

226.    The court also found, "[t]hose names that were passed up the chain of command by the investigating subordinates were almost universally approved for adverse action [by Defendant Rubio or Defendant Armstrong], and, again, the reasons for being passed up the chain of command included any form of online suggestion that one was 'pro-Hamas' including Canary Mission's own anonymous posts." *Id*. at 188–89.

227.    The court concluded that, in this process, the relevant participants made their determination in defiance of basic constitutional protections for political speech. *Id*. at 188. It ruled that public officials "consistently referred to campus protests related to Palestine as per se 'pro-Hamas[.]'" *Id*. at 187. Indeed, this process was *designed* to conflate constitutionally-protected criticism of Israel's subjugation of Palestinians with terrorism or antisemitism, and in doing so, intentionally silence and chill "public protest related to Israel's treatment of Palestinians." *Id*.

64

228.    Testimony in the *AAUP* trial revealed that, in making determinations about what constituted antisemitism, DOS had no guidance (formal or informal) or definition about what should be classified as antisemitic, nor training materials to guide DOS in making such determinations, a fact that solidifies that it was the Private Defendants' own anti-Palestinian animus-driven proclamations, as well as Defendant Miller's, regarding what constitutes antisemitic activities, and not any bona fide or pre-existing government policy, that determined who the Federal Defendants would arrest, detain, and deport.

229.    Indeed, in *AAUP*, Defendant Armstrong, suggested that a common freedom chant, "From the River to the Sea, Palestine will be free" would be seen as support for Hamas and terrorism as could statements denouncing Zionism, criticizing Israeli actions in Gaza, calling for a U.S. arms embargo to Israel, calling Israel an apartheid state, as well as statements "critic[al] of this administration's policies or actions toward Israel."

230.    He affirmed that his own opinions and subjective ideas of what constitutes antisemitism would inform decisions or recommendations related to finding visa-holders and green card-holders removable.

231.    Reviewing the coordination between the Federal Defendants who were in office in February and March 2025, the court concluded that "it would require a remarkable naivete not to conclude that this process worked as intended." *Id*. at 189. And confirming the existence of this intentional conspiratorial plan to unconstitutionally target Palestinians and supporters of Palestinians, the court concluded:

> the intent of the [Defendants Rubio and Noem] was more invidious – to target a few for speaking out and then use the full rigor of the Immigration and Nationality Act (in ways that it had never been used before) to have them publicly deported with the goal of tamping down pro-Palestinian student protests and terrorizing

similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome.

*Id*. at 173.

232.    On January 15, 2026, the court reiterated that "I find it breathtaking that I have been compelled, on the evidence, to find the conduct of such high-level officers of our government, cabinet secretaries, conspiring to infringe the First Amendment rights of people with such rights here in the United States." Transcript of Remedies Hearing at 48, *AAUP,* 802 F. Supp. 3d 120 (D. Mass. 2025).

233.    Reporting also revealed Defendant Blanche's role in the conspiracy: sometime in February or March 2025, under Defendant Blanche's leadership, the office of the Deputy Attorney General had instructed DOJ prosecutors to obtain a list of student members of Columbia University Apartheid Divest ("CUAD"), which, as described further below, Defendant Betar had wrongly alleged two months prior that Mr. Khalil was a leader of. This allegation was repeated by Defendant Canary Mission, and then finally by Defendant Noem and her agents, who would use the allegation to try to effectuate Mr. Khalil's removal.

234.    DOJ prosecutors were informed that they should be seeking these lists so that the information could be shared with DHS, which was at the time under Defendant Noem's leadership. The DOJ source told the *New York Times* that, "prosecutors came to fear that their criminal investigation was a pretext to facilitate an intimidation and deportation campaign by the Trump administration against student protesters." By that time, Mr. Khalil was already in detention.

235.    Under this coordinated campaign of retribution, as described in Section V below, at least nine individuals who are Palestinian and/or supporters of Palestinians that were pre-

selected by the Private Defendants were targeted by the Federal Defendants for arrest, imprisonment, and deportation.

## V.    NUMEROUS PALESTINIANS AND THEIR SUPPORTERS, INCLUDING MR. KHALIL, ARE ARRESTED PURSUANT TO THE CONSPIRATORIAL PLAN.

236.    In March through May of 2025, the Federal Defendants who were in office at the time directed the next stage of the conspiracy: at least nine Palestinians or their supporters—pre-selected by the Private Defendants—were subjected to a similar pattern of accusation, arrest, and attempted deportation. The Betar and/or Canary Mission Defendants were behind each of these arrests or attempted arrests.

237.    This pattern reflected the elements of the co-conspirators' plan: (i) identifying and targeting non-citizen students or academics who are Palestinian and/or support Palestinian rights; (ii) falsely accusing them of antisemitism or supporting terrorism; (iii) revoking their visas or finding them removable using sections of the INA never before deployed against constitutionally-protected speech; (iv) arresting or attempting to arrest them by often-masked agents of the Federal Defendants, lacking judicial and administrative warrants; (v) hurrying to transport arrested individuals into detention centers over 1,000 miles from their homes, in an effort to evade the jurisdiction of federal courts that Federal Defendants believed would most closely scrutinize their unprecedented action; (vi) openly seeking to deport them on the basis of their support for Palestinian rights; and (vii) touting their success at repressing support for Palestinian rights following their arrest and detention. And, at least in Mr. Khalil's case, engaging in procedural irregularities in the charging documents and even manipulating the adjudication of his immigration case and subjecting him to a sham immigration process, to ensure the conspiracy's success—Mr. Khalil's expulsion from the United States—despite the blatant constitutional violations.

238.    The goal of the conspiracy was to deny these individuals their rights to freedom of speech, travel, equal protection, and freedom from punitive detention. Another goal was to terrorize and intimidate the targets and others to silence expression and association in support of Palestinian rights. Defendants subscribed to, and sought to advance, a decades-long anti-Palestinian campaign of casting Palestinians and their supporters as inherently terroristic or antisemitic, a conflation at the heart of the plan laid out in the Blueprint.

239.    Many of the nine individuals spent weeks or months in federal detention; two chose to flee the United States; and one, Palestinian Leqaa Kordia, was released by an immigration judge one year after her arrest.

240.    In six legal challenges to their detention or anticipated detention brought by the conspiracy's targets, federal courts ruled that the federal government's actions were presumptively unconstitutional, as a violation of the First Amendment and/or because the Rubio Determination was void for vagueness.[69]

241.    Notwithstanding the patent unconstitutionality of retaliation for protected advocacy, the conspirators' draconian, repressive actions to arrest and detain these individuals—and their publicization—have effectively sent the *in terrorem* message that advocacy for Palestinian human rights would be punished.

---

[69]    *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 232 (D. Vt. 2025), *appeal filed*, No. 25-1113 (2d Cir. May 1, 2025); *Ozturk v. Trump*, 783 F. Supp. 3d 801, 809–11 (D. Vt. 2025); Transcript of Hearing at 33, *Suri v. Trump*, No. 1:25-cv-480 (PTG/WBP), 2025 WL 1392143 (E.D. Va. May 14, 2025), ECF No. 71, *appeal filed*, No. 25-1560 (4th Cir. May 19, 2025); *Ercelik v. Hyde*, No. 1:25-CV-11007-AK, 2025 WL 1361543, at *13–14 (D. Mass. May 8, 2025); *Chung v. Trump*, No. 25 Civ. 2412 (NRB), slip op. at 2 (S.D.N.Y. June 5, 2025), *appeal filed*, No. 25-1660 (2d Cir. July 8, 2025). *See also Khalil v. Trump*, 784 F. Supp. 3d 705, 767 (D.N.J. 2025), *vacated on jurisdictional grounds*, 164 F.4th 259 (3d Cir. 2026), *reh'g denied*, Nos. 25-2162 & 25-2357, 2026 WL 1453191 (3d Cir. May 22, 2026).

A.      **Targeting of Mr. Khalil**

242.    Mr. Khalil is a Muslim Palestinian whose grandparents fled Tiberias in 1948 after being displaced from their homes by Zionist militias.[70] Mr. Khalil was born in a refugee camp in Syria in 1995 where he lived with his family until age 18, when he was forced to flee to Lebanon following the arrest and eventual torture and killings of his friends and fellow activists protesting the human rights atrocities of the Assad regime. In Lebanon, he worked various jobs, taught himself English, and attended and graduated from Lebanese American University with a computer science degree.

243.    Mr. Khalil is a lawful permanent resident of the United States and married to a U.S. citizen. He is the father of a U.S. citizen infant, who was born while he was in detention, more than 1,300 miles from his family. Mr. Khalil holds Algerian citizenship. In 2022, Mr. Khalil accepted a scholarship to attend the master's degree program at Columbia University's School of International and Public Affairs ("SIPA"), where he sought to pursue his interest in international human rights and diplomacy. He finished his coursework in December 2024. He would have attended graduation ceremonies in the Spring of 2025, but he was still in ICE detention in Jena, Louisiana.

244.    While a student at Columbia, Mr. Khalil became a prominent and outspoken advocate, involved in advocacy and organizing against the Israeli government's military onslaught and genocide against Palestinians in Gaza, and the United States' and the University's support for it. He became a lead negotiator between Columbia University's Gaza Solidarity Encampment and

---

[70]    Zionist militias, most prominently the Haganah, Irgun, and Lehi, existed prior to the establishment of the State of Israel. They were precursors to the Israel Defense Forces, and many were responsible for acts of mass violence that resulted in the mass killing and displacement of Palestinians.

University administrators in the spring of 2024, frequently speaking to the press on behalf of students, and becoming a face of the student movement at Columbia at that time.

245. Because of his prominent campus advocacy, by January 2025, Mr. Khalil became the subject of a vicious campaign by Defendant Canary Mission and Defendant Betar.

### 1.    Targeting by the Private Defendants

246. Upon information and belief, sometime between late 2024 and March 2025, Defendants Betar and Canary Mission agreed with the Heritage Foundation Defendants and/or the Federal Defendants who were nominated or in office at the time, that they would surveil and identify non-citizen Palestinians or supporters of Palestinians at Columbia University. During that time, Defendants Betar and Canary Mission, through their agents, pre-selected Mr. Khalil for targeting. Once he was selected, some or all of the Betar and Canary Mission Defendants then communicated directly to some or all of the Federal Defendants, including in particular Defendant Miller and/or Defendant Rubio, to coordinate the arrest of Mr. Khalil.

247. In a January 29, 2025 post on X, Defendant Betar stated that Mr. Khalil was on their "deport list," that they had provided his contact information to "multiple contacts," and that ICE was "aware of his home address and whereabouts."[71]

248. In that same thread on X, Betar wrongly described Mr. Khalil as being a leader of CUAD and baselessly accused CUAD of being "pro-Hamas."[72] In reality, CUAD was a broad coalition of dozens of student organizations without any hierarchical organizational structure that was committed to social justice. This commitment was reflected in its support of calls for divestment from Israel resulting from its violations of international law and calls for divestment

---

[71]    Betar    Worldwide    (@Betar_USA),    X    (Jan.    29,    2025), https://x.com/Betar_USA/status/1884796686020550930 [https://perma.cc/E7LK-EJ4X].
[72]    Betar    Worldwide    (@Betar_USA),    X    (Jan.    29,    2025), https://x.com/Betar_USA/status/1884797043681403225 [https://perma.cc/VFQ5-VW7Z].

from manufacturers of weapons being unlawfully used by Israel against Palestinians in Gaza and the West Bank.

249.    Betar also wrongly identified Mr. Khalil as being in the United States on a visa, when in fact he was an LPR.[73]

250.    In a January 30, 2025 report, Defendant Canary Mission falsely accused Mr. Khalil, along with over 300 others, of "promoting Hamas ideology at Columbia" because he "[s]upported, participated in or spoke at the Columbia [student] encampment." That Canary Mission report also spotlighted the role of CUAD, accusing it of having "pro-terror objectives."

251.    On February 11, 2025, public reporting revealed that Defendant Betar had pre-selected Mr. Khalil and included him on a list of students that it had given to the Trump Administration.

252.    On March 6, 2025, just two days before Mr. Khalil's arrest by ICE, Defendant Canary Mission posted on Instagram and X: "SUSPECTED FOREIGN NATIONAL ALERT Mahmoud Khalil, allegedly from Syria, is a grad student at Columbia. Khalil appeared to be the lead negotiator for the Barnard College library occupation yesterday. He took the same role at the Columbia encampment & was suspended."[74]

253.    That same day, on March 6, 2025, Defendant Marco Rubio posted on X, "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law — including international students — face visa denial or revocation, and deportation."

---

[73]    *Id. See also* Betar Worldwide (@Betar_USA), X (Jan. 29, 2025), https://x.com/Betar_USA/status/1884796686020550930 [https://perma.cc/E7LK-EJ4X].

[74]    Canary Mission (@canarymission), X (Mar. 6, 2025), https://x.com/canarymission/status/1897731409369870762 [https://perma.cc/V555-5FAZ]; Canary Mission (@canarymission), Instagram (Mar. 6, 2025), https://www.instagram.com/reel/DG3FdjiNJ5R/ [https://perma.cc/3LYY-GHXL].

254. It was on this day that the Federal Defendants would begin the process of attempting to deport Mr. Khalil.

**2.      Overt Actions by the Federal Defendants to Carry Out Private Defendants' Deportation Recommendation**

255. This day, on March 6, HSI at DHS issued a ROA for Mr. Khalil. The only evidence contained in the ROA in support of the ultimate determination that he should be found deportable, however, was that he had been critical of Israel's subjugation of Palestinians and participated in protests at Columbia University.

256. The ROA itself contained news articles about his role as the lead negotiator for the encampments, the Canary Mission profile of Mr. Khalil, which described him as "having participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator on behalf of CUAD, an anti-Israel student coalition," and Defendant Canary Mission's March 6, 2025 "Foreign National Alert" Instagram post profiling Mr. Khalil.

257. On March 7, Andre Watson at NSD at DHS signed a letter to DOS requesting that Defendant Rubio determine whether there are adverse foreign policy consequences from Khalil's presence and activities, consistent with the Foreign Policy Ground, INA § 237(a)(4)(C) [8 U.S.C. § 1227(a)(4)(c)].

258. The memo attached the ROA containing Defendant Canary Mission's allegations, which were not vetted by Watson, and described Mr. Khalil as a "prominent pro-Palestinian activist involved in antisemitic activities." It identified that he was a "key figure" and held "leadership roles" in several protests on Columbia's campus. The memo stated that HSI was "concerned" that these activities "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."

259.    On March 8, Defendant Armstrong wrote an Action Memo recommending that Defendant Rubio find Mr. Khalil deportable, relying solely on the ROA and the memo from NSD and their corresponding criticisms of his advocacy.

260.    Indeed, in the Action Memo, Armstrong acknowledged Mr. Khalil's speech was the only grounds for the determination and that "DHS has not identified any alternative grounds of removability that would be applicable . . . including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity."[75]

261.    Nevertheless, that same day, ignoring the unconstitutionality of punishing someone based on constitutionally protected speech, and carrying out the conspiracy, Defendant Rubio made the determination that Mr. Khalil should be subject to removal under the Foreign Policy Ground, INA § 237(a)(4)(C) [8 U.S.C. § 1227(a)(4)(c)].

262.    The stated grounds in the Rubio Determination echoed language supplied by Defendants Betar and Canary Mission—and recommended in the Blueprint—that Mr. Khalil's presence in the United States was unlawful because he had "participat[ed] in antisemitic protests and disruptive activities" at Columbia University.

263.    On March 8, 2025, acting under the direction of Defendant Noem, plain clothed ICE agents followed Mr. Khalil, who was returning home with his pregnant wife from an iftar—the meal eaten by Muslims after sunset to break the daily fast during Ramadan—entered the private

---

[75]    Further confirming the baselessness of Mr. Khalil's targeting, on March 19, 2025, the FBI closed a complaint that was opened based on an anonymous tip from March 6, 2025 regarding "potential calls for violence on behalf of HAMAS by Mahmoud Khalil, a Syrian national who attends Columbia University." The regular FBI channels found that the complaint did not warrant further investigation and found no evidence that Mr. Khalil engaged in or solicited violence. And on April 15, 2025, DOS would receive a risk-assessment social media analysis report which it commissioned from Ferretly, a company that describes itself as an "AI-powered social media background screening" platform. The report found no behaviors associated with prejudice, threats, or images of weapons or other violence.

vestibule of Mr. Khalil's apartment building without a warrant, and arrested Mr. Khalil, also without a warrant.

264. Thus, within 24 hours of Defendant Canary Mission posting on its social media accounts a "suspected foreign national alert" for Mr. Khalil, at least three different offices in two different federal agencies had rubber-stamped the Private Defendants' pre-selection of Mr. Khalil and executed his arrest, detention, and attempted deportation in the manner the Private and Federal Defendants jointly planned.

265. At the time of his arrest, Mr. Khalil was an LPR of the United States. Yet, when ICE agents arrested him that evening, they repeated the same misinformation stated by the Betar Defendants, falsely stating that Mr. Khalil's "student visa" was "revoked."

266. Soon after his arrest, Mr. Khalil was processed at 26 Federal Plaza in New York City, then transferred to a detention center in Elizabeth, New Jersey. His attorneys filed a habeas petition at 4:40 a.m., in the Southern District of New York, based on evidence in the ICE Locator showing Mr. Khalil's location in New York City. Without updating the ICE Locator, federal officials swiftly transferred Mr. Khalil to an immigration jail in Jena, Louisiana—a remote location more than 1,300 miles away from his then-pregnant wife.

267. This transfer was calculated by the Federal Defendants who were in office at the time to ensure that any final order of removal issued against Mr. Khalil by the immigration courts, which are under the control of Defendant Blanche, could be immediately executed without federal court review. The Second Circuit Court of Appeals often grants stays of final removal orders issued by immigration courts pending federal court review, and it is that court that would have reviewed Mr. Khalil's immigration case if he was detained near his home. On the other hand, the Fifth

Circuit Court of Appeals, where Mr. Khalil's immigration case now is, rarely ever grants such stays.

268.    In other words, this transfer was the first step in the Federal Defendants' manipulation of Mr. Khalil's immigration proceedings to ensure they could have maximal power to control those proceedings and ensure his swift expulsion from the United States before any meaningful judicial review.

269.    Thus carrying out one of the primary goals of the conspiracy, Defendants Rubio, Miller, Armstrong, and Noem acted on the plan to arrest and deport Mr. Khalil for his pro-Palestinian advocacy, including by following the Blueprint's agreed-upon instructions to smear such advocacy as antisemitic or terroristic.

### 3.    The Conspirators Boast About Their Execution of the Plan Against Mr. Khalil

270.    Just one day after Mr. Khalil's arrest, on March 9, several of the co-conspirators made statements boasting about their role in the conspiracy.

271.    Betar posted: "As we said 5 weeks ago Khalil is on our deport list. We alerted government to his whereabouts as we said. We have provided information on many others who will shortly as well be detained and deported. Yes @ICEgov will deport you jihadis!"[76]



---

[76]    Betar    Worldwide    (@Betar_USA),    X    (Mar.    9,    2025), https://x.com/Betar_USA/status/1898758506322227701 [https://perma.cc/B7VV-DF8V].

272.    Defendant Rubio parroted Betar's messaging by stating, "[w]e will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[77]

273.    Defendant Miller also parroted this message in a post on X stating "[t]hose who sympathize with terrorism are unwelcome on our shores. They will be denied entry or sent home."[78]

274.    The next day, on March 10, Defendant Miller posted a series of Tweets clearly commenting on Khalil's arrest and conflating his advocacy with support for terrorism[79]:



**Stephen Miller** ✔
@StephenM

Vast numbers of foreign nationals who support terrorism and reject American values have been awarded visas. Revoking them is a national security imperative.

We must only admit this who embrace the core principles of our civilization.

9:54 PM · Mar 10, 2025 · **708.5K** Views

**Stephen Miller** ✔
@StephenM

No one has the "right" to a visa or a green card. If you support terrorism we don't want you here.

8:30 PM · Mar 10, 2025 · **1.5M** Views

💬 3.4K          🔁 9.4K          ♡ 56K          🔖 343          ↥

[77]    Marco    Rubio    (@marcorubio),    X    (Mar.    9,    2025), https://x.com/marcorubio/status/1898858967532441945 [https://perma.cc/FKT6-27Z3].

[78]    Stephen    Miller    (@StephenM),    X    (Mar.    9,    2025), https://x.com/StephenM/status/1898907693374398555 [https://perma.cc/FLG9-DK52].

[79]    Stephen    Miller    (@StephenM),    X    (Mar.    10,    2025), https://x.com/StephenM/status/1899277670795391005 [https://perma.cc/N87N-KSUG]; Stephen Miller (@StephenM),    X    (Mar.    10,    2025),    https://x.com/StephenM/status/1899256589090996630 [https://perma.cc/NV2Q-9TY9].

275.    That same day, President Trump issued a statement on social media that also parroted the talking points set out by the Private Defendants and adopted by the Federal Defendants, namely that Khalil was targeted based on the false accusation of terrorism. The statement also warned that more arrests would follow:

> ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the Campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity . . . We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again.[80]

276.    Also that day, the White House mocked Khalil by posting on X, "SHALOM, MAHMOUD," and quoted Trump's statement from that day.[81]



---

[80]    Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

[81]    The White House (@WhiteHouse), X (Mar. 10, 2025), https://x.com/WhiteHouse/status/1899151926777749618 [https://perma.cc/T9JS-AR4W].

277.    Also that day, in a now-deleted X post, Defendant Betar again boasted of its role in the conspiracy: "When Betar takes action, results follow. We exposed Mahmoud Khalil, the leader of the pro-Hamas rallies at Columbia University, and made sure the authorities knew exactly who he was. The result? ICE detained and is deporting him."[82]

278.    The post went on to announce the sale of "Shalom, Mahmoud" T-shirts, available for purchase on Betar's website–just hours after the White House's "Shalom, Mahmoud" post.



279.    Officials at DOJ, headed today by Defendant Blanche, also articulated anti-Palestinian animus and echoed the plan to use Khalil's detention to sow fear. Leo Terrell, head of the DOJ's Task Force to Combat Anti-Semitism, stated in a March 10, 2025 post that Mr. Khalil's arrest "is the beginning of a series of victories." Terrell added, "This arrest of this individual is an indication and should serve as a deterrent. The Trump administration is not going to allow individuals on a student visa with a green card to commit antisemitic behavior on our college campuses."

---

[82]    Betar    Worldwide    (@Betar_USA),    X    (Mar.    10,    2025), https://x.com/Betar_USA/status/1899277415492227080 [https://perma.cc/2SHA-365E].

280.    Also on March 10, 2025, Canary Mission posted on X, "We are delighted that our exposure of Mahmoud Khalil's hatred has led to such deserved consequences. We have more @Columbia news on its way…"[83] This ominous post came just before other arrests of other Columbia University students.



281.    On March 13, DHS Spokesperson Troy Edgar stated that Mr. Khalil was arrested because "he's put himself in the middle of the process of basically pro-Palestinian activity." In so doing, he, like the other Federal Defendants, parroted the Project Esther Blueprint, which sought to suggest that being "pro-Palestinian" was punishable by the state.

[83]    Canary    Mission    (@canarymission),    X    (Mar.    10,    2025), https://x.com/canarymission/status/1899180339186294804 [https://perma.cc/2RWT-CYJE].

282.    Also on March 13, in response to a posting on X from an individual asking "Do you support the deportation of Mahmoud Khalil?" the Project Esther Taskforce boasted: "That's going to be a yes from us, dog."[84]

283.    On March 15, Defendant Coates stated in an interview on Fox News that Mr. Khalil, "the one that's being deported, he's the worst of the worst."[85] Defendant Heritage Foundation posted a clip of the interview on X, describing Khalil as a "pro-Hamas protestor[]."[86]



284.    On March 19, Defendant Betar posted on X, "Mahmoud Khalil came to America as a visitor and created hate on campus. What the hell gives a middle eastern [sic] the right to come to NY and make demands on an American university? He must go! Now!"[87] The post reveals

[84]    NTFCA    (@FightAntiSemite),    X    (Mar.    13,    2025), https://x.com/FightAntiSemite/status/1900342982265421887 [https://perma.cc/36CU-ZELE].

[85]    Heritage    Foundation    (@Heritage),    X    (Mar.    15,    2025), https://x.com/Heritage/status/1900940862198087976 [https://perma.cc/LGW7-8WP7].

[86]    Id.

[87]    Betar    Worldwide    (@Betar_USA),    X    (Mar.    19,    2025), https://x.com/Betar_USA/status/1902348902138777633 [https://perma.cc/6J9Q-3HGU].

Betar's racist and supremacist worldview, in which "a middle eastern" has no right to expression or political opinion contrary to the policy of the U.S. or Israel.

285.    On March 24, 2025, Defendant Canary Mission posted an entry about Mr. Khalil on a webpage entitled "Uncovering Foreign Nationals Who Could Qualify Under Trump's Executive Order" describing him as having "participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition."

286.    Between April 5-7, 2025, Defendant Betar again admitted its central role in the conspiracy to deprive Mr. Khalil ("a middle eastern") of his constitutional right "to make a demand on an American University," by stating on its website that it was "working to deport" Mr. Khalil because "he led activities aligned with Hamas during pro-Palestinian protests."



287.   That same day, on April 11, 2025, Defendant Noem parroted the smearing of Khalil's advocacy as support for terrorism in a post on X:



4.   **The Assigned Immigration Judge Finds Mr. Khalil Removable Based on the Rubio Determination, and an Independent Federal Judge Orders Mr. Khalil Released from Immigration Detention Because the Rubio Determination is Likely Unconstitutional.**

288.   Also on April 11, 2025, Acting Chief Immigration Judge Jamee E. Comans ("the IJ" or "IJ Comans") found Mr. Khalil removable as a result of the Rubio Determination.

289.   The IJ is an officer who was then answerable to Attorney General Pam Bondi, and who reporting would later suggest was specifically selected by DOJ to preside over Mahmoud's case, and who engaged in inappropriate collaboration with current members of the BIA. She found Mr. Khalil removable just forty-eight hours after the Rubio Determination was filed in immigration court, intentionally leaving Mr. Khalil defenseless to mount a substantive challenge to the Rubio Determination. This was the first of a series of irregular, unethical, or otherwise corrupt actions taken by immigration judges, described further below, to dispense of regular agency procedure and due process, and effectuate the conspiracy's ultimate goal to leverage their plenary power over the immigration system to deport Mr. Khalil.

290.     On April 14, Defendant Miller stated in a Fox News interview, in response to a question about whether Khalil would be deported:

> Yes, he will. As will anyone who preaches hate for America. His organization said they wanted to eradicate Western civilization . . . . Under this Administration . . . people who hate America, who threaten our citizens, who rape, who murder, and support those who rape and murder are going to be ejected from this country.

291.     While in detention, Mr. Khalil missed the birth of his child, which was an excruciatingly painful and traumatizing event for him and his family. Rather than being at his wife's side during the birth of their first child, he was forced to listen to his wife's cries on a telephone line in a room crammed with 70 other men. The trauma of that experience, on top of the other pain of detention and family separation, is lasting.

292.     Six weeks later, on June 11, a federal judge in the District of New Jersey presiding over Mr. Khalil's habeas petition and motion for preliminary injunction found that his detention was presumptively unconstitutional as the Rubio Determination averring without any factual support that Mr. Khalil's speech was "adverse to the foreign policy interests of the United States" was void for vagueness. *Khalil v. Trump*, 786 F. Supp. 3d 871, 877 n.7 (D.N.J. 2025), *vacated on jurisdictional grounds*, 164 F.4th 259 (3d Cir. 2026), *reh'g denied*, Nos. 25-2162 & 25-2357, 2026 WL 1453191 (3d Cir. May 22, 2026).

293.     On June 20, the federal judge ordered that Mr. Khalil must be released on bail pending resolution of his habeas petition, after Mr. Khalil challenged his detention as retaliation for his protected speech in support of Palestinians, and as part of an unconstitutional policy.

294.     On June 23, Federal Defendants appealed the district court's decision in Mr. Khalil's habeas case to the Third Circuit. On January 15, 2026, the Third Circuit reversed the District Court's decision, ruling only that the District Court lacked subject matter jurisdiction, and

83

did not address the merits of Mr. Khalil's case. On May 22, 2026, the Third Circuit denied Mr. Khalil's petition for rehearing en banc, by a 6-5 vote.

295.    Despite the findings of the federal court in Mr. Khalil's case—and in nearly every other case brought by individuals targeted by the conspiracy—that his detention was unconstitutional, the conspirators achieved much of what they intended by their repressive scheme. As nearly a dozen declarants in Mr. Khalil's habeas case attested (albeit anonymously given their fears of retribution) Mr. Khalil's arrest produced a terrifying climate of fear, repression, and panic among students and faculty alike. It scared many foreign students from attending classes, limited their social media engagement, and caused them to forgo returning home out of fear of being arrested upon their return to the United States; it has also prevented non-citizen students and faculty from speaking about Israel's military assault in Gaza and attending academic conferences on the same. Even Columbia University leadership began censoring their comments lest they invite more retribution by the conspiratorial actors.

296.    A number of Jewish students, who described Mr. Khalil as a thoughtful and caring person who has never expressed an iota of antisemitism, expressed fear and resentment that the conspirators' leveraging of the false cudgel of antisemitism to arrest and deport non-citizens like Mr. Khalil has produced confusion, strife, and fear on campus, and transformed a climate of learning into one of repression and fear.

297.    As a result of the conspiracy to deprive Mr. Khalil of his rights and to target him because of his Palestinian identity, he spent 104 days in detention, more than 1,300 miles from his family and legal team, and continues to be subject to sham immigration proceedings, directed by Defendant Blanche, that are ensuring his removal is fore-ordained regardless of evidence, law, and the Constitution and in violation of agency regulations and elementary due process principles.

84

298.     Defendants' targeting of Mr. Khalil has damaged his reputation, cost him professional opportunities, chilled his and others' speech, and marked him and his family as targets for attack. And, as a result of the predetermined immigration court outcomes directed by Federal Defendants, he faces an imminent risk of deportation away from his family and life and to countries where he fears severe persecution.

**B.     Other Palestinians and Their Supporters are Similarly Targeted by the Conspiracy**

**1.     March 7, 2025 Attempted Arrest of Columbia Student Ranjani Srinivasan**

299.     Ranjani Srinivasan is an Indian national who was pursuing a Ph.D. from Columbia University while on a student visa. Srinivasan had also participated in student protests at Columbia against the University's and United States' support for Israel's subjugation of and genocide against Palestinians.

300.     On March 5, 2025, Srinivasan received an email from the U.S. Consulate in Chennai, India informing them that their visa had been revoked and that "information had come to light" that may make them ineligible for a visa. Upon information and belief, Defendant Rubio and/or Defendant Armstrong had revoked Srinivasan's visa.

301.     On March 7, 2025 at their Columbia University student housing, Srinivasan was approached by ICE agents who sought to arrest them, but, because the ICE agents did not have a warrant, Srinivasan's housemate did not let them in.

302.     That same day, the Project Esther Taskforce posted a news article on X about an unnamed student, likely Srinivasan, whose visa was revoked because of their alleged ties to

85

"Hamas-supporting disruptions" on campus: "It's about time! Good to see @Heritage 's Project Esther recommendations coming to fruition."[88]



303.    The next night, on March 8, 2025, the day that Mr. Khalil was arrested, ICE agents again came to Srinivasan's home to arrest them. The agents communicated with their roommate. Srinivasan was not at home.

304.    Days later, on March 11, 2025, Srinivasan made the difficult decision to flee the United States to avoid being imprisoned based on their association with protests supportive of Palestinians.

305.    On March 14, 2025, DHS released a statement celebrating Srinivasan's departure. The statement contained a quote from Defendant Noem stating, "It is a privilege to be granted a visa to live and study in the United States of America. When you advocate for violence and

---

[88]    NTFCA    (@FightAntiSemite),    X    (Mar.    7,    2025), https://x.com/FightAntiSemite/status/1898040182957351319 [https://perma.cc/M62E-VY28].

terrorism that privilege should be revoked, and you should not be in this country. I am glad to see one of the Columbia University terrorist sympathizers use the CBP Home app to self-deport."[89]

306.    That same day, Defendant Noem posted that same statement on X, along with a video of what appears to be Srinivasan at an airport.[90]

307.    Between at least April 5 and 9, Defendant Betar published a photo on its website of Srinivasan, admitting that it was "working to deport" Srinivasan for "supporting Hamas activities 'violence and terrorism' [sic] advocacy; tied to protests."

### 2.    March 9, 2025 Attempted Arrest of Columbia Student Yunseo Chung

308.    Yunseo Chung is an LPR and Columbia University student who had participated in protests against the University's and United States' support for Israel's subjugation of and genocide against Palestinians.

309.    On March 6, 2025, HSI issued an ROA for Chung. The relevant information contained in the ROA was her arrest at a protest on March 5, 2025 at Barnard College's Milstein Library. That same evening, the ROA was referred by NSD to DOS.

310.    In an Action Memo dated March 8, Defendant Armstrong recommended to Defendant Rubio that he find Chung removable, relying solely on the ROA and the memo from NSD.

311.    As in the case of Mr. Khalil, the memo received by Defendant Rubio confirmed that there was no basis to remove Chung due to any links or material support of terrorism. Defendant Armstrong acknowledged that "DHS has not identified any alternative grounds of

---

[89]    Press Release, U.S. Dep't of Homeland Sec., VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport (Mar. 14, 2025), https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and.

[90]    Secretary Kristi Noem (@Sec_Noem), X (Mar. 14, 2025), https://x.com/Sec_Noem/status/1900562292849326488 [https://perma.cc/6LTR-H3LK].

removability . . . including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity."

312. In that memo, Defendant Armstrong recognized that "Chung . . . [is] likely to challenge [her] removal under this authority, and courts may scrutinize the basis for these determinations."

313. Nevertheless, that same day, Defendant Rubio made a determination that Chung was removable, because she had "participat[ed] . . . in antisemitic protests and disruptive activities . . . ."

314. Despite Defendant Armstrong's internal acknowledgement that DHS had not identified any terrorism-related bases for removability, DHS asserted publicly that Chung had been arrested at a "pro-Hamas protest."

315. On March 9, 2025, the day after Mr. Khalil's arrest, Chung's attorney was informed that "due to the situation with the protesting" DHS could revoke her LPR status.

316. On March 10, an AUSA explained to another of Chung's attorneys that the Secretary of State had revoked Chung's visa. Her attorney explained that Chung was not present in the United States on a visa, as she is an LPR.

317. On March 25, her attorneys filed and obtained from federal court a temporary restraining order prohibiting ICE from detaining Chung, on the ground that she was likely to succeed on a claim that any ICE detention would constitute retaliation for her protected speech in support of Palestinians, and as part of an unconstitutional policy. *Chung v. Trump*, No. 25-cv-02412 (S.D.N.Y Mar. 25, 2025), ECF No. 19. And on June 5, 2025, the court issued a preliminary injunction prohibiting ICE from detaining, arresting, or transferring her. *Id.*, ECF No. 57.

318. Between at least April 5 and 7, Defendant Betar published a photo of Chung on its website, admitting that it was "working to deport her" because of "her arrest at a Barnard College protest on March 5, 2025, and that "DHS called her conduct 'concerning.'"

319. As of at least April 27, 2025, Chung's profile was featured on Defendant Canary Mission's blacklist. Her profile states she was arrested at a "pro-Hamas rally."

### 3. March 13, 2025 Arrest of Leqaa Kordia

320. Leqaa Kordia is a Muslim Palestinian who grew up in East Jerusalem, the West Bank, before coming to the United States in 2016.

321. Though not a Columbia student herself, Kordia was arrested at a protest at Columbia University in April 2024 against the University's and United States' support for Israel's subjugation of Palestinians, including Israel's genocide in Gaza, which had killed more than 200 members of her family.

322. On March 13, 2025, she was arrested by ICE in Newark, almost one year after her involvement in the student protest at Columbia. She was transferred to an immigration jail in Texas and incarcerated 1,500 miles from her family.

323. Between at least April 5 and 7, Defendant Betar admitted on its website that it was "working to deport" Kordia because "her student visa had already expired in January 2022 due to lack of attendance, and ICE targeted her for her pro-Hamas protest involvement from 2024."

324. DHS stated publicly that she had "actively participated in anti-American, pro-terrorist activities on campus," but that "her arrest had nothing to do with her radical activities."

325. On February 6, 2026, Kordia was hospitalized after suffering her first-ever seizure. This was attributable to the stress of her detention and the terrible conditions of her confinement. ICE insisted on handcuffing Kordia at all times during her hospitalization.

326.    Kordia was released on bond on March 16, 2026 by an immigration judge, over a year after her arrest.

**4.    March 14, 2025 Attempted Arrest of Cornell Student Momodou Taal**

327.    Momodou Taal, who is Muslim, is a former Ph.D. student at Cornell University, and had been active in student protests against U.S. support for Israel's subjugation of Palestinians.

328.    As early as September 24, 2024, Defendant Canary Mission had foreshadowed that ICE would target him, stating in an X post that a "leading anti-Israel protester @Cornell is from the UK & he's getting deported."[91]

329.    As early as November 23, 2024, public reporting indicated that Taal was among the pre-selected individuals on Defendant Betar's list which it had shared with the incoming Trump Administration.

330.    On February 20, 2025, Defendant Canary Mission again posted about Taal, claiming that he led an "illegal pro-Hamas encampment."[92]

331.    On March 13, 2025, Defendant Betar posted on X "Deport Alert: Momodou Taal," falsely claiming that he had "praised the Hamas attacks" on October 7.[93]

332.    On March 14, the very next day, ICE sought DOS's determination as to whether he should be deported.

333.    That same day, DOS determined that his visa should be revoked under Section 221(i) of the INA. The basis for Taal's visa revocation was that he "had been involved with disruptive protests."

---

[91]    Canary    Mission    (@canarymission),    X    (Sept.    24,    2024), https://x.com/canarymission/status/1838601788234100923 [https://perma.cc/353C-N7US].
[92]    Canary    Mission    (@canarymission),    X    (Feb.    20,    2025), https://x.com/canarymission/status/1892635336120971311 [https://perma.cc/C25W-7BNX].
[93]    Betar    Worldwide    (@Betar_USA),    X    (Mar.    13,    2025), https://x.com/Betar_USA/status/1900194755050434943 [https://perma.cc/F9KE-NRUZ].

334.    DOS revoked Taal's visa immediately.

335.    Also on March 14, according to one official at ICE, ICE began "attempt[ing] to locate Taal in the Ithaca, New York area to perform a civil arrest."

336.    Although neither Taal nor his attorneys knew at the time that his visa had been revoked or that the Federal Defendants' agents were seeking to arrest him, on March 15, Taal filed a lawsuit to enjoin the enforcement of Trump's January 20 and January 29 executive orders, which threatened adverse immigration enforcement against Palestinians or their supporters.

337.    On March 21, attorneys from DOJ emailed counsel for Taal, informing counsel that ICE intended to arrest and detain Taal, and inviting Taal to surrender to ICE's HSI.

338.    The next day, on March 22, Canary Mission posted, "**BREAKING:** Anti-U.S, pro-Hamas @Cornell student Mamadou Taal ordered to 'Report to ICE.'"[94]

339.    On March 24, 2025, Defendant Canary Mission posted an entry about Taal on a webpage entitled "Uncovering Foreign Nationals Who Could Qualify Under Trump's Executive Order" stating that he "has called for Israel's destruction, expressed support for Hamas terrorism, glorified a domestic terrorist and spread hatred of Israel and America." Mr. Khalil and Mohsen Mahdawi also appear on this same list.

340.    On April 30, 2025, DHS stated publicly that Taal was "unapologetic in his pro-terrorist views" and that he had participated in "pro-Hamas protests on campus."

341.    So as to avoid being incarcerated for his support of Palestinians, Taal chose to flee the United States on March 31, 2025.

342.    Between at least April 5 and 9, Defendant Betar published a photo of Taal on its website, admitting that "Betar is working on deporting him" because of "Pro-Palestinian posts on

---

[94]    Canary    Mission    (@canarymission),    X    (Mar.    22,    2025), https://x.com/canarymission/status/1903518836155957293 [https://perma.cc/9AWP-N25Q].

X, including 'glory to the resistance,'" using the phrase "pro-Palestinian" as though it were a derogatory term.

### 5.    March 17, 2025 Arrest of Dr. Badar Khan Suri

343.    Dr. Badar Khan Suri is Muslim and an Indian national in the United States on a J-1 visa. He is a postdoctoral fellow at Georgetown University and has made some social media posts expressing support for the Palestinian people and against Israel's subjugation of Palestinians.

344.    His wife Mapheze Saleh, a U.S. citizen of Palestinian origin, has also posted on social media expressing support for the Palestinian people, especially after several of her family members had been killed by Israel in its genocide in Gaza.

345.    Beginning in February and March 2025, the couple was subjected to a vicious smear campaign by Defendant Canary Mission as well as other anti-Palestinian groups.

346.    Defendant Canary Mission pointed to a handful of Dr. Khan Suri's social media posts criticizing Israel's subjugation of Palestinians, claiming that he "expressed support for Hamas terrorism." It also pointed to the fact that, before Dr. Khan Suri married his wife in 2013, his wife's father was an advisor to the government of Gaza between 2006 and 2010.

347.    On March 10, HSI issued an ROA for Dr. Khan Suri, stating that "Khan Suri actively spread Hamas propaganda and promotes anti-Semitism on social media," based on third-party allegations that were not verified by DHS.

348.    On March 14, NSD at DHS referred Dr. Khan Suri's name, with the ROA attached, to the Bureau of Consular Affairs at DOS.

349.    The next day, on March 15, Defendant John Armstrong at the Bureau of Consular Affairs recommended that Defendant Rubio find Dr. Khan Suri deportable.

350.    In his Action Memo, Defendant Armstrong warned: "Given the [determination's] reliance on Suri's public statements as an academic, and the potential that a court may consider

92

his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Suri to do the same."

351.   That same day, echoing the language from Defendant Canary Mission, Defendant Rubio made a determination that Dr. Khan Suri was deportable under INA § 237(a)(4)(C) because, "Suri's direct connection to Hamas leadership and involvement in antisemitic activities . . . [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization," and that Dr. Khan Suri is "actively supporting Hamas terrorism," and "actively spreads its propaganda and promotes antisemitism on social media."

352.   On March 17, Dr. Khan Suri was arrested by plain clothed federal agents as he was returning home from breaking his fast during Ramadan.

353.   He was transferred to an immigration jail in Texas and imprisoned over 1,300 miles from his wife and his three young children.

354.   On March 19, Tricia McLaughlin, a DHS spokesperson, stated that Dr. Khan Suri was "actively spreading Hamas propaganda and promoting antisemitism on social media. Suri has close connections to a known or suspected terrorist, who is a senior advisor to Hamas."[95]

355.   Similarly, between April 5 and 7, Defendant Betar published a photo of Dr. Khan Suri on its website, admitting that Betar was "working to deport him" because "he spread Hamas propaganda and had ties to a senior Hamas advisor (via his wife)."

356.   On May 14, 2025, a federal judge ordered Dr. Khan Suri released pending resolution of his habeas petition, finding that his arrest and detention was likely in violation of his First Amendment rights.

---

[95]   Tricia   McLaughlin   (@TriciaOhio),   X   (Mar.   19,   2025),
https://x.com/TriciaOhio/status/190252467291966261 [https://perma.cc/2GVG-S5SL].

### 6.    March 25, 2025 Arrest of Dr. Rümeysa Öztürk

357.    Dr. Rümeysa Öztürk is Muslim and a Turkish national who studied in the United States on an F-1 student visa. She was a Ph.D. student at Tufts University in child study and human development and completed her doctorate degree in February 2026.

358.    In March 2024, she co-authored an op-ed in a school paper, *The Tufts Daily*, criticizing the University's dismissive response to three resolutions that were passed by the student Senate criticizing Israel's subjugation of Palestinians. The resolutions included a demand that Tufts disclose its investments and divest from companies with ties to Israel.

359.    Nearly one year later, in or around February 2025, after the Trump Administration took office, Defendant Canary Mission created a profile of Dr. Öztürk stating that she engaged in "anti-Israel activism" and that she is a "supporter of the Boycott, Divestment, and Sanctions (BDS) movement," basing this assessment only on the March 2024 op-ed.

360.    On March 17, 2025, HSI issued an ROA on Dr. Öztürk. It attached the February 6, 2025 Canary Mission post that described her as having "engaged in anti-Israel activism in March 2024" and as "a supporter of the [BDS] movement."

361.    Again, the only basis for that assessment was the March 2024 op-ed referenced by Defendant Canary Mission. That op-ed was also attached to the ROA.

362.    On March 21, NSD at DHS referred her name, with the ROA attached, to the DOS Bureau of Consular Affairs and made representations about her activities based on the claims by Defendant Canary Mission, without further vetting those claims.

363.    That same day, Defendant Armstrong himself approved the revocation of her visa under INA § 221(i) based on her "actions of protesting Tufts' relationship with Israel" and "her activities and associations."

94

364.    In a memo provided to Defendant Armstrong dated March 21, 2025, Deputy Assistant Secretary for Visa Services Stuart Wilson found that DHS provided no evidence that Dr. Öztürk had engaged in "antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally," and that DHS did not "establish any potential ineligibility" for Dr. Öztürk. In addition, the memo stated, "DHS did not identify any alternative grounds of removability that would be applicable to [Dr. Öztürk], including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity."

365.    Nevertheless, Wilson noted that Armstrong could utilize the discretion afforded to him to revoke her visa based on the "totality of the circumstances."

366.    On March 25, Dr. Öztürk was accosted on the street on her way to an iftar and arrested by six plain-clothed, masked ICE agents and transferred to an immigration jail in Louisiana, over 1,000 miles from home.



*Dr. Öztürk's Arrest by masked ICE agents. Video credit: Associated Press (@AssociatedPress), YouTube (Mar. 27, 2025), https://www.youtube.com/shorts/oRiQz7mOY6A.*

367.    At the trial in *AAUP*, an ICE agent testified that senior officials at the agency pressured them to quickly arrest her in an unusual manner: "We did, we prioritized it. . . . [L]ike I said, I can't recall a time that it's come top-down like this with a [v]isa revocation . . . . under my purview anyway. And so with the superiors that were . . . inquiring about this, it made it a priority, because we worked for them."

368.    On March 27, Defendant Canary Mission boasted on its X account that "sources point to Canary Mission as primary cause" of her arrest,[96] although the fact that the ROA and subsequent decisions were based on Defendant Canary Mission was not publicly known at that time.

369.    On March 28, Defendant Rubio acknowledged that Dr. Öztürk was targeted because of her political beliefs. He said about her case, "[t]he activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States."

370.    Defendant Betar admitted that it, too, was involved in punishing Dr. Öztürk when, between April 5 and 7, it posted a photo of her on its website, admitting that "Betar is working on deporting her" because "[s]he engaged in activities supporting Hamas Propaganda. Co-authoring an Op-ed where she endorses Hamas."

371.    A federal court ordered Dr. Öztürk's release on May 9, 2025, pending resolution of her habeas petition and concluded in a subsequent opinion that "Ms. Öztürk has presented, at the very least, a substantial claim of a First Amendment violation" related to her speech in support of Palestinians.[97]

---

[96]    Canary    Mission    (@canarymission),    X    (Mar.    27,    2025), https://x.com/canarymission/status/1905262753264046392 [https://perma.cc/K7C8-CMDL].
[97]    *Ozturk*, 783 F. Supp. 3d at 810.

372. In February 2026, an immigration judge terminated Dr. Öztürk's removal proceedings, finding that DHS lacked legal grounds to deport her.

373. On April 10, 2026, after Defendant Blanche took office as head of the DOJ, the immigration judge who terminated her removal proceedings, who was under the direction of Defendant Blanche, was fired.

### 7. April 14, 2025 Arrest of Columbia Student Mohsen Mahdawi

374. Mohsen Mahdawi is a Palestinian and lawful permanent resident of the United States. He was an undergraduate student at Columbia University and had participated in protests against Israel's subjugation of Palestinians and the U.S. and University's support for it.

375. On January 30, 2025, Defendant Canary Mission published a report accusing Mahdawi, among over 300 others, of "promoting Hamas ideology at Columbia" because he "[s]upported, participated in or spoke at the Columbia [student] encampment."

376. Also on January 30, Defendant Betar posted on X: "jihadi visa holder Mohsen Mahdawi is on our deport list. He is a Jew-hater who has called for Israel's destruction and supports Hxmas [sic] terror and celebrated a terrorist who had murdered dozens of Israeli Jews in 1978. @ice will get him out soon. You heard it here."[98] Like Defendant Canary Mission, Defendant Betar proffered no support for its false claim that Mahdawi "supports [Hamas] terror."

377. On February 11, Mahdawi's name was reported to be on a list of students that Defendant Betar had pre-selected for targeting and given to the Trump Administration, alongside Mr. Khalil's and Momodou Taal's.

---

[98]    Betar    Worldwide    (@Betar_USA),    X    (Jan.    30,    2025), https://x.com/Betar_USA/status/1885168448424042922 [https://perma.cc/23RP-VFEW].

378.   On March 10, Defendant Betar posted on X: "We confirm we have provided additional information on columbia student Mohawk [sic] Mahdawi to @ICEgov[.]  We believe this bastard will be sent out of America soon!"[99]

379.   Also on March 10, Defendant Canary Mission announced "Breaking: After Mahmoud Khalil's green card was revoked. . . Canary Mission can reveal FIVE MORE SUSPECTED FOREIGN NATIONALS linked to campus extremism @Columbia," identified Mahdawi as "#2 Featured in the video - Mohsen Mahdawi," and linked to his Canary Mission profile.[100] The video described, among other activities, that Mahdawi was active in Columbia's student encampment and served as co-President of Columbia's Palestinian Student Union.



---

[99]   Betar Worldwide (@Betar_USA), X (Mar. 10, 2025), https://x.com/Betar_USA/status/1899301402851102776 [https://perma.cc/XS6H-DFXP].

[100]   Canary Mission (@canarymission), X (Mar. 10, 2025), https://x.com/canarymission/status/1899181644948582655 [https://perma.cc/57BC-TH7D]; *see also* Canary Mission (@canarymission), X (Mar. 10, 2025), https://x.com/canarymission/status/1899242519030108631.

380.    By March 12, within two days of these boasts by Defendants Betar and Canary Mission, HSI issued an ROA for Mahdawi including tweets echoing the language supplied by Defendants Betar and Canary Mission that he was an "organizer of pro-Hamas rallies."

381.    Within two days of HSI's issuance of an ROA for Mahdawi, and despite the ROA not being publicly available at the time, on March 14, Defendant Betar posted ominously on X: "Mohsen Mahdawi is next and also on the deport list."[101]



382.    That same day, Andre Watson at DHS sent a memo to the Bureau of Consular Affairs at DOS, with an ROA of Mahdawi attached, asking that it determine whether Mahdawi

---

[101]    Betar    Worldwide    (@Betar_USA),    X    (Mar.    14,    2025), https://x.com/Betar_USA/status/1900611049637724488 [https://perma.cc/RN2T-MJ7Q].

should be found removable, largely because his "involvement in disruptive protests at Columbia University align with the executive orders' focus on deporting 'Hamas sympathizers.'"

383. Based on the memo and ROA, the next day, on March 15, Defendant Armstrong recommended that Defendant Rubio find Mahdawi removable. He stated in the Action Memo, "Given the potential that a court may consider [Mahdawi's] actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Mahdawi to do the same."

384. That same day, and parroting the language of Defendants Canary Mission and Betar, Defendant Rubio made the determination that Mahdawi was removable under INA § 237(a)(4)(C) because, "through his leadership and involvement in disruptive protests at Columbia University, [he] has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction."

385. Thus, within two days of Defendants Betar and Canary Mission predicting Mahdawi's arrest, HSI had issued an ROA on him. And within two days of Defendant Betar's statement that "Mahdawi is next" for deportation, three offices at two separate agencies initiated the process to arrest, detain, and deport Mahdawi.

386. On March 20, 2025, Defendant Betar once again posted "Mohsen Mahdawi is next and also on the deport list."[102]

387. On March 24, Defendant Canary Mission posted an entry about Mahdawi on a webpage entitled "Uncovering Foreign Nationals Who Could Qualify Under Trump's Executive Order" in which it stated "Mahdawi has been entered into a U.S. government deportation

---

[102] Betar Worldwide (@Betar_USA), X (Mar. 20, 2025), https://x.com/Betar_USA/status/1902752328417173839 [https://perma.cc/72AJ-R32E].

database," citing to a news article quoting Betar USA stating, "Here are some of the names Betar submitted to the Trump administration."

388. On March 27, Mahdawi received a notification from the USCIS portal that his naturalization interview had been scheduled for April 14, 2025 in Colchester, Vermont.

389. Then, between April 5 and 7, Defendant Betar posted a photo of him on his website, admitting that "Betar is working on deporting him" because he "[o]rganized 'pro-Hamas rallies' and justified the October 7, 2023, attack on *60 Minutes."



390. On April 14, 2025, masked ICE agents arrested Mahdawi after he was summoned to the U.S. Citizenship and Immigration Services office in Colchester, Vermont, purportedly for an interview as part of his pending naturalization process.

391. In a public statement issued on April 30, DHS stated that, "Like many other anti-Israel student protestors . . . [Mahdawi's] rhetoric on the war in Israel proves his terrorist

sympathies" and that he "organized and led pro-Hamas protests on Columbia University's campus, harassed Jewish students, and openly displayed his support for a terrorist organization."

392.    However, despite Defendants' public statements smearing Mahdawi as a terrorist, the Action Memo sent by Defendant Armstrong to Defendant Rubio stated, "DHS . . . has not identified any alternative grounds of removability applicable to Mahdawi, including any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity" and made clear that there was no evidence of links to terrorism.

393.    Following the pattern DHS used with Mr. Khalil and other targets of the conspiracy, ICE sought to transfer Mahdawi to a detention facility in Louisiana. ICE was unsuccessful because his attorneys, on notice of DHS's practices, immediately filed a habeas petition, and a federal court issued a temporary restraining order preventing his transfer that same day.

394.    A federal court ordered his release on April 30, 2025, pending resolution of his habeas petition, concluding that he had raised "a 'substantial claim' of First Amendment retaliation" for his speech in support of Palestinians and that "[o]ur nation has seen times like this before, especially during the Red Scare and Palmer Raids of 1919–1920 that led to the deportation of hundreds of people suspected of anarchist or communist views." *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 231, 233 (D. Vt. 2025), *appeal filed*, No. 25-1113 (2d Cir. May 1, 2025).

395.    In February 2026, an immigration judge terminated Mahdawi's deportation proceedings, finding that DHS had not met its burden of proving by clear and convincing evidence that he could be removed from the United States.

396.    On April 10, 2026, after Defendant Blanche took office as acting head of DOJ, the immigration judge who terminated his removal proceedings, who was under the direction of Defendant Blanche, was fired.

397. On April 29, 2026, the BIA reinstated deportation proceedings against Mahdawi. The proceedings will be overseen by a different immigration judge.

**8.      May 7, 2025 Arrest of Hampshire College Student Efe Ercelik**

398. Efe Ercelik was an undergraduate student at Hampshire College and a non-citizen on an F-1 visa. He was formerly a University of Massachusetts-Amherst student and had participated in student protests against Israel's subjugation of Palestinians.

399. On April 9, 2025, an official at DOS sent a memo to ICE stating that Ercelik's visa had been revoked because his purported "involvement in antisemitic activities, his hateful rhetoric against Jewish students, and his violent attack of [a] Jewish student on campus may indicate support for a designated terrorist organization and undermine U.S. foreign policy by creating a hostile environment for Jewish Students."

400. On April 13, Defendant Betar posted on X: "We identify Efe Ercelik as one here on a visa and we have submitted his name for deportation. There's so many of these bastards nationwide he's an egregious one in Massachusetts, a rotten state."[103] The post included a screenshot of a Canary Mission profile falsely identifying him as a Columbia University student.

401. Just three days later, on April 16, ICE agents arrived at the home of Efe Ercelik, attempted to arrest him, and remained stationed outside of his home, preventing him from leaving due to the imminent threat of arrest.

402. On May 7, he was arrested by ICE when he appeared in state court regarding a separate legal matter.

403. On May 8, a federal court in Massachusetts ordered Ercelik's release from ICE detention on a motion for a temporary restraining order, finding that it was likely that his arrest

---

[103]   Betar   Worldwide   (@Betar_USA),   X   (Apr.   13,   2025), https://x.com/Betar_USA/status/1911493733079474423 [https://perma.cc/HZ9K-BKEC].

was in retaliation for his First Amendment activity in support of Palestinians. *Ercelik*, 2025 WL 1361543, at *13.

404.    The federal court also found that the federal government's arrest, detention, and attempted deportation of Ercelik "seems to have been almost *exclusively triggered by Betar Worldwide*." *Id*. at *12 (emphasis added).

## VI.    THE HERITAGE FOUNDATION DEFENDANTS ALSO TAKE CREDIT FOR THE CONSPIRACY'S IMPLEMENTATION.

405.    After the Federal Defendants who were in office at the time commenced deportation proceedings, arrested, and detained Mr. Khalil and other Palestinians and their supporters, the Heritage Foundation Defendants were quick to take credit for the fruits of their seemingly successful conspiracy. In so doing, they further confirmed the existence of a plan and ratified its shared goals and outcomes.

406.    On March 7, 2025, the Project Esther Taskforce posted a news article on X about an unnamed student whose visa was revoked because of their alleged ties to "Hamas-supporting disruptions" on campus: "It's about time. Good to see @Heritage 's Project Esther recommendations coming to fruition!"[104]

407.    Then, around May 2025, following the arrests or attempted arrests of the nine non-citizen targets of the conspiracy, Defendant Greenway admitted that it was "no coincidence that we called for a series of actions to take place privately and publicly, and they are now happening."

408.    Similarly, around May 2025, Defendant Coates described the Heritage Foundation Defendants' actions as: "the phase we're in now is starting to execute some of the lines of effort

---

[104]    National Taskforce to Combat Antisemitism (@FightAntiSemite), X (Mar. 7, 2025), https://x.com/FightAntiSemite/status/1898040182957351319 [https://perma.cc/7STG-QP6J].

in terms of legislative, legal, and financial penalties for what we consider to be material support for terrorism."

409.    And, as described in greater detail above, the Betar and Canary Mission Defendants also took credit for all the arrests, with the Betar Defendants admitting that they were "involved with Project Esther."

## VII.    GROSS PROCEDURAL IRREGULARITIES ORCHESTRATED BY THE FEDERAL DEFENDANTS' ONGOING PROSECUTION OF MR. KHALIL'S IMMIGRATION CASE REPRESENT THE CONTINUATION OF THE CONSPIRACY THAT MUST BE ENJOINED.

410.    Mr. Khalil's detention and immigration proceedings reflect a perfect storm of procedural irregularity.

411.    These procedural irregularities reveal ongoing Federal Defendant involvement in the conspiracy and further demonstrate the ways in which the Federal Defendants are continuing to leverage their plenary control to corrupt the immigration process to ensure a sham procedure that will produce the conspiracy's ultimate goal—Mr. Khalil's deportation and the broader *in terrorem* effect it is designed to have toward others engaged in Palestinian rights advocacy.

### A.    Irregularities in Mr. Khalil's Arrest and Charging

412.    An HSI agent with operational oversight over Mr. Khalil's arrest, Darren McCormack, testified in *AAUP* that on or around March 7th—one day prior to the Rubio Determination issued in Mr. Khalil's case—he was instructed by HSI leadership to conduct "pattern of life" and location surveillance on Mr. Khalil, not because Mr. Khalil was under criminal or civil investigation, but because the White House (likely including Defendant Miller) and/or Defendant Rubio had a special interest in Mr. Khalil.

413.    Agent McCormack received the Rubio Determination memo the day after he began surveilling Mr. Khalil.

105

414.    Agent McCormack testified that it was outside of normal practice for HSI, instead of Enforcement and Removal Operations ("ERO"), to be effectuating the arrest, "because while Title VIII or any sort of civil, criminal or administrative enforcement is in the statutory authority of HSI agents, we historically, in the recent time, had not enforced those laws."

415.    In addition, another HSI agent, Patrick Cunningham, testified in *AAUP* that prior to this program, HSI was not generally responsible for enforcing "Title VIII"—referring to the immigration laws used to target all nine of those who were arrested pursuant to the conspiracy—and that its authority to arrest for Title VIII violations was seldom, if ever, used.

416.    In the course of his arrest, Mr. Khalil's arresting officer informed him that his "student visa" had been "revoked" by DOS—even though Mr. Khalil was an LPR and not a visa holder, a mistake that seems to have originated with Defendant Betar on January 29, 2025.

417.    When Mr. Khalil's attorney informed the arresting agents that he was an LPR and not a visa holder, the agent simply responded that Mr. Khalil's LPR status was being "revoked" too.

418.    When Mr. Khalil's wife presented a DHS agent with documents confirming Mr. Khalil's status as an LPR, the DHS agent said "he has a green card" to the individual with whom he was on the phone. Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

**B.    Pretextual New Charges and Unprecedented Efforts by DHS, Under the Direction of Defendant Noem and Later Defendant Mullin, to Continue to Detain Mr. Khalil**

419.    On March 17, 2025, two business days after Mr. Khalil amended his habeas corpus lawsuit in federal court to challenge the illegality of his detention and removal based on the Foreign Policy Ground identified in the Rubio Determination, the Federal Defendants and/or their agents

added a new, meritless pretextual allegation against him for "willfully misrepresent[ing] a material fact" on his application for adjustment of status.

420.    They added this baseless charge only after realizing that the Foreign Policy Ground charges against him were constitutionally dubious. Thus, it is clear that Federal Defendants added the charge in order to keep the goal of retribution alive in the anticipated event that a court found the speech-based removal charge impermissible.

421.    The asserted misrepresentations are falsely manufactured, obviously pretextual, and parrot claims by Private Defendants. For example, DHS accused him of failing to disclose his "membership" in UNRWA, despite it not being a membership-based organization, and Mr. Khalil never having been a member of it. Mr. Khalil completed a Columbia-sponsored internship with UNRWA as part of his graduate program, for which he received a stipend paid for by Columbia. Accordingly, he disclosed Columbia as an employer on his application.

422.    DHS also falsely claimed he failed to disclose that he was a "member" of CUAD—a coalition of campus groups that expressly had no membership—based solely on his role as a negotiator-mediator that did not begin until *after* he submitted his application for adjustment of status.

423.    Both of these accusations parrot claims made by Private Defendants. Defendant Canary Mission's January 2025 report on Columbia, which profiles Mr. Khalil, delves into the role of CUAD, accusing it of having "pro terror objectives," and by January 2025, Mr. Khalil's Canary Mission profile stated that he was a lead negotiator on behalf of CUAD. Defendant Betar similarly asserted in January 2025 that Mr. Khalil was a leader of CUAD.[105]

---

[105]    Betar    Worldwide    (@Betar_USA),    X    (Jan.    29,    2025), https://x.com/Betar_USA/status/1884797043681403225 [https://perma.cc/VFQ5-VW7Z].

424.   On March 13, 2025, just days before the post-hoc charge was added, Canary Mission posted about Mr. Khalil's "leadership role with the pro-terror group CUAD." Canary Mission also posted about his internship with UNRWA, which it described in a video as affiliated with Hamas.[106]



425.   The misrepresentation charge was obviously pretextual. Indeed, in compiling Mr. Khalil's ROA prior to his arrest, DHS expressly reviewed his adjustment of status application, and was aware of the CUAD and UNRWA facts that it later classified as having been misrepresented, yet still determined at the time of compiling his ROA that DHS could "not identif[y] any alternative

---

[106]   Canary Mission (@canarymission), X (Mar. 13, 2025), https://x.com/canarymission/status/1900271894214934631 [https://perma.cc/D4CP-FJG8]; Canary Mission (@canarymission), X (Mar. 13, 2025), https://x.com/canarymission/status/1900204396681535501 [https://perma.cc/ZNP5-8UU2].

grounds of removability [other than the Foreign Policy Ground] that would be applicable to [Khalil]."

426. In proceedings in front of the IJ, Defendant Noem's agents provided no evidence to rebut Mr. Khalil's evidence about the unreliability of the misrepresentation charge and did not ask Mr. Khalil a single question when he provided extensive, credible testimony demonstrating he made no willful, material misrepresentation.

427. Seasoned immigration practitioners have characterized the government's issuance of the post-hoc charge against Mr. Khalil as extraordinarily unusual—both in timing and substance, particularly insofar as they relate to imagined misrepresentations about student internships or clubs.

428. On June 11, 2025, a federal court preliminarily enjoined the government from seeking to remove and from detaining Mr. Khalil based on the Foreign Policy Ground.[107] Undeterred by this determination of illegality, two days later, DHS represented to the federal court that Mr. Khalil was "now detained based on" the second, post-hoc misrepresentation charge.

429. Like the second post-hoc charge itself, Mr. Khalil's detention on such a charge was highly unusual. Immigration experts confirm that LPRs are rarely, if ever, detained based solely on the types of missing information as alleged in the second post-hoc charge. As the federal judge presiding over Mr. Khalil's habeas case found, based on overwhelming and unrebutted expert testimony:

> the evidence is that lawful permanent residents are virtually never detained pending removal for the sort of alleged omissions in a lawful-permanent-resident application that the Petitioner is charged with here. And that strongly suggests that it is the Secretary of State's [Foreign Policy Ground] determination that drives the

---

[107]    *Khalil v. Trump*, 786 F. Supp. 3d at 880–81.

Petitioner's ongoing detention—not the other [misrepresentation] charge against him.[108]

### C.    Federal Defendants' Continuation of the Conspiracy Through Plenary Control and Direction of Immigration Proceedings

430.    In addition, gross, unprecedented irregularities in the adjudication of Mr. Khalil's immigration case by the immigration courts and the BIA, both of which until April 2, 2026 were under the direction and control of then-Attorney General Pam Bondi and now are under the direction and control of Defendant Blanche, further evidence that the initiation of Mr. Khalil's removal proceedings was not for any bona fide reason, but a product of the conspiracy's desire to ensure his deportation for his Palestinian identity and constitutionally-protected support of Palestinian rights, and effectuate the broader, repressive goal of silencing pro-Palestinian speech on campuses.

431.    Following his detention, Mr. Khalil was placed in removal proceedings at the LaSalle Immigration Court in Jena, Louisiana, where his case was assigned to IJ Comans. On information and belief, IJ Comans had no other cases on her docket and was hand-picked by her DOJ superiors to adjudicate Mr. Khalil's case.

432.    On April 11, 2025, just 48 hours after DHS filed the Rubio Determination in immigration court, IJ Comans orally delivered a pre-written decision finding Mr. Khalil removable as a result of the Rubio Determination. She offered this predetermined ruling absent any other evidence and after denying numerous motions filed by Mr. Khalil's attorneys seeking to develop the factual record and obtain a full and fair hearing. In addition, IJ Comans expressly stated she would not consider constitutional challenges to the obvious illegality of the speech-based Rubio Determination.

---

[108]    *Id.* at 878.

433. On May 22, 2025, Mr. Khalil appeared for a hearing before IJ Comans. Although IJ Comans scheduled the hearing to last for only two hours, when Mr. Khalil's immigration counsel indicated they had more than two hours' worth of testimony which would necessitate—as is routine in immigration proceedings—a continuance, IJ Comans insisted the hearing would have to be rushed to be completed that day. The IJ also effectively denied Mr. Khalil's attorneys a legal visit that had been ordered by the District Court that day.

434. On June 20, IJ Comans issued a written decision memorializing her April 11 oral finding of removability on the Foreign Policy Ground, relying on the Rubio Determination. She also relied on the Rubio Determination to deny Mr. Khalil a bond hearing while ignoring the relevant factors relating to an absence of danger or flight risk.

435. The IJ did this despite the June 11, 2025 Federal District Court's preliminary injunction barring DHS and the Executive Office of Immigration Review ("EOIR") from any reliance on the Rubio Determination in seeking to detain or remove Mr. Khalil. Her decision also found Mr. Khalil removable on the post-hoc claim and ignored and/or denied his applications for asylum and withholding relief, ordering him removed.

436. Also on June 20, the District Court ordered Mr. Khalil released on bail, finding that Mr. Khalil posed no risk of flight or danger to the community.

437. After Mr. Khalil submitted a motion to the IJ to reconsider her June 20 decision because it violated the District Court's injunction against relying on the unconstitutional Rubio Determination, the IJ denied the motion without analysis.

438. After the District Court issued another decision clarifying the meaning of its June 11 injunction to ensure the IJ could not rely upon the presumptively unconstitutional Foreign Policy Ground, the IJ reopened proceedings. She subsequently issued an order vacating her finding

111

that Mr. Khalil was removable on the Foreign Policy Ground in a decision that contained highly unusual footnotes criticizing the District Court order.

439.    On September 12, the IJ issued an amended decision denying Mr. Khalil's request for a waiver of removability on the pretextual misrepresentation charge—waivers that multiple experts have attested are routinely granted to non-citizens who, like Mr. Khalil, have U.S. citizen immediate family members and no criminal history. Her ruling also declined to follow binding BIA precedent instructing that someone in Mr. Khalil's position—a lawful permanent resident with strong family ties—be eligible for the waiver he sought.

440.    The IJ also refused to provide Mr. Khalil an evidentiary hearing (which is similarly required by statute and regulation), and again, ordered him removed.

441.    She also denied the request to hold a hearing on Mr. Khalil's request to transfer venue for his case to the non-detained docket of the New York Immigration Court, which would have been the ordinary course given Mr. Khalil's residency there.

442.    By refusing to transfer venue, IJ Comans ensured that any order of removal would be reviewed by the Fifth Circuit Court of Appeals, which almost never grants stays of removal pending review, and not the Second Circuit Court of Appeals in which stays pending review are available. This was designed to allow the Federal Defendants to ensure Mr. Khalil's expulsion from the United States before IJ Coman's blatantly unconstitutional pre-ordained deportation order could be reviewed by a federal court.

443.    Reporting that has emerged since the conclusion of Mr. Khalil's removal proceedings strongly suggests that several members of the BIA interfered with IJ Coman's decision by reviewing it or authoring it in part.[109]

---

[109]    Jonah E. Bromwich & Nicholas Nehamas, *Mahmoud Khalil Hurtles Toward Potential Deportation as U.S. Speeds Case*, N.Y. Times (May 8, 2026),

444.    Just two months after ordering Mr. Khalil removed, IJ Comans was promoted to acting Assistant Director of the Office of Policy at EOIR.

445.    In striking contrast, two IJs who ruled *against* the Federal Defendants' attempt to effectuate their conspiracy against two other targets, Mahdawi and Dr. Öztürk, and ruled that those two individuals were not removable, were summarily terminated by the Trump Administration just a week after Defendant Blanche, who exercises supervisory authority and control over those IJs, took office as acting Attorney General.

446.    DOJ's actions to reward IJ Comans for punishing Mr. Khalil, and to punish the other IJs who went against its expected commands to remove other subjects of the conspiracy, is prime evidence that individuals at DOJ, and in particular Defendant Blanche, sought to control the outcome of an ultimately sham immigration process and ensure the conspiracy's aims would be carried out.

**D.    Abandonment of Agency Procedure, Obvious Conflicts of Interest and Abandonment of Elementary Due Process by the BIA, Under the Direction of Defendant Blanche, to Effectuate the Conspiracy's Ultimate Unlawful Aims**

447.    The BIA decision-making, all under the command and control of Defendant Blanche, abandoned agency procedure and engaged in highly improper and prejudicial conflicts of interest and other serious procedural irregularities to summarily affirm the IJ's decision— ensuring that all aspects of the immigration adjudication process were in service of the conspiracy's unlawful aims.

448.    To begin, after Mr. Khalil appealed the IJ's decision, the BIA addressed Mr. Khalil's appeal on an extraordinarily expedited schedule to ensure Mr. Khalil's quick expulsion

---

https://www.nytimes.com/2026/05/08/nyregion/mahmoud-khalil-deportation-case.html.    *See also* Declarations of Andrea Saenz, Dana Leigh Marks, and Ryan Wood in Support of Motion to Reopen Removal Proceedings, *Matter of M-K-*, 29 I&N Dec. 556 (BIA 2026), *available at* https://www.aclu.org/cases/khalil-v-trump#legal-documents.

from the United States. As of February 2026, the average processing time for a non-detained case like Mr. Khalil's was 795 days. The BIA issued its decision on Mr. Khalil's appeal on April 9, 2026, just nine days after the close of briefing and one week after Defendant Blanche, who exercises supervision and control over the BIA, took office as acting Attorney General.

449.    The BIA dismissed Mr. Khalil's appeal[110] and denied his motion to remand proceedings to immigration court to present highly relevant evidence of First Amendment retaliation that had come to light through discovery in *AAUP,* and notably, had never been provided to Mr. Khalil during immigration proceedings.

450.    The BIA's decision relied on the Rubio Determination, which had been enjoined by the district court as presumptively unconstitutional, both to find Mr. Khalil removable under the Foreign Policy Ground and to deny him relief from removal via his meritorious asylum and withholding claims.

451.    The BIA indicated in its decision that it was unaware of whether it was still bound by the district court's injunction given proceedings in the Third Circuit, and concluded it was not, even though the BIA was a party to Mr. Khalil's proceedings before the district court and Third Circuit (through the acting Attorney General, Defendant Blanche, who oversees EOIR and the BIA), and knew or should have known that the injunction against reliance on the Rubio Determination remained in effect.

452.    The only plausible inference for the BIA's stated pretext to abandon binding legal principle is that its defiance of law was necessary to ensure the conspiracy's ultimate goal, now being directed by Defendant Blanche.

---

[110]    *Matter of M-K-*, 29 I&N Dec. 556 (BIA 2026).

453.     Further, the BIA decision in Mr. Khalil's case was published (i.e., made publicly available and designated as precedent) six days after it was issued, on April 15, 2026. The BIA itself designated the decision as precedential, even though such designations, when not done on day of issuance, are usually done pursuant to an order by the Attorney General. The published decision continued to state that the BIA was not bound by the district court's injunction, despite a motion filed by Mr. Khalil's attorneys pointing out that most obvious error. Again, the BIA's defiance of law was in service of the conspiracy's ultimate goals.

454.     Reporting from the *New York Times* has since confirmed that at least three current members of the BIA recused themselves from Mr. Khalil's case, including in the process undertaken to determine whether to publish the decision. Experts with extensive experience in EOIR ethics training and the BIA have attested that this extraordinarily high number of recusals in a single case strongly suggests that several current members of the BIA had significant involvement in the decision-making or drafting process of the underlying IJ decision.[111] This represents a grievously improper and unethical action that further undermines any claim of neutral adjudication of Mr. Khalil's case; indeed, it demonstrates unethical collusion to effectuate the conspiracy's unlawful aims.

455.     Reporting also revealed that Mr. Khalil's case had been fast-tracked and considered a high priority, even before the BIA ever received his case. A note from internal case-tracking files in June 2025 (four months before the BIA received Mr. Khalil's appeal) said that the case was to be handled as if Mr. Khalil were still in detention—which would expedite the case, even though Mr. Khalil had already been released.[112]

---

[111]     Declarations of Andrea Saenz, Dana Leigh Marks, and Ryan Wood, *supra* note 109.
[112]     *Mahmoud Khalil Hurtles Toward Potential Deportation as U.S. Speeds Case*, *supra* note 109.

456.    As a result of the BIA ruling, Mr. Khalil is subject to a final order of removal. Absent federal judicial protection, and as a product of the conspiracy, he is presently vulnerable to re-detention and removal.

457.    While he has the right to seek a Petition for Review of the BIA decision in the Fifth Circuit Court of Appeals, the substance of that decision is necessarily and fundamentally circumscribed. Consequently, by not affording Mr. Khalil a meaningful opportunity to adjudicate his claims in the immigration courts (as he could in a federal court), such as the unconstitutionality of the Rubio Determination and the broader unlawful plan to retaliate against Mr. Khalil for his constitutionally protected advocacy, he will likely be denied, by the Federal Defendants' design, any meaningful review of his claims, despite clear constitutional violations.

458.    In addition, contrary to the practice of other courts of appeal, the Fifth Circuit's practice of rarely granting stays of removal pending its review of a final removal order increases the vulnerability of Mr. Khalil to re-detention and imminent removal before a federal court ever reviews the substance of the removal order, a fact which Defendants surely knew when they whisked Mr. Khalil to Louisiana and ensured the IJ and thereafter the BIA would race in unprecedented fashion to issue and affirm his orders of removal.

459.    The Federal Defendants' continued animus-driven efforts to ensure that the immigration courts would order him removed in retaliation for his support of Palestinian rights and to thereby deprive him of his fundamental rights to speech, equal protection, travel, and freedom from detention are causing Mr. Khalil continuing harm for which no adequate remedy at law exists.

VIII.  **DEFENDANTS REPEATEDLY IGNORED, TOLERATED, OR EMBRACED BONA FIDE ANTISEMITISM EXHIBITED FROM TRUMP ADMINISTRATION OFFICIALS AND ELSEWHERE, FURTHER DEMONSTRATING THEIR ATTACKS ON PALESTINIAN ADVOCACY ARE MERE PRETEXT DESIGNED TO SILENCE CRITICISM OF ISRAEL'S SUBJUGATION OF PALESTINIANS.**

460.    Several of the individuals involved in the development or implementation of the conspiracy ignored, tolerated, or even embraced bona fide antisemitism—i.e., caricatures or stereotypes about Jewish people and the Jewish faith, as opposed to criticism of Israeli government policy—especially antisemitism coming from politically-aligned individuals or groups.

461.    The tolerance of bona fide antisemitism from aligned individuals or groups lays bare the pretextual nature of the charges of antisemitism leveled against Mr. Khalil and other Palestinians and their supporters. It reveals that the conspirators were not actually concerned with preventing or punishing antisemitism as such; they were only interested in silencing advocacy critical of Israeli government policy, including the genocide that Israel has been charged with carrying out against Palestinians in Gaza.

462.    To begin, despite President Trump's Executive Order purporting to address antisemitism, he himself has personally expressed actual antisemitism. He has made numerous statements relying on gross stereotypes of Jewish people, implying Jewish people have dual loyalty and invoking Hitler and the Nazis in a positive light.

463.    Trump has hosted Nick Fuentes and Ye (formerly known as Kanye West) for dinner in his Mar-a-Lago home, both of whom are avowedly antisemitic. Fuentes is a Holocaust denier who has compared himself to Hitler, has reportedly promoted antisemitic claims that "the GOP is run by Jews, atheists, and homosexuals," and has reportedly stated that Jewish people have no place in Western civilization. Ye has in the past identified as a Nazi, though he recently disavowed this. He has also released a song called "Heil Hitler."

117

464. More importantly, Trump has also appointed or attracted antisemites to his Administration—the "willing Administration" with whom Defendant Heritage Foundation sought to partner—including in roles that purport to combat antisemitism. Numerous reports have tracked White House officials' ties to antisemitic persons and statements.

465. For example, Paul Ingrassia, who reportedly sent a number of racist texts to a group chat including one saying that he had a "Nazi streak," served as the White House liaison to DOJ from January to February 2025 and the White House liaison to DHS from February to November of 2025—during the very months that many of the overt acts in the conspiracy to target Palestinians and their supporters took place. In May of 2025, President Trump nominated Ingrassia to lead the Office of Special Counsel. Ingrassia withdrew his nomination in October 2025 after his racist texts were made public, but President Trump nonetheless appointed Ingrassia to become deputy general counsel at the General Services Administration.

466. Elon Musk, the former head of the Department of Government Efficiency (DOGE) and a major donor to Trump's second presidential campaign, endorsed and appeared at a campaign event for the Alternative for Germany (or AfD) party in Germany. AfD politicians have described the Holocaust as a "myth," and the party was designated by the German government's intelligence agency in 2025 as a "confirmed right-wing extremist endeavor";[113] it is regarded by many as a neo-Nazi party.

467. On February 13, 2026, Vice President JD Vance met with a leader of the AfD party while in Germany and publicly praised the party.

468. In June 2025, President Trump nominated Jeremy Carl to be the Assistant Secretary of State for International Organizations—that is, in the very same DOS targeting Mr. Khalil and

---

[113]    On February 26, 2026, a German court temporarily suspended this label pending ongoing litigation, though the Party's label as a "suspected extremist" entity remains in place.

others for arrest and deportation on purported grounds of antisemitism. Carl has mused about the need to address the "Jewish Question," and has stated that Jewish people are "completely wrong in terms of their religious practice," and that Christians should be trying to convert Jewish people "where we can." Despite numerous national Jewish organizations opposing his nomination due to his demonstrable and bona fide antisemitism, President Trump continued to support his nomination until he withdrew on March 10, 2026.

469. President Trump's appointee to lead the DOJ taskforce on antisemitism, Leo Terrell, has shared antisemitic content on social media. On March 15, 2025, Terrell shared a post by Patrick Casey saying that Trump "has the ability to revoke someone's Jew card." Casey led Identity Evropa, an organization (now defunct) whose former leader reportedly promoted the "Nazification of America" where "Normie Trump supporters are becoming racially aware and Jew Wise."

470. Michael Velchick, an attorney who joined DOJ in 2025, has reportedly praised "Mein Kampf," calling it his favorite book of 2013. Velchick is defending the Trump Administration in court over a lawsuit challenging the Administration's decision to freeze funding to Harvard over allegedly failing to address antisemitism.

471. In addition, social media accounts run by the federal government—particularly accounts belonging to DHS, the agency responsible for effectuating the arrest of Mr. Khalil—have repeatedly shared Nazi- and white supremacist-coded imagery and propaganda. On August 11, 2025, DHS social media accounts posted a recruitment image for ICE on social media, with the caption "Which way, American man?" Similarly, on January 14, 2026, the White House posted an image with the caption "Which way, Greenland man?" The book *Which Way Western Man*, which the posts appear to reference, was published by William Gayley Simpson, an avowed neo-Nazi.

119

The book claims that Jewish people are plotting to destroy Western civilization, encourages violence against Jewish people, and praises Adolf Hitler. At both times, DHS and ICE were under Defendant Noem's leadership.

472.    Similarly, DHS social media accounts shared a recruitment post for ICE on January 9, 2026, which stated, "We'll Have Our Home Again." The Instagram version of the post contained a song by the same name, which was written by the Pine Tree Riots, who are self-described as a "pro-White fraternal order." The song has been shared by neo-Nazi and white supremacist accounts, and was reportedly referenced by the white supremacist who killed three Black people at a Florida dollar store in 2023 in a racially-motivated attack. The song was later removed from the Instagram post. At that time, DHS was under Defendant Noem's leadership.

473.    On January 10, 2026, the Department of Labor posted a graphic with the text "One Homeland. One People. One Heritage." on X. The post bears a striking resemblance to the Nazi slogan "Ein Volk, ein Reich, ein Führer," which translates into "One People, One Country, One Leader."

474.    Notably, few Jewish organizations participated in the development of the Project Esther Blueprint and its assertions of a vast antisemitic activity by Palestinian supporters, nor endorsed it after it was released. In fact, several major organizations that Defendant Heritage Foundation claimed were involved rejected the claim, including the World Jewish Congress and the Republican Jewish Coalition.[114]

---

[114]    Several of those involved in the development of Project Esther—including Luke Moon and Michael Bramnick—are Christian Zionists. Christian Zionism is the belief that Jewish people's return to the Holy Land is a pre-condition that will bring about the Second Coming of Christ and will facilitate the End Times. The theology depends on the elimination of Palestinian presence anywhere in the State of Israel and is thus fully supportive of Israeli and U.S. policies undertaking or supporting ethnic cleansing of Palestinians. Under this theology, Jewish people will either convert to Christianity, or, along with other non-believers, suffer eternal damnation. The establishment of the State of Israel, to Christian Zionists, is a sign that the Second Coming is near. Steven Gardiner, *End Times Antisemitism: Christian Zionism, Christian*

475.    In addition, both Defendants Betar and Canary Mission also appear to be unconcerned with antisemitism on the right; virtually all of their targets for arrest and deportation are those who support freedom for Palestinians. Upon information and belief, neither Canary Mission nor Betar have commented upon or condemned the Trump Administration's embrace of overt antisemitism.

476.    In stark contrast, the claims about Mr. Khalil's asserted antisemitism (falsely conflated with support for Palestinians) have been repeatedly and forcefully rejected by the Columbia students and faculty who actually know Mr. Khalil. They have attested in his federal court proceedings that he cared about all students, that he believes in interfaith solidarity, and that his condemnation of Israel's practices is rooted in principles of justice and international law embraced by many thousands of Jewish people on Columbia's campus and beyond.

477.    The attempt to instrumentally use antisemitism as a cudgel to attack Columbia and its protest movement is designed to do nothing more than silence campus activism regarding Israel's subjugation of Palestinians, and worse, undermine the role of a university as a place of critical inquiry. It has nothing to do with a bona fide concern about antisemitism. As an amicus brief filed by 108 Columbia University faculty members in Mr. Khalil's Third Circuit proceedings stated:

---

*Nationalism, and the Threat to Democracy*, Pol. Rsch. Assocs. (July 9, 2020), https://politicalresearch.org/2020/07/09/end-times-antisemitism. It is, ultimately, an antisemitic ideology: under this theology, Jewish people's role is transactional, important only insofar as they serve some utility, and Jewish people are ultimately disposable, as they will either convert or perish. At the October 7, 2024 launch of Project Esther, Defendant Heritage Foundation hosted a panel discussion where one speaker— Tricia Miller, Director of CAMERA's Partnership of Christians and Jews—stated that one reason for the purported "opposition to Israel within the American church" was "biblical illiteracy; it is horrifying how many Christians are going to church, don't read their Bibles regularly, have no idea what the Bible says about God's plans for the Jewish people and Israel." The Heritage Foundation (@TheHeritageFoundation), *Never Again Is Not Enough: Remembering the Tragedy of October 7*, at 1:10:43–1:11:47, YouTube (Oct. 15, 2024), https://www.youtube.com/watch?v=G8KtkR6YP2g.

> Rather than being concerned with the safety and well-being of Jewish students on campuses, [federal government respondents, including Rubio and Noem] are leveraging anti-Semitism in a wider effort to caricature and demonize universities, including Columbia University, as hotbeds of "woke indoctrination." Its opportunistic use of anti-Semitism in a moment of crisis is expanding and strengthening longstanding efforts to undermine educational institutions. Weaponizing charges of anti-Semitism to suppress political speech critical of the state of Israel has the serious risk of undermining the legitimacy and autonomy of democratic institutions, including universities. It is on subjects such as Israel and Palestine—subjects that inspire such intense emotions and conflicting points of view—where the First Amendment's protection of academic freedom is so crucial.[115]

478.    Yet, as one of Mr. Khalil's classmates stated in a declaration submitted in Mr. Khalil's federal court proceedings, "Mahmoud [Khalil] has protected Jewish students at Columbia like myself more than the university ever has."[116]

---

[115]    Brief of Amici Curiae 108 Columbia University & Barnard College Faculty Members at 18, *Khalil v. Trump*, 164 F.4th 259 (3d Cir. 2026) (Nos. 25-2162 & 25-2357), ECF No. 55.

[116]    Additional Evidence Refuting Allegations of Antisemitism in the Rubio Memorandum and Clarifying Mr. Khalil's Role as a Negotiator on Behalf of All Students at 7, *Khalil v. Joyce*, 780 F. Supp. 3d 476 (D.N.J. 2025) (No. 2:25-cv-1963 (MEF) (MAH)), ECF No. 210-1.

## TIMELINE OF THE CONSPIRACY



## CLAIMS FOR RELIEF

### COUNT I

**Pursuant to 42 U.S.C. § 1985(3) Against the Private and Federal Defendants in their Individual Capacity for Conspiracy to Interfere with Mr. Khalil's Constitutional Rights for Damages; and Against the Federal Defendants in their Official Capacity for Declaratory and Injunctive Relief**

479.    All Private Defendants and Federal Defendants Miller, Rubio, Noem, and Armstrong plotted, planned, coordinated, and conspired collectively to target Mr. Khalil and other Palestinians and/or their supporters for arrest, detention, and deportation because of their status as Palestinian or supporters of Palestinians, and in order to deprive Mr. Khalil and others of their constitutionally-protected rights to freedom of speech, freedom from punitive detention, equal protection of the law, and interstate travel.

480.    All of those Defendants had a shared purpose: they were motivated by discriminatory animus toward Palestinians and their supporters, as well as Muslims, demonstrated, among other ways, by consistently characterizing Palestinians, including Mr. Khalil, and their supporters as antisemitic and sympathetic to terrorism, merely for their advocacy criticizing Israel's subjugation of Palestinians and demanding application of human rights protections to Palestinians. The animus is further demonstrated by tolerance of bona fide antisemitism by non-Palestinian officials in the Trump Administration.

481.    In furtherance of the conspiratorial plan, those Defendants planned, agreed, and coordinated to identify for retribution–via arrest, detention, and deportation–Palestinians who they sought to silence toward a broader goal of squelching the growing movement for Palestinian human rights. Those Defendants, acting on their animus toward Mr. Khalil and other Palestinian supporters, plotted and coordinated with each other to carry out the overt acts of surveillance, pre-

124

selection, arrest, detention, and attempted deportation of Mr. Khalil and other Palestinian supporters.

482. Once they took office, Defendants Mullin and Blanche entered into and ratified this conspiracy, which they knew was underway, and exercised their supervision and control over DHS and the immigration court systems, respectively, to manipulate and attempt to expedite Mr. Khalil's expulsion from the United States, all in furtherance of the conspirators' original aims.

483. Collectively, the conspirators sought to leverage state power to deprive Mr. Khalil and others of their constitutionally-protected rights to freedom of speech, freedom from punitive detention, equal protection, and travel, on account of their national origin and/or their support of Palestinians.

484. As a result of the overt acts carried out pursuant to the conspiracy—namely, his targeting, surveillance, arrest, transfer, imprisonment, and attempted deportation—Mr. Khalil suffered violations of his rights to free speech, to equal protection, to be free from punitive detention, and to travel freely in the United States.

485. The overt acts caused and continue to cause Mr. Khalil serious injuries, including prolonged deprivation of liberty, serious harm to his reputation, stigmatizing him as dangerous and antisemitic, immense emotional and physical stress to himself and his family, loss of job and economic opportunities and income, loss of educational opportunities and a risk to his lawful immigration status in the United States.

486. In addition, absent a declaration and an injunction prohibiting the Federal Defendants from continuing to undertake acts in furtherance of this conspiracy, including their efforts to rely upon the Rubio Determination and pretextual misrepresentation charges to detain and deport Mr. Khalil, and to exploit and manipulate sham immigration proceedings to ensure his

125

detention and deportation, Mr. Khalil will continue to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT II

**Pursuant to 42 U.S.C. § 1986 Against All Defendants for Neglecting to Prevent Conspiracy to Interfere with Mr. Khalil's Constitutional Rights**

487.    Defendants possessed knowledge of the conspiracy they planned and carried out against Mr. Khalil, other Palestinians, and their supporters. As organizers, planners, leaders, and executors of this conspiracy, all Defendants were in a position to and had the power to stop the anti-civil rights conspiracy or aid in its termination.

488.    Each of the Defendants refused to take any steps to stop this conspiracy or to stop any of the overt acts undertaken to advance the conspiracy. This includes continuing efforts by the Federal Defendants who are in office to rely upon the Rubio Determination and pretextual misrepresentation charges, to detain Mr. Khalil and chill his and others' speech, and to exploit and manipulate sham immigration proceedings to ensure his detention and deportation—which caused Mr. Khalil and other Palestinians and their supporters foreseeable injury, resulting in a violation of 42 U.S.C. § 1986.

489.    They have, instead, continued the conspiracy, seeking to re-detain and exert undue and unlawful pressure to quickly deport Mr. Khalil.

490.    The Defendants' failure to take actions to cease the conspiracy or its harmful overt acts injured Mr. Khalil and other Palestinians and their supporters, including through prolonged deprivation of liberty, serious harm to their reputations, immense emotional and physical stress to themselves and their families, loss of job and economic opportunities and income, loss of educational opportunities and a risk to their lawful immigration status in the United States.

## COUNT III

**Pursuant to U.S. Const. art. I, § 9, cl. 3, Bill of Attainder Clause,
Against Federal Defendants in their Official Capacity for Declaratory and Injunctive Relief**

491. The Federal Defendants have violated Article I, Section 9, Clause 3 of the U.S. Constitution by effecting a Bill of Attainder upon Mr. Khalil. The Federal Defendants' actions constitute legislative action within the meaning of the Bill of Attainder Clause.

492. The Federal Defendants have singled out Mr. Khalil for retributive and vindictive punishment for his Palestinian identity and his constitutionally-protected advocacy in support of Palestinian rights, by using their power to lodge unprecedented and unconstitutional grounds of removability upon Mr. Khalil to cause his detention and deportation. Federal Defendants usurped the judicial role, bypassing any valid judicial adjudication of their punishment, and thereby ensuring their plan to carry out their plan of removal through a controlled and sham set of immigration proceedings designed to produce the pre-ordained outcome of the conspiracy.

493. The Federal Defendants' actions target a narrow, identifiable group of people: Mr. Khalil and eight other non-citizen student advocates for Palestine who the Federal Defendants targeted for arrest and deportation.

494. The Federal Defendants' individually-tailored retributive action against Mr. Khalil is not undertaken for any bona fide or neutral law enforcement purpose. The Federal Defendants know Mr. Khalil has committed no crime or otherwise has no bona fide grounds for punishment of this form, and are pursuing his detention and removal on exotic grounds in order to unconstitutionally retaliate and punish Mr. Khalil and other similarly situated individuals for their Palestinian identity and/or advocacy in support of Palestinian rights.

127

495.    As a direct and proximate result of the Federal Defendants' constitutional violation, Mr. Khalil will be irreparably injured. Unless the Federal Defendants' continuing retributive acts are declared unlawful and enjoined, Mr. Khalil will suffer irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Khalil prays for judgment against Defendants as follows:

a.    For compensatory and punitive damages in an amount to be proven at trial;

b.    For a declaratory judgment that Defendants' conduct was and continues to be in violation of 42 U.S.C. §§ 1985 and 1986, and that Federal Defendants' conduct reflects a retributive and unconstitutional Bill of Attainder, and an injunction prohibiting continued reliance on unconstitutional and pretextual grounds for detention and removal;

c.    For reasonable attorneys' fees and costs of suit; and

d.    For all such other and further relief as the Court may deem just and proper.

Dated:  July 14, 2026                          Respectfully submitted,


Luna Droubi                                   s/Astha Sharma Pokharel
Matthew Melewski                              _____
Tala Alfoqaha                                 Astha Sharma Pokharel
BELDOCK LEVINE & HOFFMAN LLP                  Baher A. Azmy
99 Park Avenue, PH/26th Floor                 Adina Marx-Arpadi
New York, New York 10016                      Diala Shamas
212-490-0400                                  Center for Constitutional Rights
ldroubi@blhny.com                             666 Broadway, 7th Floor
mmelewski@blhny.com                           New York, NY 10012
talfoqaha@blhny.com                           (212) 614-6462
                                              asharhampokharel@ccrjustice.org
                                              bazmy@ccrjustice.org
                                              amarxarpadi@ccrjustice.org
                                              dshamas@ccrjustice.org


*Counsel for Plaintiff*

128