**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAHMOUD KHALIL,

Plaintiff,

-v-

THE HERITAGE FOUNDATION; Victoria COATES; Robert GREENWAY; BETAR ZIONIST ORGANIZATION, INC.; BETAR ZIONIST MOVEMENT, INC.; BETAR WORLD; Ronn TOROSSIAN; MEGAMOT SHALOM D/B/A CANARY MISSION; Jonathan BASH; Victor MUSLIN; John DOE A; Stephen MILLER, individually and in his official capacity as White House Deputy Chief of Staff for Policy and Homeland Security Advisor; Marco RUBIO, individually and in his capacity as Secretary of State; Markwayne MULLIN, individually and in his official capacity as Secretary of Homeland Security; Todd BLANCHE, individually and in his official capacity as Acting Attorney General; Kristi NOEM, in her individual capacity; John ARMSTRONG, in his individual capacity,

Defendants.

No. 26 Civ. 5929 (DLC)

# MEMORANDUM OF LAW IN SUPPORT OF THE INDIVIDUAL-CAPACITY FEDERAL DEFENDANTS' MOTION TO DISMISS

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

SARAH E. WHITMAN
Assistant Director

By: *<u>/s/ Siegmund F. Fuchs</u>*
SIEGMUND F. FUCHS
Senior Trial Counsel

PATRICK B. FENIOR
ANDREW M. VANDINI
Trial Attorneys
Civil Division, Torts Branch
U.S. Department of Justice
Ben Franklin Station
P.O. Box 7146
Washington, D.C. 20044-7146
202-598-3916
Email: siegmund.f.fuchs@usdoj.gov

Attorneys for the Individual-Capacity
Federal Defendants

# Table of Contents


PAGE(s)

PRELIMINARY STATEMENT ........................................ 1

FACTUAL BACKGROUND ........................................ 3

STANDARDS OF REVIEW ........................................ 6

ARGUMENT ........................................ 7

I. PLAINTIFF'S CLAIMS ARE STATUTORILY BARRED. ........................................ 7

II. PERSONAL JURISDICTION OVER THE INDIVIDUAL-CAPACITY FEDERAL DEFENDANTS IS LACKING. ........................................ 8

III. PLAINTIFF'S CLAIMS ARE BARRED BY QUALIFIED IMMUNITY. ........................................ 12

A. It is not clearly established whether § 1985(3) applies to federal officials........................................ 14

B. The intracorporate conspiracy doctrine bars the § 1985(3) claim. ........................................ 15

C. Plaintiff fails to sufficiently plead personal participation as to Defendants Miller, Blanche, Noem, or Mullin. ........................................ 18

D. Plaintiff fails to plead underlying constitutional violations, let alone clearly established ones. ........................................ 20

E. Plaintiff fails to plead a § 1985(3) conspiracy. ........................................ 22

F. The § 1986 claim also fails. ........................................ 26

CONCLUSION ........................................ 26

Individual-Capacity Federal Defendants Stephen Miller, Marco Rubio, Todd Blanche, Markwayne Mullin, Kristi Noem, and John Armstrong (collectively, "Individual-Capacity Federal Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim.[1]

## PRELIMINARY STATEMENT

Plaintiff Mahmoud Khalil seeks damages under 42 U.S.C. §§ 1985(3) and 1986 from high-ranking federal officials personally and against private and foreign entities and individuals, alleging they conspired to violate his First and Fifth Amendment rights. ECF 1. He alleges they had him arrested and detained through "sham immigration proceedings" to retaliate against him for First Amendment-protected activities. *Id.* ¶¶ 21, 479, 486, 495. He also alleges he was targeted because he is Palestinian and supports Palestinian rights. *Id.*

The purported conspiracy is as novel as it is far-reaching. Conspiracy claims against federal officials are largely circumscribed by the intracorporate conspiracy doctrine. As the Supreme Court recently explained, the President *alone* is vested with the executive power of the United States. *Trump v. Slaughter*, 609 U.S. 422, 464 (2026). All those working under him "exercise the *President's* power, not their own, and thus must be *responsible* to him." *Id.* (emphasis in original). Alleged agreements by federal officials in the course of their official duties are thus attributable to the same principal and no "agreement between two or more separate people" has taken place sufficient to state a conspiracy. *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). The Supreme Court has not yet applied this doctrine to § 1985(3), but has held that in light of divisions in the lower courts, federal officials sued under § 1985(3) are entitled to qualified immunity. *Id.* Plaintiff's

[1] The Federal Defendants sued in their official capacities are filing a separate motion to dismiss.

inclusion of private and foreign actors and entities here should not alter this calculus: "[I]t appears that no case exists recognizing a § 1985(3) conspiracy composed exclusively of federal and private actors." *Osborne v. Carey*, No. 16-1651, 2017 WL 939008, at *10 (S.D.W. Va. Mar. 9, 2017). This is no coincidence. Allowing plaintiffs to transform interagency communications and cooperation on Executive policy into an actionable conspiracy by including allegations that private actors supported the policy, shared information, and publicly celebrated its implementation risks turning § 1985(3) into the kind of general federal tort law the Supreme Court has long resisted. This is particularly improper in the field of immigration where the Executive's power is plenary, *Mathews v. Diaz*, 426 U.S. 67, 81 (1976), and where interagency coordination is statutorily mandated. 8 U.S.C. §§ 1103, 1104. It would subject large swaths of high-level policy formulation to suits for damages against government officials personally by the simple expedient of alleging private individuals were in support.

This Court need not entangle itself in the thicket Plaintiff's Complaint has presented as ample reasons exist to dispose of the Complaint on any number of threshold bases. First and foremost, no conspiracy to violate the law existed. Plaintiff was deemed subject to removal under a provision of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(4)(C), based on the Secretary of State's finding that Plaintiff's continued presence in the United States would have potentially serious adverse foreign policy consequences. At that time, no court had found the provision unconstitutional. Existing case law mostly limited selective enforcement challenges in the immigration context. Thus, no precedent would have placed every reasonable official on notice that § 1227(a)(4)(C)'s application here violated clearly established law. Because the conspiracy hinges on that application being clearly unlawful, qualified immunity applies.

Beyond that, Plaintiff's claims are statutorily barred and § 1227(a)(4)(C) is constitutional for all the reasons stated in the motion to dismiss filed by the Federal Defendants sued in their official capacities. Moreover, whether § 1985(3) applies to federal officials is not clearly established in the Second Circuit, Plaintiff fails to sufficiently plead personal participation by Defendants Mullin, Blanche, Noem, and Miller, and Plaintiff fails to plead an actionable conspiracy.

For all these reasons, the Court should grant the motion to dismiss.

## FACTUAL BACKGROUND

On October 7, 2023, Hamas, a designated terrorist organization since October 8, 1997,[2] unleashed "terrorist attacks . . . against the people of Israel." *See* Additional Measures to Combat Anti-Semitism, Exec. Order No. 14188 (Jan. 29, 2025);[3] *see also* ECF 1 ¶ 5 (citing the "Hamas-led attacks on October 7, 2023"). According to President Trump's Executive Order 14188:

> These attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses. Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault.

*Id.*; *see also* ECF 1 ¶ 5 (referring to the "proliferation of student protests"). Protests at Columbia University were "the most well-publicized in the country" and "the subject of national and high-intensity local attention." ECF 1 ¶¶ 15, 30. The New York Police Department was required to enter the campus four separate times to clear student encampments, which led to the arrest of at least 300 students, the suspension of at least 200 students, and the expulsion of at least twelve students.

---

[2] *See* https://www.state.gov/foreign-terrorist-organizations (last visited Nov. 3, 2026). The Court may take judicial notice of a foreign terrorist designation. *United States v. Abdi*, 498 F. Supp. 2d 1048, 1079 (S.D. Ohio. 2007).

[3] https://www.whitehouse.gov/presidential-actions/2025/01/additional-measures-to-combat-anti-semitism/ (last visited Nov. 3, 2026). The Court may consider the Executive Order as it is quoted and incorporated into the Complaint. ECF 1 ¶ 203; *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

*Id.* ¶ 131. Plaintiff played a "prominent role" in the protests and eventually became "a public face of the protest movement." *Id.* ¶¶ 15, 30.

Plaintiff claims he was the target of a far-reaching conspiracy involving private actors and high-level government officials who sought to arrest, detain, and deport non-citizen Palestinians and their supporters to suppress pro-Palestinian advocacy. *Id.* ¶ 1. This purported conspiracy originated outside the federal government and through the Heritage Foundation's formulation of "Project Esther," which Plaintiff contends served as the blueprint for the conspiracy. *Id.* ¶ 3. He alleges "upon information and belief" that Defendant Miller worked with the Heritage Foundation to develop the blueprint, apparently basing this allegation on Miller's past work with the Foundation. *Id.* ¶¶ 90-93. Plaintiff claims Project Esther set forth the "contours of the conspiracy," which included: first, falsely smearing Palestinians and their advocates as antisemitic and connected to terrorism; second, identifying and surveilling a select few Palestinians and their supporters; and third, working with a "willing" Administration to arrest, detain, and deport the pre-selected individuals on manufactured charges of antisemitism and terrorism. *Id.* ¶¶ 100-05.[4]

In Plaintiff's view, the election of President Donald Trump in 2024 "cement[ed] the conditions necessary for the conspiracy to advance" to the third and final step. *Id.* ¶ 106. He claims that, in or around November 2024, the Betar and Canary Mission Defendants began to surveil and pre-select Palestinians and their supporters and then communicated those pre-selections to Defendants Rubio and Miller. *Id.* ¶¶ 154, 171. Then, in January 2025, President Trump signed Executive Orders 14161 and 14188, which Plaintiff claims parroted and cemented Project Esther's blueprint "by falsely casting activism in support of Palestinian rights as antisemitic and terroristic."

[4] While the Complaint alleges the so-called "blueprint" encouraged "the use of federal immigration power to deport non-citizen Palestinians and their supporters," the actual language from Project Esther targets "Hamas Support Organizations." ECF 1 ¶¶ 141-43.

*Id.* ¶ 208. Plaintiff identifies a series of meetings in February and March 2025 of the Homeland Security Council under the Executive Office of the President. *Id.* ¶ 213 (citing *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 138 (D. Mass. 2025) ("*AAUP*")). According to Plaintiff, these meetings involved Defendants Miller and Armstrong (and "upon information and belief" Defendants Rubio and Noem) and were held "to plan the implementation of the conspiracy to target individuals pre-selected by the Private Defendants for arrest, imprisonment, and deportation." *Id.*[5]

Plaintiff alleges he was targeted by Defendants Betar and Canary Mission sometime between late 2024 and March 2025, which led to deportation efforts beginning on March 6, 2025. *Id.* ¶¶ 246, 254. He explains that DHS generated an internal Report of Analysis, which compiled news articles about his involvement in the Columbia protests and "pro-Hamas" encampments. *Id.* ¶¶ 255-56. This led to DHS requesting, on March 7, a determination by Defendant Rubio of any adverse foreign policy consequences from Plaintiff's continued presence and activities. *Id.* ¶ 257. The following day, on March 8, 2025, based on an Action memo Defendant Armstrong authored, Defendant Rubio advised Defendant Noem, then-Secretary of the Department of Homeland Security, that Plaintiff was subject to removal, invoking § 1227(a)(4)(C) and concluding that Plaintiff's "presence or activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States." *Khalil v. President of the United States*, 164 F.4th 259, 266 (3d Cir. 2026); *see also* ECF 1 ¶ 259. Plaintiff was arrested that day. ECF 1 ¶ 263. Through immigration proceedings, including a ruling from the Board of Immigration Appeals (BIA), Plaintiff is now "subject to a final order of removal." *Id.* at ¶ 456. He is pursuing a petition

[5] The cited reference simply notes that the Homeland Security Council regularly held interagency meetings to discuss, among other things, "student visa revocations."

for review in the Fifth Circuit.[6]

## STANDARDS OF REVIEW

If a court lacks subject matter jurisdiction over a claim, the claim must be dismissed under Rule 12(b)(1) as the court "lacks the statutory or constitutional power to adjudicate it." *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009). Although a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff . . . jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation modified). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchoine v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

On a Rule 12(b)(2) motion for lack of personal jurisdiction, plaintiff bears the burden of establishing the court's jurisdiction over each defendant. *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). "This showing may be made through the plaintiff's own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). The court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008). However, the court is "not bound to accept as true a legal conclusion

---

[6] On September 25, 2026, the BIA issued a second decision denying Plaintiff's request to reopen his immigration proceedings based on alleged procedural irregularities. *Matter of M-K-*, 30 I&N Dec. 84 (BIA 2026) (*available at* https://www.justice.gov/eoir/media/1462911/dl?inline) (last visited on Nov. 3, 2026). The BIA reasoned:

> "Most—if not all—of the respondent's arguments are meritless and raise questions as to whether they have been brought in good faith. We unequivocally reject his baseless contentions that there was any inappropriate influence on the adjudication of his case, and we emphasize that the outcome of his case was determined based on nothing other than the applicable law and the record before us."

*Id.* at 97.

couched as a factual allegation," and a plaintiff may not rely on "conclusory non-fact-specific jurisdictional allegations" to overcome a motion to dismiss. *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (internal quotations omitted).

A complaint should also be dismissed if it fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## ARGUMENT

### I. Plaintiff's Claims Are Statutorily Barred.

In their separate motion to dismiss, the Federal Defendants sued in their official capacities explain why 8 U.S.C. §§ 1252(a)(5), 1252(b)(9), and 1252(g) statutorily bar Plaintiff's claims. The Individual-Capacity Federal Defendants incorporate those arguments. That Plaintiff sues for damages is of no moment. These statutory bars apply equally to damages claims. *See Quezada v. United States*, 187 F.4th 727, 731 (5th Cir. 2026); *Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017); *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013); *Sissoko v. Rocha*, 509 947, 950 (9th Cir. 2007); *Humphries v. Various Fed. U.S. INS Emps.*, 164 F.3d 936, 942 (5th Cir. 1999); *Golding v. DHS/ICE*, No. 20-8679 (VSB), 2024 WL 3012620, at *4 (S.D.N.Y. June 13, 2024); *Arias v. ICE*, No. 07-1959, 2008 WL 1827604, at *6 (D. Minn. Apr. 23, 2008). These courts rightly recognize that regardless of the relief sought, if a plaintiff is challenging a decision to commence removal proceedings or if the claim arises from any action taken or proceeding brought to remove

an alien—both of which apply here—then the court lacks jurisdiction over the claim.[7]

## II. Personal Jurisdiction Over The Individual-Capacity Federal Defendants Is Lacking.

"[P]ersonal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione*, 937 F.2d 44, 52 (2d Cir. 1991). To bring an action against a federal official in an individual capacity, a plaintiff must show the Court has personal jurisdiction over the official *in that capacity*. *Walden v. Fiore*, 571 U.S. 277 (2014). Personal jurisdiction is governed by the general rule that "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Id.* at 283, 291. Here, the Individual-Capacity Federal Defendants are not alleged to be New York residents. Accordingly, personal jurisdiction exists over them only if New York's long-arm statute extends to them and the exercise of that jurisdiction complies with due process.

"The reach of New York's long-arm statute . . . does not coincide with the limits of the Due Process Clause. Analysis under it therefore may involve two separate inquiries, one statutory and one constitutional." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007). "If jurisdiction is statutorily impermissible, of course, [courts] need not reach the question of its constitutionality." *Id.* The New York long-arm statute provides two bases for personal jurisdiction over nonresidents: specific and general. *See* N.Y. C.P.L.R. § 301 (general); N.Y. C.P.L.R. § 302 (specific). For general jurisdiction, a plaintiff must allege facts sufficient to show the defendant engaged in a "continuous and systematic course of doing business in New York." *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 581 (S.D.N.Y. 2012) (citation omitted). The defendant must essentially be "at home" in the forum state. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014). No such allegations are made here. Consequently, personal jurisdiction can only exist under specific jurisdiction.

---

[7] Also incorporated is the argument by the Federal Defendants sued in their official capacities that collateral estoppel precludes Plaintiff's claims.

The New York long-arm statute confers specific jurisdiction over a non-resident in four situations. First, jurisdiction exists where the non-resident transacts some kind of business in the state and the claim arises from that activity. N.Y. C.P.L.R. § 302(a)(1). Second, jurisdiction exists where the non-resident commits a tortious act outside of the state, thereby causing injury to a person or property inside the state, but again, only where the claim arises out of business or revenue activity in the state. *Id.* § 302(a)(3). Third, jurisdiction exists where the non-resident owns, uses, or possesses real property in the state and the claim arises from the fact of property ownership. *Id.* § 302(a)(4). Nothing of the sort is alleged here. Finally, jurisdiction exists where the non-resident "commits a tortious act within the state." *Id.* § 302(a)(2). Under this provision, "a defendant's physical presence in New York is a prerequisite to jurisdiction." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999). Plaintiff never alleges any of the Individual-Federal Defendants stepped foot in New York to take action against him, let alone to commit a tortious act there.

Plaintiff appears to base his case for jurisdiction on the fact that he was arrested in New York and felt his injuries there. ECF 1 ¶¶ 8, 263. However, "[t]he situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001); *see also Troma Ent., Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 218 (2d Cir. 2013) ("[I]t is well-settled that residence or domicile of the injured party within [New York] is not a sufficient predicate for jurisdiction."). "The fact that the consequences of . . . alleged [tortious] acts may have continued in New York does not make New York the site of the [acts], if their first effect takes place elsewhere." *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 327 (S.D.N.Y. 2013) (internal quotations and citation omitted). Here, the original event causing Plaintiff's alleged injuries was the removal

determination made in Washington, D.C. That does not give rise to specific jurisdiction in New York, even if Plaintiff was arrested there. *See Doe*, 939 F. Supp. 2d at 328 (original event—issuance of warrant in Delaware—does not give rise to specific jurisdiction in New York where plaintiff was arrested).

Under § 302(a)(2), jurisdiction can exist where the non-resident's *agent* committed a tortious act within the state. N.Y. C.P.L.R. § 302(a)(2). Here, Plaintiff alleges he was arrested in New York by unnamed ICE agents "acting under the direction of Defendant Noem." ECF 1 ¶ 263. However, the Second Circuit has consistently held § 302(a)(2) does not confer jurisdiction over federal officials where unnamed subordinates "were simply United States employees acting as agents for the United States government." *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981); *see also Green v. McCall*, 710 F.2d 29, 33 (2d Cir. 1983); *Marsh v. Kitchen*, 480 F.2d 1270, 1273 (2d Cir. 1973).[8]

Because the New York long-arm statute does not confer jurisdiction, the Court need not conduct the constitutional inquiry. However, even there, personal jurisdiction is lacking. Plaintiff never alleges any of the Individual-Capacity Federal Defendants are essentially "at home" in New York so as to establish general jurisdiction. *Daimler*, 571 U.S. at 122. As for specific jurisdiction, Plaintiff's only relevant allegation is that the Individual-Capacity Federal Defendants caused his arrest in New York. ECF 1 ¶ 263. To be relevant, a minimum contact "must arise out of contacts that the defendant *himself* creates with the forum State." *Walden*, 571 U.S. at 284 (citation omitted) (emphasis in original). "[T]he plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285. Here, Plaintiff alleges the Individual-Capacity Federal Defendants conspired to

[8] New York recognizes a conspiracy theory of jurisdiction whereby jurisdiction over a non-resident can exist if a co-conspirator commits "an overt tortious act in New York." *Bangladesh Bank v. Rizal Com. Banking Corp.*, 226 A.D.3d 60, 76 (N.Y. App. Div. 2024). The Complaint does not allege any "overt tortious act" occurring in New York.

initiate removal proceedings as part of a nationwide policy targeting Palestinians and their supporters. ECF 1 at 60, *see also id.* ¶¶ 203-208. The net result was arrests across multiple jurisdictions. *Id.* ¶¶ 322, 352, 366, 390, 402.

That Plaintiff's arrest occurred in New York is the kind of "random, fortuitous, or attenuated contact" that does not give rise to specific jurisdiction. *Walden*, 571 U.S. at 286. Indeed, following *Walden*, multiple courts have held that initiating proceedings in one state, thereby causing an arrest in another, does not give rise to specific jurisdiction in the latter. *See Rogers v. City of Hobart*, 996 F.3d 812, 820-21 (7th Cir. 2021); *Ortiz v. Perry*, No. 17-489, 2018 WL 10127035, at *8 (N.D. Okla. May 11, 2018) (collecting cases). And multiple courts have held that the mere implementation of a nationwide policy does not confer personal jurisdiction over federal officials even if a plaintiff feels the effects of that policy in the forum state. *See Mahmud v. DHS*, 262 F. App'x 935 (11th Cir. 2008); *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1051 (9th Cir. 1997); *Feds for Med. Freedom v. Garland*, No. 23-1817, 2024 WL 1859958, at *6 (S.D. Tex. Apr. 29, 2024); *Munns v. Clinton*, 822 F. Supp. 2d 1048, 1078 (E.D. Cal. 2011); *McCabe v. Basham*, 450 F. Supp. 2d 916, 924 (N.D. Iowa 2006); *Vu v. Meese*, 755 F. Supp. 1375, 1378 (E.D. La. 1991).[9]

In sum, the New York long-arm statute does not confer personal jurisdiction over the Individual-Capacity Federal Defendants and even if it did, the exercise of that jurisdiction would

[9] Like New York, the Second Circuit also recognizes a conspiracy theory of jurisdiction whereby jurisdiction over a non-resident can exist if a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with the forum. *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021). But to comply with due process, "the conspiratorial contacts must be of the sort that a defendant should reasonably anticipate being haled into court in the forum as a result of them." *Id.* at 125 (internal quotations and citation omitted). Here, the only alleged conspiratorial act that occurred in New York is that one of the private defendants gathered information about Plaintiff there and, "[o]n information and belief," another private defendant located in Israel relied on that information and had shared similar types of information with federal officials. ECF 1 ¶¶ 189, 199. That is the very kind of "random, fortuitous, or attenuated contact" that does not give rise to specific jurisdiction, even under the so-called conspiratory theory of jurisdiction. *Lively v. Wayfarer Studios LLC*, No. 24-10049, 2025 WL 1952027, at *17 (S.D.N.Y. July 16, 2025) ("A defendant cannot reasonably anticipate being haled into court as a result of contacts that are unknown to him."); *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 195 (S.D.N.Y. 2019) (no personal jurisdiction without allegation non-resident defendant was aware of co-conspirator's in-forum acts).

offend the notions of fair play and substantial justice under *Walden*. The Court should accordingly dismiss the Individual-Capacity Defendants under Rule 12(b)(2) for lack of personal jurisdiction.

## III. Plaintiff's Claims Are Barred By Qualified Immunity.

Qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome the defense, a plaintiff must "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotations and citation omitted). Courts may address these steps in either order. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). "While the [Supreme] Court 'does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Francis v. Fiacco*, 942 F.3d 126, 145 (2d Cir. 2019) (citation omitted). "[A] body of relevant case law is usually necessary," and "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (internal quotations omitted). This is a "demanding standard." *Id.* at 63.

To allege a § 1985(3) claim, a plaintiff must plausibly allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or the equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). The statute itself "*creates* no rights." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979) (emphasis in original). Rather, "[i]t is a purely remedial

statute, providing a civil cause of action when some otherwise defined federal right . . . is breached by a conspiracy in the manner defined by the section." *Id.* It was enacted as part of the civil rights legislation passed in the aftermath of the Civil War. *Id.* However, the central theme of liability under § 1985(3) has been one of limitation and caution. *See Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995) (courts "rarely, if ever, [find] that a plaintiff has set forth sufficient facts to establish a [§] 1985 conspiracy").

The sweep of its initial language provoked strong opposition in the U.S. House of Representatives and led to a narrowing amendment "which limited the breadth of the bill so that the bill did not provide a federal remedy for all tortious, conspiratorial interferences with the rights of others." *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 834 (1983) (internal quotations and citation omitted). That narrowing amendment added "language requiring intent to deprive of *equal* protection," which the Supreme Court has interpreted to mean that for liability to attach "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102 (emphasis in original). The Court explained: "[t]he constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment." *Id.*

The Court further limited § 1985(3)'s reach in two subsequent cases. First, the Court held that § 1985(3) does not "reach conspiracies motivated by economic or commercial animus." *Scott*, 463 U.S. at 838. In doing so, the Court was particularly reluctant to expand § 1985(3) to "provide[] a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of unlawful means." *Id.* at 836; *see also Stevens v. Tillman*, 855

F.2d 394, 404 (7th Cir. 1988) ("We very much doubt that § 1985(3) properly may be used to penalize racially-motivated political campaigns."); *Gaetz v. City of Riverside*, 722 F. Supp. 3d 1054, 1061 (C.D. Cal. 2024) (declining to use § 1985(3) "to settle political scores"); *Dean v. Olens*, No. 18-4224, 2019 WL 8017734, at *9 (N.D. Ga. Feb. 7, 2019) (holding that § 1985(3) is no vehicle for "insert[ing] federal judicial referees into the court of public opinion").

Second, the Court held that the term "class" in the statutory text "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993). "Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the 'general federal tort law' it was the very purpose of the animus requirement to avoid." *Id.* (citation omitted). Finally, the Court made clear that the "invidiously discriminatory animus" requirement mandates that for liability to attach, the conspirators must have acted at least in part "because of, not merely in spite of its adverse effects upon an identifiable group." *Id*. at 272 (cleaned up). It is not enough for the conspirators to have been aware of the effects on a protected class; they must have intended that result. *Id*. at 276.

**A. It is not clearly established whether § 1985(3) applies to federal officials.**

To start, it is not clearly established in the Second Circuit that § 1985(3) applies to federal officials. In *Gregoire v. Biddle*, 177 F.2d 579, 581-82 (2d Cir. 1949), the court held that § 1985(3) is "so plainly limited to acts done under color of some state or territorial law or ordinance that no discussion can make it clearer than appears from its reading" and that "the case at bar [against federal officials] is not within that section." Some 58 years later, the Second Circuit noted that "in

the absence of prior Second Circuit case law on point," it was not clearly established as of 2001 that § 1985(3) applied to federal officials. *Iqbal v. Hasty*, 490 F.3d 143, 176-77 (2d Cir. 2007). While the *Iqbal* panel "agree[d] that the development in the case law since *Gregoire* has eroded any basis for interpreting that decision to render § 1985(3) inapplicable to federal officials," that panel opinion was vacated and reversed by *Ashcroft v. Iqbal*. *Id.* at 176. As it currently stands, no Supreme Court or Second Circuit case has held that § 1985(3) applies to federal officials. Lower courts in the Second Circuit remain divided. *Compare Sabir v. Licon-Vitale*, No. 20-01552, 2022 WL 1291731, at *13 (D. Conn. Apr. 29, 2022), *and Alharbi v. Miller*, 368 F. Supp. 3d 527, 568 (E.D.N.Y. 2019) (both explaining that whether § 1985(3) applies to federal officials is not clearly established), *with Peck v. United States*, 470 F. Supp. 1003, 1011 (S.D.N.Y. 1979) (federal officials are "persons" under statute). As such, the law in this circuit remains unsettled. And where judges themselves disagree on a legal question, the Supreme Court has mandated that qualified immunity for the federal official is "deserve[d]." *al-Kidd*, 563 U.S. at 743; *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999).[10]

**B. The intracorporate conspiracy doctrine bars the § 1985(3) claim.**

Under the intracorporate conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Abbasi*, 582 U.S. at 153. The principle applies with equal force to federal officials working throughout the Executive Branch. While the Supreme Court has yet to decide whether the doctrine

[10] In the vacated *Iqbal* panel opinion, the Second Circuit stated that even without a precedential ruling, "federal officials could not reasonably have believed that it was legally permissible for them to conspire with other federal officials to deprive a person of equal protection of the laws," noting that "[t]he proper inquiry is whether the *right* itself—rather than its *source*—is clearly established." 490 F.3d at 177 (emphasis in original). But in *Abbasi*, the Supreme Court presumed a § 1985(3) conspiracy to violate an equal protection right was properly alleged. It nonetheless held the law was not clearly established because reasonable officials would not have known and could not have predicted that § 1985(3), as a *source* of liability, "prohibited their joint consultations and the resulting policies that caused the injuries alleged." 582 U.S. at 150, 152.

applies to § 1985(3) conspiracies, it has held that division in the lower courts "demonstrates that the law on the point is not well established." *Id.* at 154. Thus, "a reasonable official lacks the notice required before imposing liability." *Id.* (citations omitted). In so holding, the Court emphasized the importance of open discussion among federal officials about government policy. *Id.* "Were those discussions, and the resulting policies, to be the basis for private suits seeking damages against the officials as individuals, the result would be to chill the interchange and discourse that is necessary for the adoption and implementation of governmental policies." *Id.*

Those same concerns inhere "as much across departments as much as within them," particularly where, as here, "conversations among White House officials and heads of departments are at issue." *K.O. v. ICE*, 468 F. Supp. 3d 350, 369 (D.D.C. 2020), *aff'd*, *K.O. v. Sessions*, No. 20-5255, 2022 WL 3023645, at *6 (D.C. Cir. July 29, 2022) ("Appellants failed to demonstrate it is clearly established in the law that officials in the Executive Branch, each answering to the same principal, can engage in a conspiracy among themselves and with their subordinates when communicating to each other about immigration policies."). Courts across the country accordingly have either applied the intracorporate conspiracy doctrine to different entities within government or held the law is not clearly established—and thus, qualified immunity applies—where government officials are sued under § 1985(3). *Id.* at 369 (collecting cases); *see also Manansingh v. United States*, No. 21-16192, 2023 WL 7295184, at *2 (9th Cir. Nov. 6, 2023); *A.I.I.L. v. Sessions*, No. 19-481, 2022 WL 997276, at *19 (D. Ariz. Mar. 31, 2022); *Vlahadamis v. Kiernan*, 837 F. Supp. 2d 131, 157 (E.D.N.Y. 2011); *McEvoy v. Spencer*, 49 F. Supp. 2d 224, 226 (S.D.N.Y. 1999). There is no question the law is unclear as to whether any so-called conspiracy amongst federal officials in implementing federal policy could give rise to § 1985(3) liability and that the Individual-Capacity Federal Defendants should be entitled to qualified immunity.

The allegation that the Individual-Capacity Federal Defendants conspired with private individuals does not change that outcome. Plaintiff alleges that private and foreign individuals desired certain immigration policies, advocated for them, lobbied for them, supplied supporting arguments and evidence, and celebrated their implementation. Those assertions do not change that the Executive's power over immigration is plenary, the President *alone* is vested with the executive power of the United States, and all those working under him "exercise the *President's* power, not their own, and thus must be *responsible* to him." *Slaughter*, 609 U.S. at 464 (emphasis in original). Application of the intracorporate conspiracy doctrine should not be so easily undone by the simple expedient of alleging that private citizens supported a government policy, no matter how vehement the conviction or how frequent they lobbied policymakers, particularly when it comes at the cost of subjecting high-level government policy and communications between heads of departments and the White House to personal-capacity damages suits.

To do so would turn § 1985(3) into the general federal tort law the Supreme Court has sought to avoid. *Friends of Falun Gong v. Pac. Cultural Enter.*, 288 F. Supp. 2d 273, 282 (E.D.N.Y. 2003), *aff'd sub nom.*, 109 F. App'x 442 (2d Cir. 2004). And it would quell ordinary citizens from participating in the type of public advocacy and discourse that is the foundation of our governing structure, lest every white paper, campaign, or social media post in support of a policy give rise to potential § 1985(3) liability. *Cf. Scott v. Greenville County*, 716 F.2d 1409, 1424 (4th Cir. 1983) (private citizens who speak out publicly in support of certain conduct, even if they openly express their prejudices in private meetings with public officials, insufficient to allege § 1985(3) conspiracy); *Gaetz*, 722 F. Supp. 3d at 1069 (private citizens lobbying government for particular result insufficient to allege § 1985(3) conspiracy). The Individual-Capacity Federal Defendants are unaware of any case expanding § 1985(3) to cover alleged agreements between federal officials

carrying out Executive policy and private individuals who support that policy, particularly without evidence of an agreement to do something unlawful. Plaintiff offers no compelling reason for this Court to be the first.

### C. Plaintiff fails to sufficiently plead personal participation as to Defendants Miller, Blanche, Noem, or Mullin.

Defendants Mullin, Blanche, Noem, and Miller are entitled to qualified immunity for an additional reason: Plaintiff does not sufficiently allege their personal participation in a statutory or constitutional violation. *Sant v. Stephens*, 821 F. App'x 42, 45 (2d Cir. 2020) (finding that § 1985 claim failed because plaintiff did not allege defendant "personally participated" in decision causing injuries). To start, in a Complaint containing 495 paragraphs, only one pertains to Defendants Mullin and Blanche, alleging that "[o]nce they took office"—over a year after Plaintiff was first deemed subject to removal—they "entered into and ratified this conspiracy, which they knew was underway, and exercised their supervision and control over DHS and the immigration court systems, respectively, to manipulate and attempt to expedite Mr. Khalil's expulsion from the United States." ECF 1 ¶ 482. But under *Iqbal*, "knowledge and acquiescence" does not suffice. 556 U.S. at 677. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Id.* at 676. Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* Here, Plaintiff fails to allege a single action taken by Defendants Mullin and Blanche "to manipulate and attempt to expedite Mr. Khalil's expulsion from the United States." ECF 1 ¶ 482 The additional blanket allegations that these events occurred "under Defendant Blanche's leadership" or "under his direction and control" do nothing to move the needle. ECF 1 ¶¶ 233, 267, 297, 430, 445-47, 452. Since *Iqbal*, the Second Circuit has been clear: a plaintiff must plead a supervisor's *personal* participation and cannot rest on the "supervision of

others who committed the violation." *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020); *Hedrick v. Alfred*, No. 25-980, 2025 WL 4669732, at *10 (N.D.N.Y. Sept. 25, 2025) (plaintiff cannot link high-ranking official to alleged misconduct by simply referencing chain of command). "[I]f such allegations sufficed, high-ranking federal officials would find themselves in litigation every day around the country." *Bundy v. Sessions*, 387 F. Supp. 3d 121, 130 (D.D.C. 2019).

The identical allegations against Defendant Noem, that the alleged misconduct occurred "under [her] leadership," "under [her] direction," or by her "agents," similarly are insufficient. ECF 1 ¶¶ 234, 263, 426, 471-72. The only specific allegation against her is that she met with federal officials "to plan the implementation of the conspiracy." *Id.* ¶ 213. That conclusory allegation is devoid of any factual content and the cited reference simply notes that the Homeland Security Council regularly met to discuss "student visa revocations." *AAUP*, 802 F. Supp. 3d at 138. In any event, the allegation Defendant Noem attended is made "upon information and belief." ECF 1 ¶ 213. That too fails to sufficiently allege her personal participation. *Lezama v. Harpers Hot Shot Trucking, LLC*, No. 24-1347, 2025 WL 1942403, at *1 (M.D. Tenn. July 15, 2025) ("Plaintiff may not simply assert claims based 'upon information and belief' as a way of avoiding pleading requirements.").

Finally, the allegations against Defendant Miller, namely, that "upon information and belief" he met with the private defendants "to develop the Blueprint for the conspiracy" and was "likely" interested in Plaintiff, are equally speculative and insufficient to allege his personal involvement. ECF 1 ¶¶ 90, 114, 412. The only basis for these allegations is that Defendant Miller had worked with those private defendants in the past. That Defendant Miller allegedly agreed with student visa revocations, *id.* ¶¶ 97, 136, "hope[d]" to work on the issue, *id.* ¶¶ 98, 105, posted tweets that "mirrored," "mimicked," and "parroted" certain sentiments about student protestors,

*id.* ¶¶ 118, 138, 273-74, and confirmed during an interview that a decision to deport Plaintiff was made, *id.* ¶ 290, at best suggest his support for—rather than any personal involvement in—the decision to find Plaintiff removable. Absent any specific allegation as to what Defendant Miller in fact did, he is entitled to qualified immunity. For the reasons stated, so too are Defendants Mullin, Blanche, and Noem.

### D. Plaintiff fails to plead underlying constitutional violations, let alone clearly established ones.

In their separate motion to dismiss, the Federal Defendants sued in their official capacities explain why Defendant Rubio's § 1227(a)(4)(C) decision did not violate the First Amendment or equal protection. The Individual-Capacity Federal Defendants incorporate those arguments, which entitle them to qualified immunity, as a conspiracy without an underlying constitutional violation cannot state a § 1985(3) claim. *Friends of Falun Gong*, 288 F. Supp. 2d at 273.[11] They are also entitled to qualified immunity because even if Plaintiff had alleged underlying constitutional violations, they were not clearly established at the time of the Rubio determination. At that time, the *only* court to have found § 1227(a)(4)(C) unconstitutional was reversed on appeal because the plaintiff had not exhausted his petition for review. *See Massieu v. Reno*, 915 F. Supp. 681 (D.N.J.), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996). Moreover, in *Reno v. Am.-Arab Anti-Discrimination Comm.*, the Supreme Court rejected First and Fifth Amendment selective-enforcement challenges to removal, holding that "[a]n alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." 525 U.S. 471, 488 (1999) ("*AADC*"). The Supreme Court rejected a similar First Amendment challenge for those who had established permanent residence in this country. *See Harisiades v. Shaughnessy*,

[11] The Federal Defendants sued in their official capacities also explain why the Complaint fails to allege violations of the right to travel and to be free from punitive detention. The Individual-Capacity Federal Defendants incorporate those arguments. Even if the Complaint sufficiently alleged such violations, they were by no means clearly established.

342 U.S. 580, 591-92 (1952). And the Second Circuit has previously found "no authority clearly establishing an equal protection right to be free of selective enforcement of the immigration laws based on national origin, race, or religion." *Turkmen v. Ashcroft*, 589 F.3d 542, 550 (2d Cir. 2009). Based on the foregoing, the law was by no means clearly established.

Since the Rubio determination, *no court* has sustained an equal protection challenge to § 1227(a)(4)(C), let alone one alleging that federal officials targeted a specific ethnicity or their supporters for selective enforcement. While some courts have since found that § 1227(a)(4)(C) violates the First Amendment, to the extent the removability determination was based on First Amendment-protected activities, those cases all postdate the determination made here and could not have clearly established anything during the relevant timeframe. ECF 1 at 68 n.69 (collecting cases). Whether qualified immunity shields official action is "assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (citation omitted). Cases "that postdate the conduct in question" cannot give "fair notice" of what is unlawful and "and are of no use in the clearly established inquiry." *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004). Moreover, some of those courts that have taken issue with § 1227(a)(4)(C)(i)'s reliance on First Amendment-protected activities have recognized that "the plain language of the Deportation Provision authorizes that application," *Stanford Daily Publ'g Corp. v. Rubio*, No. 25-6618, 2026 WL 2549090, at *27 (N.D. Cal. Aug. 28, 2026), and that "the Public Officials are not wrong to suggest that the matter is complex" and further, that the Executive's plenary power over immigration balanced against First Amendment rights "do not admit of easy compromise." *AAUP*, 802 F. Supp. 3d at 181-82. These are hardly the hallmarks of clearly established law.

Qualified immunity applies unless *every reasonable official* would have known and could have predicted that reliance on alleged First Amendment-protected activities rendered

§ 1227(a)(4)(C) clearly unlawful. Even if the Court finds that the Individual-Capacity Federal Defendants somehow miscalculated in this "complex" area of the law that "does not admit of easy compromise," qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. "[I]t protects all but the plainly incompetent or those who knowingly violate the law." *Id.* Plaintiff cannot come close to making that requisite showing here. And without an underlying clearly established constitutional violation, the § 1985(3) claim fails.

**E. Plaintiff fails to plead a § 1985(3) conspiracy.**

The Supreme Court "has repeatedly said that the essence of a conspiracy is an agreement to commit an unlawful act." *United States v. Jiminez Recio*, 537 U.S. 270, 274 (2003); *see also Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (same for § 1985(3) conspiracy). Here, no agreement to commit an unlawful act could have existed because the plain language of § 1227(a)(4)(C) authorizes the very application Plaintiff now challenges as unlawful. And, at that time, no court had even remotely suggested otherwise. This begs for the application of qualified immunity. *See Cooper v. Dillon*, 403 F.3d 1208, 1220-21 (11th Cir. 2005) (officers entitled to qualified immunity for enforcement of statute before it was declared unlawful).

Further, as stated previously, *Griffin* held that a conspiracy under § 1985(3) must also be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." 403 U.S. at 102. That is hard to square in the immigration context where the Supreme Court has rejected equal protection challenges to removals based on selective enforcement, *AADC*, 525 U.S. at 489; and the Second Circuit has previously found "no authority clearly establishing an equal protection right to be free of selective enforcement of the immigration laws based on national origin, race, or religion." *Turkmen*, 589 F.3d at 550. The Individual-Capacity Federal Defendants

are unaware of any court finding a § 1985(3) conspiracy in the context of immigration removal policy. That alone entitles them to qualified immunity.

Even if discriminatory animus could give rise to a § 1985(3) conspiracy in the immigration context, the claim here fails. Recall, to be an actionable under § 1985(3), the very purpose of the conspiracy must be motivated at least in part "because of, not merely in spite of its adverse effects upon an identifiable group." *Bray*, 506 U.S. at 272. "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right." *Id.* at 275. Rather, "[t]he right must be aimed at; its impairment must be a conscious objective of the enterprise." *Id.* (cleaned up). The Complaint identifies several non-Palestinians selected for removal as part of this alleged conspiracy. ECF 1 ¶¶ 299, 343, 357. That belies any suggestion the conspiracy targeted only Palestinians. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996) (to establish selective enforcement claim "the claimant must show that similarly situated individuals of a different race were not prosecuted").

As for the alternative assertion that Plaintiff was targeted because of his *support* for Palestinians in violation of his First Amendment rights, a much more plausible explanation exists for why Plaintiff was investigated: his prominent role in the Columbia University protests. The Rubio determination found that Plaintiff was subject to removal because he "participat[ed] in antisemitic protests and disruptive activities." ECF 1 ¶¶ 205, 262. That determination helped implement the President's effort to combat antisemitism. Plaintiff counters that antisemitism is a pretext. In doing so, he seeks to capitalize on public statements made by some of the defendants in this case. But the Supreme Court has recently recognized, "[p]olitical discourse by prominent public figures is increasingly couched in terms that would have scandalized the public just a short time ago." *Mullin v. Doe*, 609 U.S. 324, 348–49 (2026). They are hardly a basis for reading a

discriminatory motive into Executive policies that are otherwise race neutral. *Id.* The Supreme Court has been particularly hesitant to second-guess immigration policies based on past statements by public officials, let alone rely on those statements to find a policy "inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018); *see also Dean*, 2019 WL 8017734, at *5 (taking adverse action against individuals protesting race-based issue does not mean defendant's action was motivated by racial animus).

Even if the Court credits the allegation Plaintiff was targeted because of his political views, it is not clearly established in the Second Circuit whether § 1985(3) applies to political animus. *See Vidurek v. Koskinen*, No. 17-9064, 2018 WL 3597644, at *12 (S.D.N.Y. July 25, 2018) (collecting cases). The Supreme Court has refused to define "class" in § 1985(3) to mean "a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray*, 506 U.S. at 269. "Which classes of persons are and are not protected varies among the circuit courts of appeals, and Supreme Court guidance is relatively sparse." *Dean*, 2019 WL 8017734, at *4. That, of course, means federal officials also have little guidance to draw upon. What is clear is that courts have refused to interpret § 1985(3) as a vehicle for policing one political group's attempt to nullify the influence of another or for acting as judicial referee in the court of public opinion. *Supra*, at 17. That is precisely what Plaintiff asks here.

Finally, even assuming Plaintiff alleged sufficient animus, his claim fails. It is well settled that "conclusory, vague, or general allegations of conspiracy" do not state a § 1985(3) claim. *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011). The bulk of Plaintiff's allegations involve attempting to establish a meeting of the minds by loosely connecting like-minded social media posts from various defendants, both private and public, that "parrot," "mimic," or "mirror" each other. ECF 1 ¶¶ 15, 118, 136, 138, 173, 206, 208, 272-73, 275, 281, 287, 384, 421, 423. In

*Twombly*, the Court made clear that "[w]ithout more, parallel conduct does not suggest conspiracy." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 556-57 (2007).

That principle applies with equal force to conspiracy allegations lodged at federal officials. *Iqbal*, 556 U.S. at 684; *see also Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 103 (N.D.N.Y. 2013) ("Even detailed allegations of parallel conduct do not suffice without some factual basis for inferring the existence of an agreement."). The only suggestion of planning prior to President Trump's inauguration is based "upon information and belief" that Defendant Miller worked with the Heritage Foundation to formulate Project Esther. ECF 1 ¶¶ 90, 114. This allegation is based solely on the fact that Defendant Miller had worked with members of the Heritage Foundation before. *Id.* ¶¶ 92, 113. Otherwise, Plaintiff notes that some of the private defendants shared information with federal officials about people to target for removal. The government should be free to receive leads from any source. That does not mean every private individual who provides a tip or a lead is a co-conspirator. *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983) ("The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985."); *see also Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (where government exercises independent judgment, reliance on information by private individuals does not constitute joint action). In the end, Plaintiff hangs his conspiracy on the fact that the private defendants lobbied for a particular immigration policy, provided information via social media or otherwise, and celebrated its implementation. Private individuals have done so in the past on a variety of topics and will likely do so in the future. Any suggestion that such conduct means a conspiracy is afoot is speculative, conclusory, and insufficient to state a § 1985(3) claim.

### F. The § 1986 claim also fails.

Because Plaintiff fails to plead an underlying § 1985(3) claim, the derivative § 1986 claim must also be dismissed. *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council, Inc.*, 968 F.2d 286, 292 (2d Cir. 1992).

## CONCLUSION

Plaintiff seeks damages from high-ranking federal officials *personally* for implementing Executive immigration policy. Nothing in the Complaint warrants such extraordinary relief. The Individual-Capacity Federal Defendants respectfully request the Court grant their motion to dismiss and dismiss them from this case.

Dated: November 3, 2026
New York, New York

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

SARAH E. WHITMAN
Assistant Director, Torts Branch

By: *<u>/s/ Siegmund F. Fuchs</u>*
SIEGMUND F. FUCHS
Senior Trial Counsel
PATRICK B. FENIOR
ANDREW M. VANDINI
Trial Attorneys
Civil Division, Torts Branch
U.S. Department of Justice
Ben Franklin Station
P.O. Box 7146
Washington, D.C. 20044-7146
202-598-3916

Email: siegmund.f.fuchs@usdoj.gov

Attorneys for the Individual-Capacity
Federal Defendants

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this memorandum of law complies with the word count limitations set forth in Local Civil Rule 7.1(c) and contains 8746 words, exclusive of the caption, the table of contents, the table of authorities, the signature blocks, and this certificate.

*/s/ Siegmund F. Fuchs*
SIEGMUND F. FUCHS
Senior Trial Counsel
U.S. Department of Justice