**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAHMOUD KHALIL,

Plaintiff,

v.

THE HERITAGE FOUNDATION; Victoria COATES; Robert GREENWAY; BETAR ZIONIST ORGANIZATION, INC.; BETAR ZIONIST MOVEMENT, INC.; BETAR WORLD; Ronn TOROSSIAN; MEGAMOT SHALOM D/B/A CANARY MISSION; Jonathan BASH; Victor MUSLIN; John DOE A; Stephen MILLER, individually and in his official capacity as *White House Deputy Chief of Staff for Policy and Homeland Security Advisor*; Marco RUBIO, individually and in his official capacity as *Secretary of State*; Markwayne MULLIN, individually and in his official capacity as *Secretary of Homeland Security*; Todd BLANCHE, individually and in his official capacity as *Acting Attorney General*; Kristi NOEM, in her individual capacity; John ARMSTRONG, in his individual capacity,

Defendants.

Case No. 26-cv-5929 (DLC)

**MEMORANDUM OF LAW IN SUPPORT OF THE HERITAGE FOUNDATION, VICTORIA COATES, AND ROBERT GREENWAY'S MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 2

I. The Heritage Defendants ........ 2

II. Allegations of Ties Between Defendant Stephen Miller and the Heritage Defendants ........ 3

III. Project Esther ........ 3

IV. The Heritage Defendants' Purported Connection to the Alleged Conspiracy Through Project Esther ........ 6

V. The Events Surrounding Khalil's March 8, 2025 Arrest and Post-Arrest Public Commentary ........ 7

LEGAL STANDARDS ........ 8

ARGUMENT ........ 9

I. The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims, As They Arise From His Removal Proceedings ........ 9

II. The Court Lacks Personal Jurisdiction Over the Heritage Defendants ........ 10

III. Plaintiff's § 1985(3) Claim Against the Heritage Defendants Fails Because It Does Not Plausibly Allege an Unlawful Conspiracy Between Heritage, Coates, or Greenway and Any Other Defendant ........ 10

A. Publishing a Policy Paper Is Not an Agreement to Violate Khalil's Rights ........ 12

B. The Complaint Pleads No Specific Facts Establishing a Meeting of the Minds or Concerted Action Between the Heritage Defendants and Any Other Defendant ........ 14

C. Independent Federal Government Decision-Making Caused Khalil's Alleged Injuries ........ 22

IV. Plaintiff's § 1985(3) Claim Against the Heritage Defendants Fails Because It Does Not Plausibly Allege a Non-Political Class-Based Animus Against Khalil ........ 25

V. Plaintiff's § 1986 Claim Fails Because It Must Be Predicated on a Valid § 1985 Claim, and Even If It Were, It Would Still Be Time-Barred as to the Heritage Defendants ........ 26

A. Khalil's § 1986 Claim Fails in the Absence of a Valid § 1985 Claim ........ 26

B. The One-Year Statute of Limitations Bars Khalil's § 1986 Claim Against the Heritage Defendants ........ 26

VI. The Heritage Defendants Incorporate the Federal Defendants' Arguments by Reference to the Extent They Relate to Counts I and II Against the Heritage Defendants ........ 28

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alharbi v. Miller*,
368 F. Supp. 3d 527 (E.D.N.Y. 2019), *aff'd in part, dismissed in part*, 829 F. App'x 570 (2d Cir. 2020)....................20, 23

*Am. Ass'n of Univ. Professors v. Rubio*,
802 F. Supp. 3d 120 (D. Mass. 2025)....................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................8, 12, 15, 23

*Berenson v. Gottlieb*,
No. 25-2709-CV, 2026 WL 3135334 (2d Cir. Oct. 20, 2026)....................25

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014)....................13

*Ciambriello v. Cnty. of Nassau*,
292 F.3d 307 (2d Cir. 2002)....................11

*Citibank N.A. v. Hello Flatbush LLC*,
No. 23 Civ. 10920, 2024 WL 3362624 (S.D.N.Y. July 10, 2024)....................2

*Connick v. Myers*,
461 U.S. 138 (1983)....................14

*Cox v. City of New Rochelle*,
No. 17-CV-8193 (PMH), 2020 WL 5774910 (S.D.N.Y. Sept. 28, 2020)....................11, 16

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010)....................2

*Doe v. Avon Old Farms Sch., Inc.*,
No. 3:21-CV-748 (JAM), 2023 WL 2742330 (D. Conn. Mar. 31, 2023)....................22

*Eades v. Kennedy, PC Law Offices*,
799 F.3d 161 (2d Cir. 2015)....................8

*Fisk v. Letterman*,
401 F. Supp. 2d 362 (S.D.N.Y. 2005)....................21

*Friends of Falun Gong v. Pac. Cultural Enter., Inc.*,
288 F. Supp. 2d 273 (E.D.N.Y. 2003), *aff'd sub nom. Friends of Gong v. Pac. Culture*, 109 F. App'x 442 (2d Cir. 2004) ....................11, 13, 17, 23, 24

*In re Gen. Motors LLC Ignition Switch Litig.*,
No. 14-MD-2543, 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) ....................14

*Ginsberg v. Healey Car & Truck Leasing, Inc.*,
189 F.3d 268 (2d Cir. 1999)....................13

*Gong v. Sarnoff*,
No. 23-CV-00343, 2024 WL 3638335 (S.D.N.Y. Aug. 1, 2024)....................23

*Gonzalez v. Hasty*,
802 F.3d 212 (2d Cir. 2015)....................27

*Griffin v. Breckenridge*,
403 U.S. 88 (1971)....................25

*Gropper v. Fine Arts Hous., Inc.*,
12 F. Supp. 3d 664 (S.D.N.Y. 2014) (Cote, J.)....................11, 15

*Guarniere v. City of New York*,
No. 21 Civ. 1739 (DLC), 2023 WL 2456639 (S.D.N.Y. Mar. 10, 2023)....................26

*Harris v. City of New York*,
186 F.3d 243 (2d Cir. 1999)....................27

*Jones v. Dalton*,
867 F. Supp. 2d 572 (D.N.J. 2012) ....................21

*Kesner v. Dow Jones & Co.*,
515 F. Supp. 3d 149 (S.D.N.Y. 2021)....................12, 20

*Khalil v. President, United States*,
164 F.4th 259 (3d Cir. 2026) ....................9

*Lalonde v. City of Ogdensburg*,
No. 8:22-CV-164, 2026 WL 879447 (N.D.N.Y. Mar. 31, 2026) ....................26, 27, 28

*Lankford v. City of Clifton Police Dep't*,
546 F. Supp. 3d 296 (D.N.J. 2021) ....................21

*Lewis v. Williamson Cnty., Tex.*,
No. 24-CV-3092 (LTS), 2025 WL 2452292 (S.D.N.Y. Aug. 25, 2025) ....................20

*Lucente v. Cnty. of Suffolk*,
980 F.3d 284 (2d Cir. 2020)....................27

*Mahdawi v. Trump*,
183 F.4th 103 (2d Cir. 2026) ....................9

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000)....................8

*Morpurgo v. Inc. Vill. of Sag Harbor*,
697 F. Supp. 2d 309 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011)....................21

*Ochoa v. Bratton*,
No. 16-CV-2852 (JGK), 2017 WL 5900552 (S.D.N.Y. Nov. 28, 2017)....................11

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) ....................10

*Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*),
525 U.S. 471 (1999)....................9

*Rich v. New York*,
No. 21 Civ. 3835 (AT), 2022 WL 992885 (S.D.N.Y. Mar. 31, 2022) ....................26, 28

*Segreto v. Town of Islip*,
No. 12-CV-1961 (JS) (WDW), 2014 WL 737531 (E.D.N.Y. Feb. 24, 2014)....................15

*Singleton v. City of New York*,
632 F.2d 185 (2d Cir. 1980)....................27, 28

*Thomas v. Roach*,
165 F.3d 137 (2d Cir. 1999)....................11

*Thompson v. Kline*,
504 F. Supp. 3d 200 (W.D.N.Y. 2020) ....................10

*Ugo-Alum v. New York State Dep't of Motor Vehicles*,
No. 23 Civ. 7458 (JPC), 2024 WL 3553168 (S.D.N.Y. July 26, 2024) ....................27

*Van Stuyvesant v. Crane*,
No. 1:23-CV-4394 (LTS), 2023 WL 4848404 (S.D.N.Y. July 27, 2023) ....................22

*Washington v. City of Jersey City*,
No. CV 24-8597 (SDW) (JSA), 2025 WL 1742694 (D.N.J. June 23, 2025) ....................17

*Whitehurst v. 230 Fifth, Inc.*,
No. 11 Civ. 0767 (CM), 2011 WL 3163495 (S.D.N.Y. July 26, 2011)....................16

*Wingate v. Samad*,
No. 9:25-CV-00207, 2026 WL 45184 (N.D.N.Y. Jan. 7, 2026) ....................27, 28

**Statutes**

8 U.S.C. § 1252 ........ 9

42 U.S.C. § 1985(3) ........ 1, 10, 13, 14, 17, 20, 21, 25

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(1) ........ 1, 8

Federal Rule of Civil Procedure 12(b)(2) ........ 1, 8

Federal Rule of Civil Procedure 12(b)(6) ........ 1, 8

Defendants The Heritage Foundation ("Heritage"), Victoria Coates, and Robert Greenway (collectively, the "Heritage Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff Mahmoud Khalil's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).

## PRELIMINARY STATEMENT

Khalil, a former Columbia University graduate student and perhaps the most vocal advocate of pro-Palestinian causes in the United States, claims that the Heritage Defendants and other pro-Israel organizations conspired with individuals in the Federal Government to deprive him of "equal protection of the laws, freedom of speech and travel, and freedom from punitive detention." The Heritage Defendants' principal wrong, according to Khalil, was their October 7, 2024 publication of a policy paper, *Project Esther: A National Strategy to Combat Antisemitism*, which was critical of the pro-Palestinian movement. But Heritage did not act tortiously in exercising its First Amendment speech and petitioning rights to advocate for a robust government response to antisemitism. Khalil ironically seeks to use this Court to penalize the Heritage Defendants for political speech by claiming that his own constitutional rights were violated. That effort necessarily fails. Resolving today's motion does not require the Court to choose either side of this ideological conflict. Instead, the Court must simply acknowledge that, in criticizing the Heritage Defendants for crafting and disseminating Project Esther's data-driven call to action, Khalil has not stated a claim against them for a § 1985(3) conspiracy.

## FACTUAL BACKGROUND[1]

### I. The Heritage Defendants

Heritage is a prominent conservative think tank and 501(c)(3) not-for-profit organization based in Washington, D.C. Compl. ¶ 33.

Victoria Coates works at Heritage's Washington, D.C. office. Compl. ¶ 34. At Heritage, she serves as "Vice President of the Kathryn and Shelby Cullom Davis Institute for National Security and Foreign Policy." Compl. ¶ 34. She is also "co-chair of the National Task Force to Combat Antisemitism," an independent organization and former Heritage entity whose purpose "is to organize and guide all willing and able partners in a coordinated effort" to address antisemitism in the United States. Compl. ¶ 34; Moran Declaration in Support of Motion to Dismiss, Exhibit 1 ("Ex. 1") at 17.[2] Between 2017 and 2021, Coates worked in various roles in the first Trump Administration. Compl. ¶ 34. During this time, she served on President Trump's transition team, was a member of the National Security Council, and later served as Deputy National Security Advisor. Compl. ¶ 112.

Robert Greenway was the Director of the Allison Center for National Security at Heritage. Compl. ¶¶ 35, 111. Like Coates, Greenway also worked in multiple roles in the first Trump Administration between 2017 and 2021. Compl. ¶ 35. He served as a deputy assistant to President Trump and as the Senior Director of the National Security Council's Middle Eastern and North African Affairs Directorate. Compl. ¶ 111.

---

[1] The factual allegations in the Complaint are accepted as true only for purposes of this motion, but not to the extent that they are contradicted by documents integral to the pleading or incorporated by reference, or by documents of which this Court can take judicial notice. *See, e.g.*, *Citibank N.A. v. Hello Flatbush LLC*, No. 23 Civ. 10920, 2024 WL 3362624, at *1 (S.D.N.Y. July 10, 2024).

[2] Because the Complaint relies on and incorporates by reference portions of the 33-page document "Project Esther: A National Strategy to Combat Antisemitism," the Court may properly consider it on a motion to dismiss. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); Compl. ¶ 3 (referring to Project Esther as "the blueprint . . . for the conspiracy"); Compl. ¶ 99 n.35 (linking to the full text of Project Esther on Heritage's website).

## II. Allegations of Ties Between Defendant Stephen Miller and the Heritage Defendants

Like Coates, Greenway, and thousands of other conservatives, Stephen Miller served in the first Trump Administration between 2017 and 2021. Compl. ¶¶ 34, 35, 47. Miller served as a senior advisor to President Trump at the same time Coates and Greenway served on the National Security Council. Compl. ¶ 113. According to the Complaint, Miller "has close ties with the" Heritage Defendants "and share[s] their strategic goals." Compl. ¶¶ 47, 114.

While still a private citizen, Miller worked with Heritage on an online course titled "Presidential Administration Academy," which was "intended to train 'the next conservative presidential administration.'" Compl. ¶ 92. On September 20, 2023, Heritage released a video advertising the course. Compl. ¶ 92 n.31. In late April 2024, more than six months before President Trump's reelection, the Complaint alleges that Miller continued to "publicly collaborat[e] with the Heritage Foundation to prepare for a second Trump Administration." Compl. ¶¶ 137-38.

In November 2024, President Trump appointed Miller to serve as an advisor to the White House during his second term. Compl. ¶ 47.

## III. Project Esther

Heritage, through its National Task Force to Combat Antisemitism, began drafting Project Esther soon after the tragic events of October 7, 2023. Compl. ¶¶ 34, 90. Heritage launched Project Esther on the one-year anniversary of Hamas's terrorist attack on Israel. Ex. 1 at 1; Compl. ¶¶ 5, 34.

Coates and Greenway co-led Project Esther's creation and are two of its principal authors. Compl. ¶¶ 3, 34-35. The Complaint alleges that while still a private citizen and before President Trump was reelected for a second term, Miller also assisted with its creation. Compl. ¶¶ 90, 92. The Complaint lists six additional non-defendants who assisted with this effort. *See* Compl.

¶¶ 107, 110, 116.

At a discussion the day Heritage released Project Esther, Greenway remarked:

> Ultimately we're looking at, again, creating circumstances in which . . . a federal administration would know exactly how it can contribute. Where it can be the most impactful in supporting and assisting the execution of this. And in those actions where only a federal government, or in some cases a state government, can take.

Compl. ¶ 146.

Project Esther is premised on the argument that the October 7 attack revealed and emboldened antisemitism throughout the world, including the United States. Ex. 1 at 1-2, 6. For example, it reports that 8,873 antisemitic incidents occurred in the United States in 2023, "a 140 percent increase from 2022 and the highest the [Anti-Defamation League] has recorded since it began tracking the statistic in 1979." Ex. 1 at 7.

According to Project Esther, "groups comprising the 'pro-Palestinian' movement, including those that merely use this issue cynically in the furtherance of other goals," are "part of a highly organized global Hamas Support Network (HSN) and therefore effectively a terrorist support network." Ex. 1 at 7; *see also* Compl. ¶ 123. Project Esther contends that the Hamas Support Network ("HSN") and individual Hamas Support Organizations ("HSOs") that comprise it include groups such as "National Students for Justice in Palestine [], alternatively known as the Palestine Solidarity Committee []; American Muslims for Palestine []; Jewish Voices for Peace []; and Samidoun, along with" groups that financially support Hamas. Ex. 1 at 7. As Khalil concedes, this viewpoint is not novel. Compl. ¶¶ 100, 238. Rather, it has been shared "by Defendant Canary Mission for nearly a decade." Compl. ¶ 100. Khalil describes it as part of "a decades-long anti-Palestinian campaign of casting Palestinians and their supporters as inherently terroristic or antisemitic[.]" Compl. ¶ 238.

Project Esther aims to weaken the HSN and its affiliated HSOs so that they "will cease to exist as a functional, effective support apparatus for Hamas inside the United States." Ex. 1 at 17. If the HSN and its affiliates "were left alone," Project Esther speculates, it is "likely that antisemitism will grow across the United States and that the American Jewish community will . . . eventually fall[] victim to the HSN agenda. Over time, the HSN's victims will grow to include other American minority groups that are incapable of aligning with the HSN and its HSOs." Ex. 1 at 17.

Project Esther warns that "inadvertent violations of the rights of other Americans, even supporters of [the Hamas Support Network] and its [Hamas Support Organizations], during the conduct of civic operations or activities could expose both individuals and Project Esther to liability." Ex. 1 at 17. Therefore, "Project Esther will adhere scrupulously to the law—federal, state, and local—and ensure that we do not violate the rights of any HSN or HSO leaders, members, or supporters." *Id.* Project Esther lists laws that could be used to further its goals, including "the Foreign Agents Registration Act (FARA); the Racketeer Influenced and Corrupt Organizations Act (RICO); and counterterrorism, hate speech, and immigration laws." Ex. 1 at 27. Its two references to deportation are its goal that "[f]oreign HSO leaders and members [are] deported from the U.S." and, more broadly, its inclusion of "immigration laws" in its list of many laws available "to exploit HSN and HSO vulnerabilities." Compl. ¶ 142; Ex. 1 at 22, 27.

Arguing that the Biden Administration's corresponding "U.S. National Strategy to Counter Antisemitism" was "feckless," Project Esther describes dismantling Hamas and affiliated organizations as "an opportunity for public-private partnership when a willing Administration occupies the White House." Ex. 1 at 15, 17; *see also* Compl. ¶¶ 7, 104. Project Esther encourages Americans "across all dimensions of American society along with other like-minded organizations

and super-empowered individuals" to "counter the [Hamas Support Network]." Ex. 1 at 25.

Project Esther notes that its advocacy for such a "public-private partnership" is not new. Drawing an analogy to pre-World War II America, it describes diverse swathes of Americans (including journalists, prosecutors, congressional investigators, mobsters, and law enforcement) all contributing to the shared goal of dismantling the pro-Nazi organization known as the German-American Bund. Ex. 1 at 17. It offers this historical victory as a model for society to dismantle the global "Hamas Support Network" today. Ex. 1 at 17. Continuing this analogy, Project Esther concludes with Martin Niemöller's famous poem equating his indifference to Nazism to Nazi complicity. Ex. 1 at 29, 31 n.22.

## IV. The Heritage Defendants' Purported Connection to the Alleged Conspiracy Through Project Esther

Khalil alleges that, with Project Esther as "the blueprint . . . for the conspiracy," the Heritage Defendants jointly conspired with other private defendants (the "Betar Defendants" and the "Canary Mission Defendants") and the "Federal Defendants" to single him out, along with "other non-citizen Palestinians and their supporters for arrest, detention, and deportation, as punishment for their support of Palestinian rights." Compl. ¶¶ 1, 3.

As noted above, Heritage released Project Esther on October 7, 2024, a month before the Presidential election. Khalil claims that in November 2024, the Betar and Canary Mission Defendants began surveilling and pre-selecting "the targets of the conspiracy—certain Palestinians and their supporters, including Khalil—for federal officials to punish, after doxxing and publicly smearing them as antisemitic and supportive of terrorism." Compl. ¶ 3; *see also* Compl. ¶¶ 9, 154-55. Khalil alleges that "Betar and/or its agents" have admitted to "being 'involved in Project Esther.'" Compl. ¶ 12. Khalil further alleges that "sometime between late 2024 and March 2025, Defendants Betar and Canary Mission agreed with the Heritage Foundation Defendants and/or the

Federal Defendants . . . that they would surveil and identify non-citizen Palestinians or supporters of Palestinians at Columbia University." Compl. ¶ 246.

## V. The Events Surrounding Khalil's March 8, 2025 Arrest and Post-Arrest Public Commentary

On the first day of his second term, President Trump signed an Executive Order expressing "the administration's desire to target non-citizens who 'advocate for, aid, or support designated foreign terrorists and other threats to our national security' and those who 'bear hostile attitudes toward [U.S.] citizens, culture, government, institutions, or founding principles.'" Compl. ¶¶ 203-04. Nine days later, President Trump signed another Executive Order stating "that the Trump Administration will target for investigation 'post-October 7, 2023, campus anti-Semitism.'" Compl. ¶ 205. He later described the order as "a 'promise' to 'Deport Hamas Sympathizers and Revoke Student Visas[.]'" Compl. ¶ 206.

By February 11, 2025, the Betar Defendants had given Khalil's, another Columbia student's, and a Cornell University student's names to the Trump Administration for recommended arrest and deportation. Compl. ¶ 157. The Federal Defendants at the Department of State and Department of Homeland Security then "work[ed] together to revoke those individuals' visas and/or charge them as removable under a previously rarely invoked provision of the Immigration and Nationality Act ('INA')." Compl. ¶ 11.

In early 2025, several of the Federal Defendants met twelve to twenty times to coordinate "the arrests, imprisonment, and attempted deportation of those pro-Palestinian non-citizens the Betar and Canary Mission Defendants had selected for punishment." Compl. ¶ 10; *see also* Compl. ¶ 213. At these meetings, the Federal Defendants agreed to review individuals the Canary Mission Defendants and Betar Defendants had pre-selected for arrest and deportation. Compl. ¶ 214 & n.67.

On March 8, 2025, Secretary Rubio determined that Khalil was removable. Compl. ¶ 261. That same day, ICE agents arrested Khalil. Compl. ¶ 263. On April 11, 2025, an immigration court found Khalil removable from the United States. Compl. ¶ 432.

Many voiced approval of Khalil's arrest, including Coates and the National Task Force to Combat Antisemitism. Compl. ¶¶ 282-83. Both the Canary Mission Defendants and the Betar Defendants claimed responsibility for his arrest. Compl. ¶¶ 12, 193, 271, 277, 280.

## LEGAL STANDARDS

When considering a motion to dismiss, the Court must take as true all factual allegations in the Complaint, though it is "not bound to accept as true a legal conclusion couched as a factual allegation" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The plaintiff bears the "burden of proving by a preponderance of the evidence" that jurisdiction exists. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Rule 12(b)(1) provides that the Court must dismiss a claim when it "lacks the statutory or constitutional power to adjudicate it." *Id.* Rule 12(b)(2) provides that a plaintiff must make a prima facie showing that the court has personal jurisdiction over the defendant. *See Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

### I. The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims, As They Arise From His Removal Proceedings

The sole mechanism to challenge Khalil's removal proceedings exists outside of this Court's jurisdiction. "A petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5). "Judicial review of all questions of law and fact" that "aris[e] from any action taken or proceeding brought to remove an alien from the United States" must be litigated on petition for review ("PFR"). § 1252(b)(9). Such questions include "interpretation and application of constitutional and statutory provisions." *Id.* This provision acts as an "'unmistakable zipper clause' and 'a general jurisdictional limitation,'" that channels "'most claims that even relate to removal' into PFRs." *Mahdawi v. Trump*, 183 F.4th 103, 115, 117 (2d Cir. 2026) (first quoting *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 482-83 (1999); then quoting *Khalil v. President, United States*, 164 F.4th 259, 275 (3d Cir. 2026)).

Likewise, § 1252(g) bars the Court from entertaining "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings . . . against any alien," § 1252(g), including claims like those Khalil brings here that the government has been "selectively enforcing immigration laws against [him] in violation of [his] First [] Amendment rights." *AADC*, 525 U.S. at 474.

Khalil's claims against the Heritage Defendants plainly arise from his removal proceedings. The Complaint alleges that Defendants "plotted, planned, coordinated, and conspired collectively to target Mr. Khalil and other Palestinians and/or their supporters for arrest, detention, and deportation because of their status as Palestinian or supporters of Palestinians." Compl. ¶ 479. But for Khalil's arrest, detention, and attempted deportation by the Federal Government—all of

which arose from his removal proceedings—he would have suffered no harm from the supposed conspiracy he alleges in the Complaint.

## II. The Court Lacks Personal Jurisdiction Over the Heritage Defendants

Under the conspiracy theory of specific jurisdiction, "one conspirator's minimum contacts allow for personal jurisdiction over a co-conspirator, even when the co-conspirator lacks such contacts itself." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 270 (2d Cir. 2023). The "three requirements for imputing the minimum contacts of one co-conspirator to another" are: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.*

The Complaint does not allege that any Heritage Defendant is based in New York, nor does the Complaint describe any "minimum contacts" that any of the Heritage Defendants personally had with the state. Given this, Khalil's theory of personal jurisdiction for the Heritage Defendants presumably rests on the conspiracy theory of specific jurisdiction. As shown in Section III, Khalil fails to plausibly allege that the Heritage Defendants participated in the purported conspiracy. As a result, the Court lacks personal jurisdiction over them. *Id.*

## III. Plaintiff's § 1985(3) Claim Against the Heritage Defendants Fails Because It Does Not Plausibly Allege an Unlawful Conspiracy Between Heritage, Coates, or Greenway and Any Other Defendant

To sufficiently plead a claim against the Heritage Defendants for conspiracy to interfere with civil rights, the Complaint must provide facts establishing that "two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).

Because conspiracy claims are easily made and risk leading to protracted proceedings, they require detailed fact pleading. *See Thompson v. Kline*, 504 F. Supp. 3d 200, 211 (W.D.N.Y. 2020).

Conspiracy claims "containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002); *see also Ochoa v. Bratton*, No. 16-CV-2852 (JGK), 2017 WL 5900552, at *9 (S.D.N.Y. Nov. 28, 2017). Speculative allegations must be set aside. *See Gropper v. Fine Arts Hous., Inc.*, 12 F. Supp. 3d 664, 671 (S.D.N.Y. 2014) (Cote, J.) (Courts may not "infer the existence of an agreement from the alleged violations of [the law]. To accept such an argument would permit every civil rights case to become a civil rights conspiracy case, which the Second Circuit has rejected in analogous contexts.").

To plausibly allege the existence of a conspiracy, a plaintiff must "present facts tending to show agreement and concerted action." *Cox v. City of New Rochelle*, No. 17-CV-8193 (PMH), 2020 WL 5774910, at *7 (S.D.N.Y. Sept. 28, 2020). Although the "conspiracy need not be shown by proof of an explicit agreement," a plaintiff must show "that the parties have [at least] a tacit understanding to carry out the prohibited conduct." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). Still, even "tacit agreement cannot be supported by conclusory allegations." *Gropper*, 12 F. Supp. 3d at 672. Plausibly alleging an explicit or tacit agreement is critical because, in the absence of "a meeting of the minds, the independent acts of two or more wrongdoers do not amount to a conspiracy." *Cox*, 2020 WL 5774910, at *7.

As discussed below, Khalil fails to plausibly allege a conspiracy involving the Heritage Defendants. At their core, his allegations against the Heritage Defendants are premised on their publication of a data-driven policy paper urging the Government to take lawful action. But publication of a written report, even if influential, is not indicative of concerted action. *See Friends*

*of Falun Gong v. Pac. Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003), *aff'd sub nom. Friends of Gong v. Pac. Culture*, 109 F. App'x 442 (2d Cir. 2004). The remaining Heritage-specific allegations involve unilateral statements and actions by third parties, the Heritage Defendants' statements reflecting shared ideology with other defendants—ideology in the mainstream of public debate at the time—and the Heritage Defendants' expected professional connections to a conservative administration. These allegations fail to establish even a tacit unlawful agreement between the Heritage Defendants and any other defendant. At most, they support an inference of independent, parallel conduct. Where such an inference is at least "equally plausible," the underlying allegations cannot support a conspiracy claim. *See Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 192 (S.D.N.Y. 2021); *see also Twombly*, 550 U.S. at 567 (a conspiracy is not adequately pleaded where "an obvious alternative explanation" for defendants' conduct exists).

### A. Publishing a Policy Paper Is Not an Agreement to Violate Khalil's Rights

For more than half a century, the Heritage Foundation has authored and promoted conservative policies, serving as an intellectual leader in the conservative movement. Ideological think tanks like Heritage research and support certain policy positions with the goal of influencing public discourse and spurring government action. As is common in Washington, D.C., Heritage's employees often move through the revolving door between private policy work and government service. Khalil alleges that Heritage's work influenced members of the public and the Federal Government. Even if it did, this does not support an inference of an unlawful agreement.

Imagine, for example, that a healthcare think tank published a controversial policy paper in 2020 examining COVID-19's disproportionate spread among Southern communities due to mass attendance at religious services. The paper called on the next Democratic administration to revoke certain tax advantages for any organizations that failed to follow CDC guidance on masking

and capacity restrictions during religious worship services. When the next Democratic administration did, in fact, revoke tax advantages for noncompliant religious organizations, they might well have recourse against the Government for suppressing religious worship, but they would not have a cause of action against the think tank. Even if federal officials reviewed and were persuaded by the arguments of the policy paper, the Federal Government acted with independent decision-making authority that only it holds.

Petitioning is protected under the First Amendment and does not reflect a conspiracy. Nor is calling for public-private action inherently unlawful. In fact, Project Esther's call to action explicitly pledges to "adhere scrupulously to the law" and draws inspiration from Americans' (ultimately successful) call for public-private efforts to dismantle the German-American Bund, a pre-World War II pro-Nazi organization. Ex. 1 at 17, 29. The Second Circuit has held that a private actor's request for official assistance that later leads to government action does not, without facts showing a shared unlawful goal, establish joint action or conspiracy. *See Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014). Where the government "exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the officer's conduct . . . ." *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) (explaining the necessary involvement of private parties in state action in the context of § 1983).

Imposing liability on the Heritage Defendants for publishing a persuasive publication, even one that portrayed certain political actors in an "exceedingly bad light" and allegedly resulted in adverse government action, would "turn § 1985(3) into the generalized federal tort law that it was clearly not intended to be." *Friends of Falun Gong*, 288 F. Supp. 2d at 281 (rejecting the notion that § 1985(3) covers press reports, even libelous ones, that influenced government officials'

decision-making). The Court should reject Khalil's attempt to expand § 1985(3) beyond Congress's intended scope, especially where doing so risks chilling lawful political speech. *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."); *see also In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2015 WL 8130449, at *2 (S.D.N.Y. Dec. 3, 2015) (observing that although protected speech may still bear evidentiary value, ultimately, under the *Noerr-Pennington* doctrine, defendants cannot be liable based solely on conduct that is protected under the First Amendment).

### B. The Complaint Pleads No Specific Facts Establishing a Meeting of the Minds or Concerted Action Between the Heritage Defendants and Any Other Defendant

Khalil attempts to lump the Heritage Defendants into the purported conspiracy by citing (1) unilateral statements and actions by third parties in purported support of Project Esther; (2) the Heritage Defendants' public statements, including their after-the-fact supposed "credit-taking"; and (3) the Heritage Defendants' unremarkable professional connections to Defendant Miller and the second Trump Administration more generally. As discussed below, these allegations are too speculative and conclusory to establish the requisite meeting of the minds or concerted action between the Heritage Defendants and any other defendant.

#### i. Unilateral statements and actions by third parties

Khalil devotes a significant portion of his 131-page Complaint to describing the Betar and Canary Mission Defendants' efforts to identify targets of the alleged conspiracy. These allegations fail to plausibly connect these independent actions to any agreement, tacit or otherwise, with the Heritage Defendants.

Failing to allege a single concrete instance where any Heritage Defendant directly communicated with any Betar or Canary Mission Defendant, Khalil speculates that "sometime

between late 2024 and March 2025, Defendants Betar and Canary Mission agreed with the Heritage Foundation Defendants and/or the Federal Defendants . . . that they would surveil and identify non-citizen Palestinians or supporters of Palestinians at Columbia University." Compl. ¶ 246. Beyond "sheer conjecture" (which he hedges through "and/or"), he does not "allege how [he is] so informed or why [he has] such a belief"; "[a]s such, [his] allegations are insufficient." *Segreto v. Town of Islip*, No. 12-CV-1961 (JS) (WDW), 2014 WL 737531, at *10 (E.D.N.Y. Feb. 24, 2014); *see also Gropper*, 12 F. Supp. 3d at 671-72 ("'[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" (quoting *Twombly*, 550 U.S. at 557)).

Perhaps recognizing a dearth of allegations plausibly connecting the Heritage Defendants to the identification of Khalil for deportation, Khalil focuses on the Betar Defendants' unilateral statements in support of Project Esther. *See* Compl. ¶¶ 12, 173-76. In January 2025, Betar expressed on X that it would "submit names of pro terror supporters" to Heritage "and their important Project Esther work." Compl. ¶ 174. That same month, Betar claimed on X that it "set up our Zionist information center and [was] documenting @nyu students who support Hamas in coordination with Project Esther of @Heritage." Compl. ¶ 175. In November 2025, eight months after Khalil's arrest, one of Betar's agents claimed that Betar "is 'involved with Project Esther[.]'" Compl. ¶ 176. These one-way communications support "an obvious alternative explanation" that the Betar Defendants, allegedly "arms of a century-old movement founded on principles of Jewish supremacy and territorial expansion in [Palestine]," supported Project Esther's position but acted independently with no input by, or agreement with, any Heritage Defendant. *See Twombly*, 550 U.S. at 567; Compl. ¶ 39. Betar's efforts to publicly link itself to Heritage (a prominent conservative force and household name) can also be read as self-promoting. The Complaint

contains other allegations of Betar's self-promotion, including its X post (without any reference to the Heritage Defendants) claiming sole credit for Khalil's arrest while simultaneously advertising its sale of "Shalom, Mahmoud" T-shirts. Compl. ¶ 278.

The Complaint does not identify any response to or acknowledgment of Betar's statements by any Heritage Defendant. While Betar expressed vague intent to send names to Heritage at some point in the future, the Complaint does not allege that Betar ultimately transmitted any list of names to Heritage, that Heritage solicited names, or that Heritage ever acted on any Betar-supplied name. Instead, the Complaint alleges that by November 2024, Betar was already in communication with prospective Trump cabinet appointees regarding its list of names for deportation. Compl. ¶ 170. By January 2025, "Betar had communicated specifically with [] Marco Rubio" (who in October 2023 had already expressed a desire to cancel Hamas-supporters' visas), "Miller, and then-attorney general Pam Bondi[] to share its pre-selected list of people[.]" Compl. ¶¶ 151, 171. In March 2025, around the time of Khalil's arrest, an ICE official testified that "Betar was one of the lead sources of information" that the government "used to investigate student protestors for arrest and deportation." Compl. ¶ 179. Khalil's allegations of reciprocal communications between Betar and federal actors contrast sharply with the one-directional statements from Betar referencing Heritage and Project Esther. This contrast underscores the conclusory nature of Khalil's allegations against the Heritage Defendants and their purported agreement to a conspiracy.

Courts routinely dismiss conspiracy claims when the underlying allegations of co-defendant communications are too conclusory to establish a meeting of the minds. *See, e.g.*, *Cox*, 2020 WL 5774910, at *7 (allegations that private defendants and police officer defendants "collaborated" to "concoct a story" against plaintiff were too conclusory to allege unlawful agreement); *Whitehurst v. 230 Fifth, Inc.*, No. 11 Civ. 0767 (CM), 2011 WL 3163495, at *6

(S.D.N.Y. July 26, 2011) (allegations "that the 'owners, managers and employees of [a restaurant] use[d] intimidation, harassment, denial of service, discriminatory billing practices, and outright expulsion as [a] means to prevent African-Americans from patronizing'" the establishment were too conclusory to allege an unlawful agreement); *Washington v. City of Jersey City*, No. CV 24-8597 (SDW) (JSA), 2025 WL 1742694, at *17 (D.N.J. June 23, 2025) (emphasis added) (dismissing § 1983 conspiracy claim against EMTs where allegations "that the EMTs 'communicat[ed]' and 'act[ed] in concert' with [police department] officials, absent any identified communications or actions *by the EMTs*, [were] conclusory and fail[ed] to allege a meeting of the minds or circumstantial evidence to support a conspiracy").

Any consistent public messaging among the defendants also fails to establish a meeting of the minds. For example, the Complaint contends that the Heritage Defendants and other private defendants circulated similar messaging that support for the destruction of Israel is equivalent to terrorism and support for Hamas. *See, e.g.*, Compl. ¶¶ 375-76. Khalil also argues that the Federal Defendants "parroted" or "echoed" the policies set forth in Project Esther. Compl. ¶¶ 208, 262, 269. Similarly, he states that, "[i]n line with [Project Esther's] strategy, the Canary Mission defendants began focusing on *non-citizen* students" and casting them as "'pro-Hamas.'" Compl. ¶ 181 (emphasis in original). But shared ideology and convergent messaging between groups with a common cause is precisely the kind of parallel activity that cannot support an inference of agreement. *See Friends of Falun Gong*, 288 F. Supp. 2d at 279 (dismissing § 1985(3) claim against publishers of purportedly defamatory articles where plaintiffs relied "on conclusory allegations of concerted action" by "alleging that the defendants published defamatory articles at the same time"). Nor is Project Esther's viewpoint novel. As Khalil alleges, "for nearly a decade," Canary Mission has characterized pro-Palestinian support as being "connected to terrorism." Compl.

¶ 238. The concept of focusing on non-citizens also predated Project Esther's publication, and was endorsed by both Defendants Marco Rubio and Stephen Miller in the immediate aftermath of October 7, 2023. Compl. ¶¶ 97, 151. And on day one of his second term, President Trump issued an executive order directed against non-citizens supporting foreign terrorists. Compl. ¶ 203. These facts support a reasonable inference that, in anticipation of President Trump's second term, the Canary Mission Defendants pivoted to focusing on non-citizen Hamas supporters absent any unlawful agreement with the Heritage Defendants. *See also* Compl. ¶ 180 ("In or around late 2024, with a friendly Trump Administration soon assuming power, the Canary Mission Defendants eagerly reoriented Canary Mission's work[.]").

**ii. The Heritage Defendants' public statements**

To bolster his conspiracy claim against the Heritage Defendants, Khalil appears to have mined their public statements for any references to Hamas, Khalil, and Columbia University. These statements fail to suggest concerted action between the Heritage Defendants and any other defendant to further the conspiracy. Nearly one month after October 7, 2023, Heritage posted on X "describing Students for Justice in Palestine as 'pro-Hamas' and advocating that foreign student members of the organization be deported 'swiftly.'" Compl. ¶ 75. In one line of Coates' 2024 book *Battle for the Jewish State*, she factually reports that Columbia hosted one of the first protest encampments, and on this basis characterizes the institution as "'ground zero'" for "'pro-Hamas demonstrations and antisemitic attacks on campus.'" Compl. ¶ 127. Project Esther also acknowledges that the protest encampments began at Columbia, includes Columbia in a list of twenty-one universities that had ten or more professors, totaling 856 overall, that "openly advocated or supported up to 63 different HSOs," and remarks based on this statistic: "It is no wonder the country witnessed antisemitic mobs . . . at Columbia, NYU, and Princeton, to name

only a few, on the eve of the Jewish holiday of Passover following Congress's passage of a funding bill in support of Israel—a bill that included $9 billion for humanitarian aid to Gaza." Ex. 1 at 10, 12; Compl. ¶¶ 128-29.

After Khalil's highly public arrest, both Heritage and Coates posted critical statements about him on X, voicing support for his arrest. Compl. ¶¶ 81, 282-83. Before Khalil's arrest, Coates posted that Columbia had cancelled its graduation ceremonies due to student demonstrations. Compl. ¶ 80 & n.22. These public statements may reflect disdain for Hamas and even pro-Palestinian demonstrators perceived to be supporting Hamas. They do not support an inference that Heritage or Coates agreed with any other defendant to specifically target Khalil or Columbia as part of an unlawful conspiracy. A contrary conclusion would be impermissibly speculative.

Khalil also contends that after the Federal Defendants arrested Khalil and others, the Heritage Defendants quickly took "credit for the fruits of their seemingly successful conspiracy." Compl. ¶ 405. The day before Khalil's arrest, in response to a news article discussing "an unnamed student whose visa was revoked because of their alleged ties to 'Hamas-supporting disruptions' on campus," the Project Esther Taskforce posted on X: "It's about time. Good to see @Heritage's Project Esther recommendations coming to fruition!" Compl. ¶ 406. In May 2025, Greenway stated that it is "'no coincidence that we called for a series of actions to take place privately and publicly, and they are now happening.'" Compl. ¶¶ 18, 407. That same month, Coates stated: "'the phase we're in now is starting to execute some of the lines of effort in terms of legislative, legal, and financial penalties for what we consider to be material support for terrorism.'" Compl. ¶¶ 18, 408.

These public statements do not establish a private conspiracy between the Heritage

Defendants and any other defendant. As discussed in Section III.A, ideological think tanks like Heritage exist to advocate for certain policy positions with the goal of influencing public discourse and spurring government action. These statements can equally be read as the Heritage Defendants believing that Project Esther's advocacy prompted lawful, independent action by an ideologically aligned administration. *See Kesner*, 515 F. Supp. 3d at 192 (journalists' parallel activity, which included writing about plaintiff and citing each other's work, failed to support a claim of civil conspiracy due to the "at least equally plausible" competing inference that the journalists acted separately to investigate plaintiff); *Alharbi v. Miller*, 368 F. Supp. 3d 527, 568-69 (E.D.N.Y. 2019), *aff'd in part, dismissed in part*, 829 F. App'x 570 (2d Cir. 2020) (allegations including President Trump's campaign statements, retweets, signing and drafting of an executive order/proclamation, and a former defendant's public praise lacked "any semblance of concerted action between the individual defendants" to plausibly allege § 1985(3) anti-Muslim conspiracy); *Lewis v. Williamson Cnty., Tex.*, No. 24-CV-3092 (LTS), 2025 WL 2452292, at *2 (S.D.N.Y. Aug. 25, 2025) ("conclusory and vague allegations about a conspiracy involving a Texas city and county, four media companies located in New York and California, and a Texas booster club" failed to state a § 1985(3) claim where they did not establish concerted action between the varied defendants).

#### iii. The Heritage Defendants' professional connections to the second Trump Administration

Finally, Khalil gestures to the conservative Heritage Defendants' professional connections with individuals in the Trump Administration. He alleges, for example, that while still a private citizen, Federal Defendant Stephen Miller helped draft Project Esther and contributed to an online course "intended to train 'the next conservative presidential administration.'" Compl. ¶¶ 92, 114. And, like Coates, Greenway, and thousands of other people sharing conservative viewpoints,

Miller "shared" the Heritage Defendants' strategic goals and served in the first Trump Administration. Compl. ¶¶ 34, 35, 47, 114. Long before President Trump's reelection, Miller continued to "publicly collaborat[e] with the Heritage Foundation to prepare for a second Trump Administration." Compl. ¶¶ 93, 137-38.

These connections are neither surprising nor unlawful. It is common in Washington for think tank employees to oscillate between private sector policy work and government service following changes in presidential administrations. "[F]reewheeling and speculative allegations" of relationships between alleged co-conspirators "fail to raise a reasonable inference of a conspiracy." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 340 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011). To make his federal conspiracy case, Khalil must do more than establish that a prominent conservative think tank has professional ties to and consistent ideological goals with a conservative presidential administration.

To prop up his conspiracy claim, Khalil also identifies undated meetings between Miller and the Heritage Defendants. Compl. ¶ 114. These meetings fail to establish a conspiracy. *See Fisk v. Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005) ("Alleging merely that a private party regularly interacts with a state actor does not create an inference of agreement to violate a plaintiff's rights."); *Jones v. Dalton*, 867 F. Supp. 2d 572, 585 (D.N.J. 2012) (granting summary judgment on § 1985(3) claim because "[t]he mere occurrence of several meetings" between alleged co-conspirators, without more, "do[es] not establish a meeting of the minds"); *Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 318 (D.N.J. 2021) ("claim that there was a [§ 1983] conspiracy" because two alleged co-conspirators "spoke to one another" rested "on 'speculation and conjecture,' and would not permit a jury finding of conspiracy") (citation omitted).

Ultimately, beyond the publication of Project Esther, a document that expressly disclaims

unlawful action, Khalil fails to show how "each individual [Heritage] [D]efendant was personally and directly involved in the alleged conspiracy and/or constitutional violations." *Van Stuyvesant v. Crane*, No. 1:23-CV-4394 (LTS), 2023 WL 4848404, at *9 (S.D.N.Y. July 27, 2023). This is fatal to his claim. *See id.*; *see also Doe v. Avon Old Farms Sch., Inc.*, No. 3:21-CV-748 (JAM), 2023 WL 2742330, at *7-8 (D. Conn. Mar. 31, 2023) (emphasis added) (although plaintiff offered "89 allegations germane to the purported conspiracy" and "cit[ed] certain times, dates, and interactions between the defendants as veritable 'smoking guns,'" plaintiff did "not allege any non-conclusory overt acts that *each defendant performed* in furtherance of this purported conspiracy").

### C. Independent Federal Government Decision-Making Caused Khalil's Alleged Injuries

As private actors, the Heritage Defendants have no control over deportation proceedings. Khalil's allegations support a reasonable inference that independent federal government decision-making led to Khalil's arrest and deportation proceedings.

Khalil's allegations establish that President Trump and members of his current administration harbored views consistent with Khalil's deportation before Project Esther's publication. "As a presidential candidate pursuing his second term," President Trump criticized Senator Chuck Schumer after he refused to shake the Israeli Prime Minister's hand, calling Schumer "a proud member of Hamas." Compl. ¶ 148. In June 2024, President Trump referred to then-President Biden as "a 'very bad Palestinian, a weak one.'" Compl. ¶ 149. On October 15, 2023, a year before Heritage released Project Esther, then-Senator Rubio, in reference to pro-Palestinian student protests, remarked "that the U.S. should 'cancel the visa of every foreign national out there supporting Hamas and get them out of America.'" Compl. ¶ 151. In the months following October 7, 2023, Stephen Miller posted several statements in support of banning

"jihadist migration" and deporting Hamas supporters. Compl. ¶¶ 96-98.

Khalil cites Miller's post-October 7 statements and involvement with Project Esther as evidence of an agreement between the Federal Defendants and the Heritage Defendants. But it is more plausible that Miller, like President Trump, Secretary Rubio, and other prominent conservatives, independently held these views and independently acted on them. As Khalil alleges, Miller previously served in the first Trump Administration and was a "key architect of the [first] Trump Administration's efforts to exclude individuals from Muslim-majority countries, dubbed the 'Muslim Ban.'" Compl. ¶ 47. In a 2018 lawsuit related to this "Muslim Ban," plaintiffs alleged that Miller was already "'well documented as holding racist and xenophobic views, particularly against Muslim immigrants.'" *Alharbi*, 368 F. Supp. 3d at 561. It strains credulity to conclude on this set of allegations that Miller endeavored to deport Khalil because of any agreement with the Heritage Defendants.

Even if Project Esther successfully influenced the Federal Defendants' decision-making, it still does not establish a meeting of the minds or concerted action. *See Friends of Falun Gong*, 288 F. Supp. 2d at 279; *Gong v. Sarnoff*, No. 23-CV-00343, 2024 WL 3638335, at *5 (S.D.N.Y. Aug. 1, 2024) (despite private actors furnishing accusatory information about anti-CCP protestor plaintiff to police officers, there was no private-public concerted action to support a conspiracy where it was "'natural' and 'rational'" for the police officers to conduct their "own review of the situation before determining independently whether any further police action was necessary." (quoting *Twombly*, 550 U.S. at 566)).

Days into President Trump's second term, he issued an executive order that the White House described as having a "promise" to "Deport Hamas Sympathizers and Revoke Student Visas[.]" Compl. ¶ 206. This action is consistent with his anti-Hamas campaign statements and

Rubio's October 15, 2023 statement that the United States should revoke Hamas supporters' visas. Compl. ¶¶ 148-49, 151. On March 8, 2025, Rubio determined that Khalil was removable. Compl. ¶ 261. That same day, ICE agents arrested Khalil. Compl. ¶ 263. President Trump later described Khalil's arrest as "[f]ollowing [his] previously signed Executive Orders[.]" Compl. ¶ 280. On April 11, 2025, an immigration court found Khalil removable. Compl. ¶ 432. These actions support an inference that numerous federal actors chose to deport Khalil independent of any action by the Heritage Defendants.

Like the police officers in *Gong*, it was "natural and rational" for the Federal Defendants to independently review the propriety of arresting and deporting Khalil. And unlike the private actors in *Gong*, who provided information directly to law enforcement, the Heritage Defendants' connection to Khalil's arrest is even more attenuated where the Complaint contains no allegation that the Heritage Defendants (through Project Esther or otherwise) identified Khalil as a target or provided accusatory information about him to any defendant.

Khalil contends that the Federal Defendants did not independently review the propriety of arresting and deporting him. To support this view, he cites a court's commentary in *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 187 (D. Mass. 2025) ("*AAUP*"). Compl. ¶ 225. *AAUP* does not support this conclusion. There, the court expressed disapproval that federal "decisionmakers at every step" interpreted "core First Amendment speech and expressive conduct," such as protest participation, to be "support for terrorism." *AAUP*, 802 F. Supp. 3d at 187. The court explained that without the government's individualized review of the protestors' activities, the federal review process of Betar and Canary Mission-supplied names for deportation was "essentially frictionless." *Id.* at 188. This reflects criticism of the federal decisionmakers' independent review process, rather than a lack of one.

## IV. Plaintiff's § 1985(3) Claim Against the Heritage Defendants Fails Because It Does Not Plausibly Allege a Non-Political Class-Based Animus Against Khalil

A conspiracy alleged pursuant to 42 U.S.C. § 1985(3) must have the purpose of "depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." § 1985(3). Section 1985(3) also requires Plaintiff to allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). While "[r]eligious, gender, and racial discrimination certainly fulfill[ ] the class-based animus requirement of [Section] 1985(3)," the Second Circuit has explained "the scope of [S]ection 1985 might not extend to include discrimination against political groups except where that discrimination was based on racial animus." *Berenson v. Gottlieb*, No. 25-2709-CV, 2026 WL 3135334, at *3 (2d Cir. Oct. 20, 2026) (internal quotation marks omitted).

Not only does the Complaint fail to allege an unlawful conspiracy between the Heritage Defendants and any other defendant, but it characterizes the Heritage Defendants' alleged hostility toward Khalil as the result of his "activism in support of Palestinian rights." Compl. ¶ 208. Affiliation with a certain political class is not protected under § 1985(3). *See Berenson*, 2026 WL 3135334, at *3. Even if the Court were to accept Palestinians as a race or other protected class, Khalil fails to plead that the Heritage Defendants' motivating factor for the alleged conspiracy was animosity against Palestinians *per se*. The Complaint describes multiple instances in which the Heritage Defendants have been completely transparent about the aim of their policies, which are not directed toward the Palestinian race. As Project Esther explains in detail, the Heritage Defendants' criticisms are of the "pro-Palestinian" movement that is "part of a highly organized global Hamas Support Network." Ex. 1 at 7. According to Project Esther, this network includes Jewish Voices for Peace, *id.*, and Project Esther also criticizes Jewish Senators Chuck Schumer

and Bernie Sanders for their "anti-Israel" positions. *Id.* at 16.

The Complaint's own list of similarly situated "targets" of the alleged conspiracy demonstrates that the targeting was not motivated by an animus against the Palestinian people: Ranjani Srinivasan is from India, Compl. ¶ 299; Yunseo Chung was born in South Korea, Compl. ¶ 308; and Momodou Taal is from Gambia, Compl. ¶ 327. In fact, only two of the eight supposed "targets" of the conspiracy that Khalil mentions are Palestinian.

Conversely, if being Palestinian were the motivating factor of the alleged conspiracy, the Complaint fails to identify any Palestinian targeted for deportation who did *not* have a prominent role in advocacy against Israel. Taken together, the factual allegations in the Complaint confirm that Khalil's purported class is not race, but activism and viewpoint.

## V. Plaintiff's § 1986 Claim Fails Because It Must Be Predicated on a Valid § 1985 Claim, and Even If It Were, It Would Still Be Time-Barred as to the Heritage Defendants

### A. Khalil's § 1986 Claim Fails in the Absence of a Valid § 1985 Claim

"A § 1986 claim must be predicated on a valid § 1985 claim." *Guarniere v. City of New York*, No. 21 Civ. 1739 (DLC), 2023 WL 2456639, at *5 (S.D.N.Y. Mar. 10, 2023). Thus, for the reasons discussed above, Khalil's § 1986 claim fails.

### B. The One-Year Statute of Limitations Bars Khalil's § 1986 Claim Against the Heritage Defendants

Section 1986 provides a one-year statute of limitations period. *See Rich v. New York*, No. 21 Civ. 3835 (AT), 2022 WL 992885, at *9 (S.D.N.Y. Mar. 31, 2022), *aff'd sub nom. Rich v. Miller*, No. 25-1387-CV, 2026 WL 2683000 (2d Cir. Sept. 14, 2026). The claim accrues when the "[p]laintiff knew, or had reason to know of the harm or injury." *Id.* (dismissing as untimely § 1986 claim brought over one year after plaintiff's arrest).

"The continuing violation doctrine provides an 'exception to the normal knew-or should have-known accrual date.'" *Lalonde v. City of Ogdensburg*, No. 8:22-CV-164 (LEK/DJS), 2026

WL 879447, at *2 (N.D.N.Y. Mar. 31, 2026) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)). Courts in the Second Circuit "consistently" disfavor continuing violation arguments, applying the doctrine "only under compelling circumstances." *Ugo-Alum v. New York State Dep't of Motor Vehicles*, No. 23 Civ. 7458 (JPC), 2024 WL 3553168, at *13 (S.D.N.Y. July 26, 2024).

"[T]he continuing violation doctrine only applies in the conspiracy context where 'no single act is sufficiently decisive to enable a person to realize that he has suffered a compensable injury.'" *Lalonde*, 2026 WL 879447, at *2 (quoting *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980)) (observing that the continuing violation doctrine could apply after someone develops silicosis after years of ingesting coal dust, or after someone incrementally becomes disabled due to operating defective equipment). "The mere existence of a conspiracy does not change the application of the doctrine." *Lalonde*, 2026 WL 879447, at *2 (citing *Singleton*, 632 F.2d at 192). Where the continuing violation doctrine applies, a claim is timely only where the plaintiff alleges non-time barred acts contributing to the alleged violation. *See Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015).

Courts assess the applicability of the continuing violation doctrine on a defendant-by-defendant basis. *See Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 310 (2d Cir. 2020) (applying the doctrine against individual defendants where each defendant plausibly committed non-time barred unlawful acts against plaintiff); *see also Lalonde*, 2026 WL 879447, at *4; *Wingate v. Samad*, No. 9:25-CV-00207 (BKS/TWD), 2026 WL 45184, at *5 (N.D.N.Y. Jan. 7, 2026) (claim was untimely where group pleading failed to establish which specific defendants undertook non-time barred unlawful acts).

Khalil's § 1986 claim began to accrue on March 8, 2025, his arrest date, when he "knew,

or had reason to know," of his injury. *See Rich*, 2022 WL 992885, at *9. Because Khalil brings his § 1986 claim well over a year after his March 8, 2025 arrest, it is untimely. This is not the rare case where "no single act is sufficiently decisive to enable a person to realize that he has suffered a compensable injury." *Singleton*, 632 F.2d at 192. As a result, the continuing violation doctrine cannot save his § 1986 claim. *See id.*; *see also Lalonde*, 2026 WL 879447, at *2.

In any event, for his claim against the Heritage Defendants to be timely under the continuing violation doctrine, Khalil must plausibly allege some unlawful act specific to each Heritage Defendant within the year prior to July 14, 2026 (the date he filed this action). *See Wingate*, 2026 WL 45184, at *5. During this time period, Khalil alleges no act, let alone any unlawful one, specific to Heritage or Greenway. He identifies a single act by Coates during this time period: on May 23, 2026, she remarked on X, "Honest question: why does Khalil want so badly to stay in a place he believed to be complicit in genocide? It's just bizarre." Compl. ¶ 81. Khalil does not allege, nor could he, that this observation was an unlawful act in furtherance of the conspiracy. Instead, for the year preceding this action, Khalil broadly alleges that "[e]ach of the Defendants . . . continued the conspiracy" after his arrest, "seeking to re-detain [him]." Compl. ¶¶ 488-89. This is precisely the kind of "grouped and conclusory allegations" that fails to differentiate between individual defendants and forecloses applying the continuing violation doctrine to any Heritage Defendant. *See Wingate*, 2026 WL 45184, at *5. Accordingly, even if the doctrine applied here, Khalil's § 1986 claim against the Heritage Defendants would still be time-barred.

## VI. The Heritage Defendants Incorporate the Federal Defendants' Arguments by Reference to the Extent They Relate to Counts I and II Against the Heritage Defendants

The Heritage Defendants incorporate by reference the motion to dismiss arguments made by the U.S. Department of Justice on behalf of the Federal Defendants to the extent they relate to

Khalil's claims against the Heritage Defendants. If the Court dismisses Counts I and II against the Federal Defendants, it should likewise dismiss the claims against the Heritage Defendants.

## CONCLUSION

For the foregoing reasons, the Heritage Defendants request that the Court grant their motion to dismiss the Complaint with prejudice.

Dated: November 3, 2026

*/s/ John S. Moran*

**MCGUIREWOODS LLP**
John S. Moran (*admitted pro hac vice*)
jmoran@mcguirewoods.com
Emily E. Kelley (*admitted pro hac vice*)
ekelley@mcguirewoods.com
888 16th Street N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 857-1700
Facsimile: (202) 857-1737

Roy G. Dixon, III
rdixon@mcguirewoods.com
201 N. Tryon St., Suite 3000
Charlotte, N.C. 28202
Telephone: (704) 343-2000
Facsimile: (704) 343-2300

*Counsel for Defendants The Heritage Foundation, Victoria Coates, and Robert Greenway*

**CERTIFICATE OF COMPLIANCE**

I HEREBY CERTIFY that the foregoing Memorandum of Law complies with Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. The Memorandum of Law contains 8,734 words as calculated by the word processing system used to prepare the document, excluding the case caption, table of contents, table of authorities, and signature block.

*/s/ John S. Moran*
John S. Moran

*Counsel for Defendants The Heritage Foundation, Victoria Coates, and Robert Greenway*